UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MICHAEL BERRY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiff, <br><br> vs. <br><br> KIOR, INC., FRED CANNON, and JOHN K. KARNES, <br><br> Defendants. | No.: 4:13-cv-2443 <br><br> **PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Lead Plaintiffs Dave Carlton and Sharon Kegerreis (collectively the "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Amended Complaint (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, *inter alia*: (a) review and analysis of relevant filings made by KiOR Inc. ("KiOR" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of the defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) information readily obtainable on the internet; and (e) interviews of several confidential witnesses with personal knowledge of the relevant facts.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than the defendants Fred Cannon ("Cannon") and John H. Karnes ("Karnes") (together with the Company, "Defendants") who purchased KiOR securities between August 14, 2012 and January 8, 2014, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

2.      KiOR is a "clean tech" company that specializes in manufacturing and selling renewable biofuels from cellulose (i.e., plant-derived materials). As with other "clean tech" companies founded in the wake of the Obama Administration's enactment of The American Recovery and Reinvestment Act of 2009, KiOR has received a substantial amount of funding from tax-payer dollars. The Brookings Institution estimates that the Obama Administration will have spent over $150 billion towards "clean tech" initiatives by the end of 2014.[1] To be certain, in February 2011 alone KiOR announced that it received a "Loan Guarantee Term Sheet for over $1 billion" from the U.S. Department of Energy.

3.      Notwithstanding the overwhelming amount of public funding and tax credits, the "clean tech" sensations have largely failed. Solyndra, Abound Solar, Beacon Power, Fisker Automotive, A123 Systems, and ECOtality are just a handful of examples. KiOR is the most recent addition to the list. During a January 2014 broadcast of "60 Minutes," investigative

---

[1] JESSE JENKINS, ET AL., BEYOND BOOM & BUST: PUTTING CLEAN TECH ON A PATH TO SUBSIDY INDEPENDENCE 4 (2012).

reporter Lesley Stahl interviewed Vinod Khosla, the "father of the Cleantech revolution," during a segment titled "The Cleantech Crash."[2]  Mr. Khosla, who controls over 50% of KiOR's outstanding common stock, provided Ms. Stahl with an overview of KiOR's cellulose conversion process while touring the Company's first commercial scale biofuel facility in Columbus, Mississippi (the "Columbus Facility").   The Columbus Facility, formerly a paper mill, is designed to turn woodchips into fuel.  The key to the conversion lies within a "magic catalyst" which, when applied to the woodchips, creates "something that looks just like crude oil" in a matter of seconds through a "thermo-chemical reaction."   The crude-like substance is then distilled on-site into "clean green gasoline."  In response to Mr. Khosla's explanation, Ms. Stahl offered an apt reply: "You make it sound almost – sorry – too good to be true."

4.     In fact it was.   In April 2012, the Company mechanically completed the Columbus Facility and began the "commissioning" phase which would last until September 2012.  Following commissioning, the Columbus Facility entered the "start-up phase," where it would remain for the next year and a half (and possibly beyond) despite repeated promises and assurances from Cannon and Karnes that the Columbus Facility was "turning the corner towards steady state operations" and that the "very, very typical" start-up issues would be resolved.

5.     By December 23, 2013, when KiOR announced in a press release that it would be shutting down the Columbus Facility for "mechanical improvements" during the first quarter of 2014, the Company had spent over $70 million on "start-up" costs, a figure initially estimated to total $18 million, without even coming close to operating the Columbus Facility at its 13 million gallon nameplate capacity.

---

[2] *60 Minutes: The Cleantech Crash* (CBS television broadcast Jan. 5, 2014) (transcript available at: http://www.cbsnews.com/news/cleantech-crash-60-minutes).

6. Only recently, during a conference call on January 9, 2014, well after a year past the initial goal for steady state commercial production, did KiOR expand on the December 23, 2013 press release and reveal the severity of the Columbus Facility's start-up problems. Contrary to the manner in which Cannon and Karnes repeatedly downplayed these start-up problems, Defendants informed investors that the Columbus Facility would be ceasing commercial production for the entire first quarter of 2014 in order to "address the three key drivers of Columbus' performance: throughput, yield and overall process efficiency and reliability."

7. Throughout the Class Period, Defendants misled investors concerning the timing of projected production levels of biofuel at the Columbus Facility. Specifically, despite constant setbacks, mechanical and design problems, and missed milestones, Defendants continued to falsely reassure investors that the Company remained on track to achieve commercially meaningful biofuel production levels at the Columbus Facility during the timeframes promised.

8. In one particularly egregious example, Karnes, KiOR's Chief Financial Officer ("CFO"), assured investors during a November 8, 2012 earnings call that the Company would be able to meet its production estimate of between 500,000 and 1,000,000 gallons of blend stock sales before the end of 2012. For this to occur, KiOR needed to produce over 9,400 gallons of product per day every day over the course of the following 53 days. When the Company later revealed that the Columbus Facility had in fact failed to commence "production operations" at the Columbus Facility during 4Q12, Cannon offered the following response:[3]

> I do recognize however that many of you were expecting us to commence
> commercial shipments late last year, consistent with our guidance from our last
> conference call. Did we set an aggressive target for ourselves? Yes. Am I

---

[3] All conference call excerpts were obtained from transcripts provided by either the Company or Seeking Alpha.

disappointed that we missed our target? Absolutely yes. Did we encounter unexpected startup issues unrelated to our technology? Yes we did. *However, we have overcome these normal startup issues and we have proven that KiOR's proprietary biomass to fuels technology works at commercial scale at Columbus.*[4]

9.     In another example, during the Company's 1Q13 earnings conference call on May 9, 2013, Cannon touted that KiOR and its Columbus Facility were "running as expected" and on track to produce between 300,000 and 500,000 gallons before the end of 2Q13 on June 30, 2013. In reality, the Company had not shipped a single gallon of fuel at any point during the second quarter and, as revealed in a subsequent press release, would in fact continue to ship nothing until June 28, 2013. For KiOR to meet Cannon's May 9, 2013 forecast, the Columbus Facility would have had to produce roughly 5,800 gallons per day every day for the remainder of the second quarter, which totaled 52 days. Cannon's forecast was wildly misleading given the fact that at this point in time the Columbus Facility had failed to operate on an uninterrupted basis for even 30 days, let alone 52!

10.     Contrary to Cannon's assurances, KiOR had not overcome the start-up issues plaguing the Columbus Facility. The following chart displays just how severe and persistent the start-up issues were:[5]

---

[4] Certain statements, or portions thereof, have been italicized for emphasis. Unless stated otherwise, all italicized font style has been added for emphasis and does not appear in the original.
[5] The following chart contains information obtained from KiOR's quarterly and annual financial reports filed with the SEC during the Class Period, as well as earnings conference calls hosted by Cannon and Karnes.



**KiOR Columbus Facility Start-Up Costs**
**Estimated vs. Actual**

Amount (millions)

—— Actual Quarter Start-Up Cost

----- Estimated Start-Up Cost Total*

**Time Period**

\* Estimates represent total remaining start-up costs, except for 2Q13 and 3Q13 estimates which estimated start-up costs to be incurred in following quarter only.

11.     As the above chart indicates, Defendants spent approximately $2 million in 1Q12, $6 million in 2Q12, $10 million in 3Q12, and so on and so forth through the present day for a total of over $70 million. Regardless of the consistently increasing start-up costs, Defendants would falsely represent that the Company had made significant progress towards obtaining steady state operations. Each quarter, Defendants would claim that less and less money would be needed to achieve commercial production. Contrary to the numerous promises made by Cannon and Karnes as to the Columbus Facility's imminent "lining-out," KiOR spent millions of dollars each quarter repairing these purportedly normal and "very, very typical" start-up issues. Given Cannon and Karnes' positions within the Company and the importance of the Columbus Facility's production capabilities, they were very aware of these intensifying costs and their plant managers' apparent futile efforts to subdue them.

12.     To be sure, the Columbus Facility's severe design problems were apparent to

6

everyone within just a few days of entering the "start-up" phase according to information obtained from confidential witnesses interviewed by Plaintiffs' Counsel's investigator. Specifically, former operations employees described severe design problems with respect to various aspects of the Columbus Facility's technology, including but not limited to the bio-oil fractionation, Vapor Recovery Unit ("VRU"), and woodchip feeding systems. Asked whether the "start-up" problems were design issues, one confidential witness replied, "the whole damn thing was a design issue. It was hastily put together and they were trying to make it run."

13. While the Company was ultimately unable to avoid shutting down for "mechanical improvement[s]," it delayed doing so for over an entire year while deceiving investors all along. KiOR's ability to survive as a going concern depended on the news coming out of the Columbus Facility. Throughout KiOR's quarterly (Form 10-Q) and annual (Form 10-K) filings during the Class Period, the Company repeated that the "[t]he lack of any committed sources of financing . . . raises substantial doubt about [KiOR's] ability to continue as a going concern" and that KiOR's ability to secure additional financing "[would] be contingent upon, among other things, successful start-up of [its] Columbus Facility . . . ." Cannon and Karnes needed to make the Columbus Facility sound as promising as possible in order to avoid a complete collapse of the Company.

14. For Cannon and Karnes, the Columbus Facility was only a part of the problem. Over the course of the Class Period, the Company's net operating losses and accumulated deficits increased by roughly 60%. In September 30, 2012, KiOR held "cumulative operating net losses of $175.2 million and an accumulated deficit of $197.1 million." By the following year, KiOR had "generated $299.3 million of operating losses and an accumulated deficit of

$339.7 million." Without any substantial revenue, the Company required hundreds of millions of dollars in debt financing. While the terms of the loans allowed certain interest payments to be satisfied through warrants, the value of the warrants depended on the Company's stock price. Consequently, to keep the Company afloat, Cannon and Karnes perpetuated the misrepresentations about the viability and production capabilities of the Columbus Facility so as to keep KiOR attractive to prospective investors.

15.    KiOR's cash flow and debt problems were amplified by the terms of its loan with the Mississippi Development Authority (the "MDA Loan"). In exchange for $75 million in investment, KiOR promised to "make specified investments within Mississippi by December 31, 2015, including an aggregate $500.0 million investment in property, plant and equipment located in Mississippi and expenditures for wages and direct local purchases in Mississippi totaling $85.0 million." Failure to do so would (and quite possibly will) trigger a default resulting in "the acceleration of repayment amounts due under the loan agreement." The MDA Loan, of course, is secured by KiOR's equipment, land, and buildings. The only way KiOR would have been (or will be) in a position to satisfy its investment obligations under the MDA Loan was to successfully draw enough investment to facilitate the construction of its planned second commercial production facility either in Natchez, Mississippi (the "Natchez Facility"), or adjacent to the Columbus Facility (the "Columbus Facility II"). However, as stated previously, KiOR's ability to secure additional financing "[would] be contingent upon, among other things, successful start-up of [its] Columbus Facility . . . ." Without the successful portrayal of the Columbus Facility, KiOR was not going to be able to secure the financing necessary to construct its second commercial production facility, was not going to be able to satisfy its obligations

under the MDA Loan, and would have been responsible to repay its $75 million on an accelerated basis. Such a default would have been (and may still be) catastrophic to the Company.

16.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) the Company was not on track to produce commercially meaningful quantities of biofuel at the Columbus Facility at the timetables provided by the Company; (b) contrary to KiOR's public statements, the delays and lack of production at the Columbus Facility were attributable to design deficiencies; (c) the Columbus Facility required numerous operational, design and equipment changes costing tens of millions of dollars just to move toward commercially meaningful production of biofuels; and (d) additional mechanical improvements were required after over a year of repairs in order to obtain yields of biofuel that would create a sustainable business. When promised productions were not met, Defendants issued false reassurances to investors.

17.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

<div align="center"><b>JURISDICTION AND VENUE</b></div>

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17C.F.R. §240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company's headquarters are located in this District.

21.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

22.     Court-appointed Lead Plaintiffs Dave Carlton and Sharon Kegerreis each purchased KiOR common stock during the Class Period and have suffered damages as a result. Lead Plaintiffs' certifications were previously filed with the Court in connection with their respective motions for appointment as Lead Plaintiff, and are incorporated herein by reference.

23.     Defendant KiOR is a Delaware corporation with its headquarters located at 13001 Bay Park Road, Pasadena, Texas, 77507. Its common stock is traded on NASDAQ under the ticker symbol "KIOR."

24.     Defendant Fred Cannon has served at all relevant times as the Company's President, CEO, and a member of the Company's Board of Directors. Cannon joined KiOR in 2008 as President, Chief Operating Officer, and a director. In July 2010, Cannon was appointed CEO. Prior to KiOR, Cannon spent 30 years in the fluidic catalytic cracking industry with AkzoNobel Catalysts LLC. Cannon is experienced in the refining catalyst business.

25.     Defendant John H. Karnes has served at all relevant times as the Company's

CFO. Karnes joined KiOR in February 2011. On December 1, 2013, Karnes unexpectedly submitted his resignation as CFO of KiOR effective December 3, 2013. Upon information and belief, Karnes was forced to resign as a result of the fraud alleged herein.

26.     Cannon and Karnes are collectively referred to herein after as the "Individual Defendants."

27.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

28.     KiOR is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful

acts complained of herein were carried out within the scope of their employment with authorization.

29.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to KiOR under *respondeat superior* and agency principles.

## CONFIDENTIAL WITNESSES

30.     Confidential Witness No. 1 ("CW1") was a "Commissioning and Start-Up Consultant" for KiOR between June 2012 and February 2013.  CW1 reported directly to the Columbus Facility's former Operations Superintendent at KiOR (who is described below in detail as Confidential Witness No. 2).   While at KiOR, CW1 worked with the Columbus Facility's Biomass Fluid Catalytic Cracking system, hydrotreater, VRU, and biofuel feeding system. Prior to working at KiOR, CW1 spent three years in the petroleum, chemical, and power industries focusing on project management and engineering.

31.     CW1 confirmed that technology specific design issues existed within the Columbus Facility.  CW1 identified the VRU (Vapor Recovery Unit) in particular as having significant design flaws giving rise to production shortfalls. According to CW1, the VRU was a persistent, ongoing problem that would need to be redesigned before being able to run smoothly.

32.     Confidential Witness No. 2 ("CW2") was KiOR's former "Operations Superintendent" for the Columbus Facility from June 2012 through February 2013.   CW2 reported directly to Dale Douglas, the Columbus Facility's "Operations Manager," who reported directly to Greg Neve, the Columbus Facility's "Plant Manager." CW2 advised that CW1, CW2, Dale Douglas, and Greg Neve all left KiOR in February 2013.  When asked why, CW2 said that they all "saw the writing on the wall" and "everyone started looking" for new employment.

While at KiOR, CW2 was responsible for the day-to-day running of the Columbus Facility. CW2 also worked with operators and maintenance staff to reach daily production goals at the Columbus Facility. CW2 worked indirectly with Cannon and Karnes. CW2's supervisor, the "Operations Manager," had direct contact with Cannon and Karnes. Prior to working at KiOR, CW2 spent approximately 22 years in project planning and plant commissioning. CW2 has commissioned multiple refineries and possesses experience with regard to crude oil units, vacuums, cracking units, steam methane reforming systems, liquefied neutral gas systems, coke machinery, and other similar industry processes.

33.     CW2 confirmed that the Columbus Facility had "operational problems" stemming from "design issues." CW2 attended "operational meetings everyday" with the "Plant Manager" to discuss plant and production issues. CW2 confirmed that the Columbus Facility was burdened by "all kinds of problems" during the "start-up" phase. CW2 identified several problems in particular. CW2 confirmed that certain equipment at the Columbus Facility was undersized and could not handle the wastewater byproduct being produced. CW2 also confirmed that the fractionating system was prone to buildup of excess tar, which led to equipment jams. CW2 further confirmed that the woodchip feeding system used to feed the Columbus Facility's conversion system was unable to properly supply the systems with sufficient biomass to maintain constant operations. CW2 explained that the feeding system initially was unable to properly supply the woodchips into the system (i.e., the feeding system "kept plugging up"). Moreover, the feeding system was unable to properly retain the woodchips while feeding them into the system because of leakage. CW2 advised that without sufficient woodchips, the "charge rate woodchip system" would shutdown. CW2 recalled several blackouts occurring in November

13

2012, the longest two lasting between two and six hours. CW2 confirmed that the Columbus Facility was unable to produce enough of its own power to keep running during the blackouts. CW2 confirmed that engineers from KiOR's Texas office traveled to the Columbus Facility on a regular basis to discuss facility issues during meetings attended by CW2. With regard to the ongoing problems at the Columbus Facility, CW2 confirmed that "the whole damn thing was a design issue. It was hastily put together and they were trying to make it run." CW2 also confirmed that within just a few days of operations, these problems at the Columbus Facility were apparent to everyone.

## **BACKGROUND**

34.     KiOR purports to be a renewable fuels company, producing cellulosic gasoline and diesel from abundant non-food biomass, such as wood chips, grasses, and non-edible portions of plant. The Company's proprietary catalytic process produces cellulosic gasoline and diesel from lignocellulosic biomass. The Company's cellulosic gasoline and diesel are hydrocarbon fuels similar to their traditional petroleum-based counterparts.

35.     KiOR purportedly completed demonstrating and validating the efficacy of its technology through laboratory testing at its pilot testing (or demonstration facility) unit outside of Houston, Texas. According to KiOR, the pilot unit was designed to process 10 bone dry tons ("BDT") per day of biomass to be converted into fuel products.

36.     KiOR's business plan was to incrementally scale this technology to show investors to that the technology could scale up in size to be a commercially viable producer of renewable fuel. KiOR would finance this through debt and equity raisings and governmental loans.

37.     KiOR's first step toward commercialization was the completion of an initial-scale commercial production facility in Columbus, Mississippi (the Columbus Facility).     The Columbus Facility was designed to process 500 BDT per day and produce up to 13 million gallons of cellulosic diesel and gasoline per year.

38.     In April 2012, KiOR completed mechanical construction of the Columbus Facility.  The total cost was $213 million.

39.     After demonstrating that the technology could scale up and reliably produce fuel at the Columbus Facility, KiOR intended to raise enough capital to construct its planned first standard commercial production facility in Natchez, Mississippi (the Natchez Facility).  KiOR's standard commercial production facilities were designed to use 1,500 BDT per day and produce up to 40 million gallons of cellulosic diesel and gasoline per year.  KiOR initially estimated that it would cost $460 million to build this second facility.

40.     To fund the construction and outfitting of the Columbus Facility and to fund the Company's operations, KiOR relied on loans and equity financings—as KiOR did not generate any material revenue or sales.  KiOR had an incentive to maintain a high stock price.  KiOR regularly issued warrants to purchase KiOR common stock as part of its financings or to renegotiate debt.  For example, on January 26, 2012, KiOR entered into a $75 million loan and security agreement with certain lenders.  During the Class Period, certain payments due on the loan were made through warrants to purchase KiOR stock, in lieu of cash, based on average price per share thresholds of KiOR common stock.  KiOR had also issued warrants to renegotiate equipment loans.

41.     Because KiOR constantly needed a flow of cash through new investment and

15

loans to operate, build out, and grow its business, it was under intense pressure to provide good news out the Columbus Facility.

## FALSE AND MISLEADING STATEMENTS

*August 14, 2012*

42.     The Class Period begins on August 14, 2012 when the Company issued a press release announcing its financial results for the second quarter ended June 30, 2012. The press release was filed as an exhibit to the Company's Form 8-K filed on August 14, 2012. For the quarter, the Company recognized no revenues and reported a net loss of $23 million or $0.22 per share.

43.     Regarding its operations and future production of biofuel, the Company falsely stated that it anticipated commencement of operations by September 2012 and the commissioning process was on track. Commissioning is the process to verify that the Columbus Facility is fully functional and fit to purpose. The press release stated in relevant part:

> "We are proceeding on schedule with the commissioning of our Columbus facility and are on track to start the facility up next month," said Fred Cannon, KiOR's President and Chief Executive Officer. "With startup in September, we anticipate that the Columbus facility will be providing America's first truly sustainable cellulosic gasoline and diesel for American vehicles in the fourth quarter. Also, we expect that the final construction costs for the Columbus facility will be about four percent under our latest cost estimate."

> "In addition to the progress at the Columbus facility, our research and development efforts have generated major advances to our proprietary biomass-to-fuels technology. Once implemented, we believe that these improvements should allow us to increase our nameplate capacity up to 20 percent and significantly decrease the capital intensity of our facilities," Cannon concluded.

> . . .

> KiOR did not recognize revenue during the second quarter of 2012; its activities remained focused on construction of its first commercial facility in Columbus,

research and development designed to improve production yields, and obtaining necessary financing for its expansion plan.

44. The Company held an earnings call on August 14, 2012 to update investors regarding KiOR's progress towards producing commercially viable quantities of its biofuel. On this earnings call, Defendant Cannon reiterated KiOR's false statements in the press release issued earlier that day. Cannon stated in relevant part:

[C]ommissioning of our Columbus facility remains on track and we are getting ready to startup the facility in September. Given the *typical startup issues* that we expect to face, we remain confident that our cellulosic gasoline and diesel *will be an American cars and trucks during the fourth quarter of this year.*

45. Cannon also reiterated that the operations would commence in a few weeks and that the majority of the commissioning process was complete. He stated in relevant part:

During last quarter's call, I stated we plan to begin startup operations around September, and I feel confident we will hit this milestone. The commissioning process has been moving along smoothly and we have not had any showstoppers.

. . .

We're just finishing up the last commissioning – majority of the plant is commissioned now, is complete. So we're just finishing up the last few pieces of equipment to get the – to be fully commissioned. And then we'll start the startup phase, which means we'll start heating up the circulating catalyst, heating the catalyst up and preparing to put the biomass in. *And so that's kind of where we are.*

46. Defendant Karnes also discussed the Company's financial results on the conference call. The various financials discussed on the call echoed what the Company had previously disclosed in its accompanying press release, including but not limited to the quarterly loss, various expenses, start-up costs, and the ability to raise additional capital depending on the "successful operating history from [the Columbus Facility]."

47. The Company also filed its Form 10-Q quarterly report on August 14, 2012.

KiOR's financials reflected nearly a doubling in long-term debt in the six-month period between December 31, 2011 and June 30, 2012 and a substantial an increase in loss from operating activities. The Company's total operating loss and deficit since inception equaled $148.3 million and $170.2 million, respectively.

48. The Form 10-Q also presented the Company's "discussion and analysis" of KiOR's financial condition and results of operations. Here, the Company touted its ability produce cellulosic gasoline, diesel and fuel oil.

> To demonstrate the scalability of our BFCC process from pilot scale, we have constructed a demonstration scale unit that represents a 400-times capacity increase over our pilot unit. *We have increased our overall process yield of biomass-to-cellulosic fuel from approximately 17 gallons per bone dry ton of biomass, or BDT, to approximately 67 gallons of cellulosic gasoline, diesel and fuel oil per BDT.* Our research and development efforts are focused on increasing this yield to approximately 92 gallons per BDT.
>
> . . .
>
> We have not generated any revenue to date. However, *we expect to generate revenue in the second half of 2012 from sales of our cellulosic gasoline and diesel from our initial-scale commercial production facility, which we mechanically completed in April 2012 and began the commissioning process.* Commissioning is the process to verify that our plant facility is fully functional and fit to purpose. *We also expect to generate revenue from the sale of renewable identification numbers,* or RINs, that we will retain if we sell our cellulosic gasoline and diesel to customers who are not obligated parties under the Renewable Fuel Standard program, or RFS2. Under RFS2, various varieties of renewable biofuels are assigned RINs for accounting, which are denominated in gallons of ethanol equivalent, or GEEs, based on their energy content. *We expect that our cellulosic gasoline and diesel will have a GEE value of between 1.5 to 1.7.* In July 2012, we received EPA approval for the registration of our cellulosic gasoline and we are continuing to seek approval for the registration of our cellulosic diesel.

49. The Form 10-Q also provided insight into the Company's "Results of Operations" and "Liquidity and Capital Resources." Of significance, KiOR represented that:

- We expanded and commissioned a hydrotreater in our demonstration unit

18

providing a fully integrated manufacturing process from woodyard to the tanks *and it is now operating at capacity.*

- Our general and administrative expenses increased by $6.6 million, or 92%, for the three months ended June 30, 2012 compared to the same period in 2011. *This increase was primarily the result of $6.0 million of start-up costs, an increase of $5.7 million compared to the same period in 2011, incurred at our initial-scale commercial production facility in Columbus, Mississippi* which was mechanically completed and began the commissioning process during the second quarter of 2012. Commissioning is the process to verify that our plant facility is fully functional and fit to purpose.

- We believe that our $107.0 million of cash and cash equivalents as of June 30, 2012 will enable us to meet our liquidity needs for at least the next 12 months from June 30, 2012. *In addition, we believe that our initial-scale commercial production facility will begin to generate positive cash flows at some point over the next 12 months.*

- Funding the start-up of our Columbus facility, including rentals, repairs, replacements, start-up costs, consulting fees, overtime and other expenses attendant commissioning and commencing operations of the facility. *As of June 30, 2012, we estimate remaining costs will range between $4 million and $10 million.*

- The terms of our Loan and Security Agreement (as defined below) for our January 2012 $75 million term loan provide that we may not make capital expenditures on our first standard commercial production facility in excess of $25 million until we have raised at least $100 million from sales of our equity securities in one or more transactions. *We expect any such financing will be contingent upon, among other things, successful commissioning and start-up of our Columbus facility,* entering into satisfactory feedstock supply and offtake agreements for the facility, receipt of necessary governmental and regulatory approvals and permits, any required equity financing, there being no material adverse effect on us or our industry (including relevant commodity markets) and general market conditions.

50.    KiOR's Form 10-Q for 2Q13 is signed by Defendant Karnes and certified by both Karnes and Cannon pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

51.    Defendants' statements and assurances with regard to the Columbus Facility's commissioning and production capabilities (as discussed above) were false and misleading

because they were not reasonably based on the facts known at the time. The Columbus Facility was in the commissioning phase when Defendants made these statements. As explained by KiOR, "commissioning" is "the process to verify that [the] plant facility is fully functional and fit to purpose," which it was not based on the millions of dollars that would be spent on repairs going forward. Given the amount of start-up problems that would follow the commissioning process (as described below), it is evident that numerous problems with the plant facility existed at the time Defendants made the above statements. Consequently, Defendants' estimates and assurances regarding the Columbus Facility's completion timeline and production capabilities were either intentionally false and misleading or made with reckless disregard to accuracy. Defendants intentionally failed to disclose the true nature of the Columbus Facility and the problems that existed at the time they made these misleading statements.

*November 8-14, 2012*

52.     On November 8, 2012, the Company held a conference call to discuss its results for the third quarter ended September 30, 2012. During the call Cannon acknowledged that the Company failed to meet its stated goal of commencing operations in September. Cannon stated in relevant part:

> Starting first with Columbus. *Recall on our last earnings call in August, I said, we planned to commence start-up operations at the facility in September and to make our first commercial shipments during the October, November timeframe. In this regard, I'm pleased to report, that we started production at the Columbus facility in October. Our proprietary technology is operating as designed at commercial scale and producing a high quality renewable crude oil, conforming to our design specs.* We have also been building our oil inventory and anticipating, commencing, upgrading operations in the next week or so.
>
> *All of this gives me confidence, that we will share of the world's first cellulosic gasoline and diesel fuel products on schedule later this month.* I will give you a bit more color on the facility start-up and performance, but first, I want to take

stock of what we have accomplished getting to this point and what to add then a production at Columbus means for the U.S. generally and the renewable fuel sectors specifically.

53.    During the call Cannon falsely reassured investors that he was "extremely pleased with the performance of [KiOR's] technology at Columbus. [KiOR's] testing and operations to date have proven that all of the proprietary aspects of KiOR's production process work at a commercial scale." Cannon continued to falsely reassure investors that the only issues arising were normal start-up and "very, very typical" issues with a plant start-up.

> **<Q - Mahavir Sanghavi>**: Thanks for taking my question. Hi, Fred and Mark. First question, Fred, just wanted to get a sense of what was the longest continuous operation at Columbus, and maybe you could talk about some of the start-up issues, and also give us a sense of – it seems like the proprietary parts are working as you had expected. So could you maybe give us some sense of where the yields are coming, where you expect the yields to be in next 12 months or so?
>
> **<A - Fred Cannon>**: Okay. Sure. We've run a few days, three days in a continuous production where we've run everything in the plant from wood chips to high-quality oil. And then a portion the start-up, which is extremely normal you run in the short periods and you find things that need correcting. *We've had normal kind of start-up things, the solenoid valve on the cogeneration unit went out and shut us down. Things like that, we've had leaks, which is – on the flue gas, which is very typical of start-up, pumps seals and other things. Just, very, very typical.* As far as the KiOR proprietary technology, we're extremely pleased. We have a converter that circulates catalysts extremely well, we're extremely pleased with that, and we've tested the whole plant, we've run the whole plant on our own generated power from the cogen that's fully operational. So it's been more the normal start-up things, whether this was a KiOR plant, or refinery, or a petrochemical plant, it's the normal start-up things. …

54.    During the same call Karnes falsely assured investors about the Columbus Facility by reiterating that for the fourth quarter 2012 "prior guidance of around 500,000 gallons of blend stock to one million gallons of blend stock sales, seems like a reasonable planning cases assuming the start-up continues as we've got it planned . . . ."

55.    Karnes also discussed the Company's quarterly financials on the conference call,

including but not limited to the Company's continued net loss, various expenses, start-up costs, and the ability to raise additional capital.

56.     On November 8, 2012, the Company also issued a press release announcing its financial results for the third quarter ended September 30, 2012. The press release was filed as an exhibit to the Company's Form 8-K filed on November 8, 2012. For the quarter, the Company reported no revenues, and a net loss of $27 million or $0.26 per share.

57.     In the press release, the Company continued to tout the commercial viability of its biofuel production, reporting to investors in its press release that:

> "*I am pleased to announce that we have commenced operations at the Columbus facility and have produced a high quality oil that is in line with our specifications for upgrading into cellulosic gasoline and diesel*," said Fred Cannon, KiOR's President and Chief Executive Officer. "More importantly, we believe the high quality of the oil from the Columbus facility validates KiOR's proprietary biomass fluid catalytic cracking, or BFCC, technology at commercial scale. *The facility's performance to date not only meets our expectations based on our experience at our pilot and demonstration scale facilities*, but also gives me confidence that we remain on track to upgrade our oil in order to ship America's first truly sustainable cellulosic gasoline and diesel for American vehicles."
>
> "Furthermore, our research and development efforts continue to make progress increasing our yields and reducing our capital intensity. Our work continues on our next generation catalyst platform, which we believe can produce a yield of 72 gallons per bone dry ton of biomass when implemented at our full scale commercial facility in Natchez. Moreover, we believe that this catalyst platform will reduce the amount of coke made in our process by up to 25 percent, which would enhance the capital efficiency of our commercial facilities by giving us the ability to process up to 25 percent more feedstock without significant additional capital," Cannon concluded.

58.     KiOR also filed its Form 10-Q quarterly report on November 14, 2012. Similar to the 2Q12 Form 10-Q, the 3Q12 Form 10-Q was signed by Karnes and certified by both Karnes and Cannon pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. The 3Q12 Form 10-Q also made similar false and misleading representations regarding the progress of the Columbus

Facility towards production, start-up costs, and liquidity. Significantly, the Company represented that remaining start-up costs for the Columbus Facility would fall between "$3 million and $6 million" and that KiOR's ability to secure additional financing "will be contingent upon, among other things, successful start-up of [its] Columbus Facility . . . ."

59. The Company's 3Q12 Form 10-Q also provided the complete financial reports highlighted by the accompanying press release and conference call. These financials reflected the Company's growing net losses from operating activities and expenses, including but not limited to KiOR's cumulative operating loss and deficit of $175.2 million and $197.1 million, respectively.

60. The statements and assurances made by Defendants in connection with operations at the Columbus Facility during 3Q12 (as discussed above) were false and misleading because they too were not reasonably based on the facts known at the time. By November 14, 2012, the date KiOR filed its 3Q12 Form 10-Q, the Columbus Facility "ha[d] not produced any cellulosic gasoline or diesel . . . ." Further, the Company anticipated that the remainder of the start-up phase would involve "many start-ups and shutdowns that [would] disrupt and delay [KiOR's] production activities for significant time periods." Defendants' account of the Columbus Facility's operations makes no mention of the design flaws relating to the fractionating system, woodchip feeder system, the VRU, or other issues described by operations staff members CW1 and CW2; according to CW2, these design flaws were readily apparent to everyone within a few days after the start of production. Given the severe start-up problems being encountered by the operations staff and the fact that the Columbus Facility had produced only a limited amount of "high quality oil" (as opposed to cellulosic gasoline), the Columbus Facility was utterly

incapable of producing between 500,000 and 1,000,000 gallons of blend stock sales before the end of the year, a period of *less than two months* from the date of the November 8, 2012 investor conference call. To be sure, for Defendants' prediction to be accurate, the Columbus Facility would have had to produce over 9,400 gallons of product per day every day through the end of the year in order to meet just the lower bound of the forecast. Defendants' statements and omissions regarding the capability of the Columbus Facility were either intentionally false and misleading or were made with extreme reckless disregard as to their accuracy.

*March 18, 2013*

61.     On March 18, 2013, the Company issued a press release announcing that its first shipment of cellulosic diesel was being shipped from the Columbus Facility—several months behind the late November date Cannon promised to investors during the November 8, 2012 conference call. The press release was attached as an exhibit to KiOR's Form 8-K filed on March 18, 2013. In the press release Cannon falsely touted the commercial scalability of the Company's technology:

> This facility demonstrates the efficacy of KiOR's proprietary catalytic biomass-to-fuel process with the potential to deliver cellulosic gasoline and diesel to the U.S. We are proud to be making history in Mississippi. The technology is simply scalable and we believe sufficient excess feedstock exists in the Southeast alone to build almost fifty KiOR commercial scale facilities."

62.     Likewise, during an earnings call also held on March 18, 2013, the Company falsely reassured investors about the commercial scalability viability of its production of biofuel at the Columbus Facility even though it acknowledged that it had failed to commence commercial shipments as previously promised by the Company—let alone have "500,000 gallons of blend stock to one million gallons of blend stock sales" Karnes reiterated during the

November 8, 2012 conference call. The Company claimed that purported normal startup issues contributing to delays had been overcome.

63. Defendant Cannon stated in relevant part:

As our last update in November, we have made substantial progress in addressing all three of these risks. Yesterday our Columbus facility made the world's first commercial shipment of cellulosic diesel fuel, the most important step in answering the remaining questions surrounding our scale up risk. With this shipment, we have now operated our proprietary biomass to fuel platform from beginning to end at commercial scale, with the final hydrocarbon products, gasoline and diesel produced by our facility on specification and ready to drop into American cars and trucks.

A mitigation of scale up risk due to commercial production of cellulosic gasoline and diesel at Columbus is a remarkable achievement by the KiOR team. In four years we have successfully achieved a 20,000 ton scale up in our proprietary biomass to fuels technology from proof of concept in our pilot plant to our demonstration plant and now to our first commercial scale facility at Columbus. In less than two years after breaking ground in Columbus, we have constructed, commissioned and operated our technology on a commercial scale. Quality of the world's first commercially produced cellulosic gasoline and diesel has exceeded our expectations and I couldn't be more proud of the KiOR team for this accomplishment,

*I do recognize however that many of you were expecting us to commence commercial shipments late last year, consistent with our guidance from our last conference call. Did we set an aggressive target for ourselves? Yes. Am I disappointed that we missed our target? Absolutely yes. Did we encounter unexpected startup issues unrelated to our technology? Yes we did. However, we have overcome these normal startup issues and we have proven that KiOR's proprietary biomass to fuels technology works at commercial scale at Columbus.*

In fact, we know now that our technology performs better in terms of quality as it is scaled. From very good oil at the very small pilot plant to even improved quality oil at the demo and now to our best ever quality oil made at Columbus. So high in quality we're converting over 90% of our oil from Columbus into transportation fuel. This compares to conventional crude oil which is globally only 70-70% conversion.

64. Cannon then told investors that for the remaining nine months of 2013, fuel production would be between 3 to 5 million gallons. Cannon stated in relevant part:

Now, our focus at Columbus turns towards achieving steady state operations. Until we have the facility fully lined down, which we believe could take at least nine months, any guidance that we might give to the basic metrics of plant performance that we use in petrochemicals or have to have an unusually wide error bar around that. Given what I just said about the fact that production volumes in the first quarter will be negligible, looking at the remaining nine months of the year, *we believe our volume expectations to be approximately 3 to 5 million gallons for the balance of the year.* We have learned a lot at Columbus over the last several months and we believe we can apply the learnings from Columbus to the engineering and design of Natchez.

65.     Cannon also reiterated that half of the delay was attributable to again "normal startup issues" and not a technology or plant design issue. Cannon stated in relevant part:

> Ed. *I think, probably the – in the big picture they're all normal start-up issues unrelated to our technology.* We had one event, which was – which was, probably account for almost half of our total delay in our actual production of fuel. And that was in late November, *a total blackout in the city of Columbus,* which also blacked out the KiOR plant. It happened at a time – at probably the worst possible time it could happen, when the plant was not fully running at rate, which – of course, then we supply our own power, so it's not a thing. So, to have on a very cold night a total blackout caused, obviously, just like a refinery, a lot of pluggage. *And that took us many weeks to work through and then some residual after that. So – and then the other was just normal start-up kind of things of getting unit ops on operation. But thank goodness, we have all that behind us now, and we've made fuel, so we're quite excited about that.*
>
> . . .
>
> Now, what we're seeing Columbus is just operability issues and that can be a pulp. It can be in a control valve, other *things that are very, very normal when you're starting up a plant.* Technology, the chemistry, we couldn't be more happy about. Every time the converter runs it makes a very, very high quality beautiful oil and now we've commissioned and run the upgrading section and product quality we couldn't be more happy with. So it's just mechanical, operational things that we just have to work through and get the reliability up.

66.     Karnes confirmed during the call that the Columbus Facility had failed to commence "production operations at Columbus during the fourth quarter." He also echoed Cannon's estimates in terms of production. While recognizing that guidance as to the Columbus

Facility has been a problem in the past, he assured investors that "shipments can be expected to be a bit sporadic as units operations are optimized over the months again, gradually smoothing later in the year as the plants focus turns from lining out to maximizing utilization and efficiency." To this end, he forecasted a "2013 total production target of 3 to 5 million gallons . . . simply occur[ing] linearly starting from essentially zero in Q1 [2013]."

67.     Karnes also assured investors that the growing start-up costs associated with the Columbus Facility would "decline rapidly over Q2 and Q3, tapering off completely by the end of Q3 as the facility lines out in the second half of the year."

68.     Cannon and Karnes similarly noted during the call that the news of the Columbus Facility's first shipment "[would] provide the financing markets with the confidence to fund the construction of [KiOR's] planned Natchez facility." Karnes confirmed as much, stating that "as soon as Columbus begins producing . . . [KiOR] can raise the capital" needed for a second production plant.

69.     On March 18, 2013, the Company also issued a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2012. In the fourth quarter of 2012, the Company recorded its first revenues since inception, $87,000, and also reported a net loss of $29.7 million and $96.4 million, for the fourth quarter and full year 2012 respectively. In its press release the Company continued to tout the commercial scalability and viability of its production of biofuel., stating in relevant part:

> "KiOR hit its most significant milestone to date with the Company's first commercial shipment of cellulosic diesel from its newly commissioned production facility in Columbus, Mississippi," said Fred Cannon, KiOR's President and Chief Executive Officer. "Commencement of commercial shipments from Columbus validates the efficacy of KiOR's biomass-to-hydrocarbon-fuels technology at scale and goes a long way toward dispelling

concerns about the renewable fuels industry's ability to make a meaningful contribution to the US's fuel supply needs," Mr. Cannon continued. "This very positive development, along with EPA's recent actions qualifying our cellulosic gasoline for the RFS2 market and increasing our gasoline blend rate to 25%, de-risk our business strategy and creates a market for KiOR's hydrocarbon fuels nearly twice the size of the current ethanol market.

70.    On March 18, 2013, the Company also filed its annual report on Form 10-K. The Form 10-K was signed and certified by Cannon and Karnes. In the Form 10-K, KiOR noted its running operating loss and deficit of $204.9 million and $226.8 million, respectively.

71.    KiOR also provided additional clarity with regard to its purported 4Q12 sales:

Our product revenue increased by $85,000 for the year ended December 31, 2012 compared to the same period in 2011 as we recorded our first product revenue in November 2012. All revenues from external customers in the year ended December 31, 2012 are attributable to customers in the United States. In November 2012, we entered into a contract whereby we sold 1,024 gallons of our cellulosic diesel produced from our research and development facilities to an obligated third-party to blend with 20,924 gallons of diesel. We then purchased the blended diesel from the obligated third-party for sale to one of our offtake customers for fleet testing. During the fourth quarter of 2012, we sold 12,800 gallons of this blended diesel, of which approximately 597 gallons was our cellulosic diesel. Revenue consisted of our fuel price plus incremental fees incurred to purchase diesel and costs to blend it with our cellulosic diesel. We expect to sell the remaining blended diesel in the first quarter of 2013 to complete the fleet testing. In addition, we generated and sold 1,741 cellulosic diesel RINs in the fourth quarter of 2012. We expect that our revenues from sales of cellulosic gasoline and diesel and RINs will be limited and unpredictable, at least in the near term, as we continue in the start-up phase at our initial-scale commercial production facility.

72.    Defendants' statements and omissions relating to the Columbus Facility's operations during the fourth quarter of 2012 were intentionally false and misleading or made with reckless disregard to their accuracy. As indicated by KiOR in its Form 10-K for 2012, start-up costs associated with the Columbus Facility had already reached an exorbitant $30.2 million by December 31, 2012, over 150% more than estimated by KiOR in the Company's Form 10-K

filed the previous year. Further, Defendants' production target of 3 to 5 million gallons was impossible given the ongoing production delays and readily apparent design flaws plaguing the Columbus Facility as described by CW1 and CW2. Moreover, instead of discussing the severe design flaws described by CW1 and CW2, Defendants attribute the lag substantially to the blackouts that occurred in November 2012 which, according to CW2, lasted between two and six hours and presented an issue simply because the plant itself was not able to generate enough power. Additionally, as described by CW2, a critical mass of the Columbus Facility's operations team left KiOR in February 2013, adding yet another significant obstacle in the way of achieving steady state operations. After roughly an entire year with no production whatsoever and no resolution to the design issues in sight, Defendants' forecasts were entirely baseless and either intentionally or recklessly misleading.

*May 9-29, 2013*

73.     On May 9, 2013, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2013. The press release was attached as an exhibit to KiOR's Form 8-K filed on May 9, 2013. For the quarter, the Company reported total revenues of $71,000, and a net loss of $31.3 million or $0.30 per share. The Company also continued to misleadingly tout the commercial scalability and viability of fuel production.

> *"Building on the first gallons of cellulosic diesel we shipped in March, we continue to make progress with operations at our Columbus facility,"* said Fred Cannon, KiOR's President and Chief Executive Officer. "The on-stream percentage of our core technology in the first quarter improved approximately 500 percent over the fourth quarter. Most of our individual run times are longer than the previous runs, and we are working toward taking the facility into a steady state of operations."

> "Most significantly," Cannon continued, "*our core technology is continuing to operate as designed*, and the facility is producing high quality oil and cellulosic

fuel. With these positive trends, we expect that our fuel shipments will increase and become more frequent."

74.     During an earnings conference call held that same day, the Company continued to reassure investors the Columbus Facility was "running as expected," reiterated prior guidance, and touted vast incremental improvements in reliability were made. The Company continued to assert that any downtime in production were attributable to "typical issues." Cannon stated in relevant part:

> Our core technology continues to perform at or above our expectations. We are pleased with the progress of the startup of the facility and it is consistent with both our experience and our guidance from last quarter. Most importantly, the facility is running. As we expected, we are beginning to see everything coming together. The operational data from last quarter bears this out.
>
> During the first quarter, the conversion unit of the Columbus facility, which contains KiOR's proprietary BFCC technology, operated for a total of 441 hours, representing an on-stream percentage of approximately 20%. This represents an improvement of approximately 500% from the on-stream percentage during the previous quarter. Through these start-ups and runtimes, our BFCC technology has consistently performed.
>
> . . .
>
> *Approximately 70% of the downtime during the quarter has been associated with addressing typical issues in the Vapor Recovery Unit or VRU at the facility. I call them typical because our VRU is at the back end of our conversion process. So, any variability in the operating conditions upstream, which happen on a frequent basis during a start-up, shows up in the form of plugging in this VRU.*

75.     During the call, the Company continued to mislead investors regarding the commercial scalability and viability of its production of biofuel, specifically providing guidance of "300,000 to 500,000" gallons of total fuel production for the second quarter. Defendant Cannon stated in relevant part:

> *Consistent with our previous guidance, we expect that total fuel production during the second quarter will range between 300,000 and 500,000 gallons,*

*keeping us on track to fall within our projected production range of 3 million to 5 million gallons for 2013.* With the gasoline pathway now approved by EPA and effective, we can produce, ship and sell both our cellulosic gasoline and diesel with a clear path to market under RFS2. Now having proven our technology, produced high-quality oil and upgraded to consistently high-quality diesel and gasoline, we are on our way to filling up more vehicles in America with cellulosic fuel made from nonfood sources and offering a significantly less environmental footprint when compared to conventional fuels. And this from a company which just came into existence in late 2007.

76.     During the May 29, 2013 Cowen Technology, Media & Telecommunications Conference, Karnes' investor presentation continued to reassure investors that the issues the Company has seen at the Columbus Facility were minor and did not implicate the propriety of the Company's technology.

That's a good question. The question is our Columbus plant now, we've been in the start-up mode for around three quarters. We initially estimated that the plant would come up a little bit quicker than that. *And then what we've seen is, the good news is, all the complications that we've incurred have been minor. None of them have implicated any of KiOR's technology.* And the fact that the oil we've made has always been the highest quality oil that we made at any point in the process, pilot, demonstration, what have you . . . .

77.     The Company's Form 10-Q filed on May 10, 2013, also addressed the progress of the Columbus Facility. The Form 10-Q for 1Q13 was signed by Karnes and certified by Karnes and Cannon. With respect to KiOR's first shipment of cellulosic fuel occurring in March 2013, the Form 10-Q explained that KiOR "commenced limited sales of [its] cellulosic diesel" due to "limited continuous production" at the Columbus Facility which had not yet "reached 'steady state' production." Furthermore, while the Form 10-Q which reported $68,000 in product revenue (as opposed to the Company's accompanying press release claimed $71,000 in product revenue), only $16,000 was attributable to production out of the Columbus Facility. KiOR also booked an additional $12 million in start-up expenses associated with the Columbus Facility.

31

The Form 10-Q also indicated operating losses and accumulated deficit of $234.1 million and $258.1 million, respectively.

78.    The Company also discussed its plans for its first standard production facility in Natchez, Mississippi. Estimating the cost of construction to be $460 million, the Company noted that its ability to obtain financing for the project would be "contingent upon, among other things, successful fuel production at the Columbus facility . . . ."

79.    Defendants' statements and omissions relating to the Columbus Facility's operations during 1Q13 were intentionally false and misleading or made with reckless disregard to their accuracy. Notwithstanding the fact that the Columbus Facility had not yet "reached 'steady state' production" due to its severe design flaws, and that it had produced a mere $16,000 in product revenue (attributable to an unspecified "limited" number of gallons of cellulosic fuel), Defendants affirmed estimates of between 300,000 and 500,000 for the following quarter and between 3 and 5 million for the remainder of the year. Considering that Defendants made this estimate on May 9, 2013, to accomplish such a feat KiOR would have had to produce roughly 5,800 of gallons a day, seven days a week, for the remaining 52 days of 2Q13, just to meet the lower bound of its estimate. Furthermore, Defendants' false assurances were based on Cannon's misrepresentations that the VRU's ongoing problems were "typical," unrelated to design, despite the fact that the VRU was responsible for 70% of the plant's downtime during the quarter and, according to CW1 and CW2, was plagued by severe design issues. Given all this, along with KiOR's efforts to fill and train a new managerial and operations staff due to the exodus of key employees in February 2013 as noted by CW2, Defendants' statements and/or failure to disclose the true status of the Columbus Facility were deceiving and therefore inherently misleading.

32

**THE TRUTH EMERGES THROUGH PARTIAL DISCLOSURES WHILE
DEFENDANTS CONTINUE TO ISSUE FALSE ASSURANCES**

*July 1, 2013*

80.     On July 1, 2013, the Company issued a press release providing an update on production at the Columbus Facility. The press release was attached as an exhibit to KiOR's Form 8-K filed on July 1, 2013. The announcement revealed that the Company had made its "first fuel shipment since March, 2013" on June 28. Notwithstanding the fact that KiOR had not shipped any fuel since its first ever shipment of fuel from the Columbus Facility back in March 2013, KiOR reassured investors that its recent "reliability and optimization efforts in areas of the facility unrelated to KiOR's core technology" had given the Company "confidence, more than ever, that the performance targets for the Columbus plant [were] attainable in the months ahead . . . ." The press release did not address the fact that it had failed to meet its 2Q13 production estimate of 300,000 to 500,000 gallons of fuel or revise its year-end production estimate of 3 to 5 million gallons. Rather, the Company falsely reassured investors that the Columbus Facility was operating on track to meet unrealistic targets given the design and production problems plaguing the factory's operations.

81.     This adverse news caused the Company's stock price to fall on July 1, 2013 from $5.71/share to $5.42/share or 5.08%. KiOR stock price continued to fall on July 2, 2013 and closed at $4.80/share on July 2, 2013, a 16% decline from its June 28, 2013 closing price.

*August 8-9, 2013*

82.     KiOR issued another press release on August 8, 2013. The press release was attached to the Company's Form 8-K filed on August 8, 2013. The press release confirmed that KiOR, in total, had shipped 75,000 gallons of cellulosic fuel—far below the 300,000-500,000

gallons Defendant Cannon had promised investors a mere three months earlier. The Company

stated in a press release the following:

> "In total," Cannon continued, "we shipped over 75,000 gallons of cellulosic fuel from Columbus. The BFCC unit is running now and producing high quality oil that we are preparing to upgrade into fuel and ship to our customers. Over the next few months, we will focus on further building that progress and we look to push the facility closer to its nameplate capacity."

83. KiOR also hosted an investor conference call on August 8, 2013. During the call, Cannon addressed the progress of the Columbus Facility and continued to falsely reassure investors that the issues at the Columbus Facility were not design issues.

> Today, I'd like to talk to you about how we are progressing at Columbus. There are 3 phases that we would view as necessary to go through to bring a first-of-kind facility like this to a first -- to a steady state. First, is the reliability phase, which concentrates on simply running the facility and building on-stream percentage. After that, comes the throughput phase, in which we will build throughput of the facility toward nameplate capacity while maintaining on-stream percentage. The last is optimization phase, during which we will work to increase the process efficiency of the facility which, for us, is reflected in yield. We are still continuing our start-up path at Columbus and lining out the facility, but we have made significant progress on the first phase and are getting greater on-stream reliability. And we are beginning to work on the second phase by increasing throughput to nameplate capacity.

> . . .

> The operation was terminated when we needed to make a repair in the Wood Yard, and that was just to replace some bearings. *To reiterate, nothing about the KiOR technology prevented this run from going even longer. These are the types of start-up issues we're experiencing. And while they can be certainty be frustrating, they're all relatively small in nature. As has been the case since we first started the facility, these issues are not related to our core technology. They are simply part of the break-in process.*

84. Cannon continued by reassuring investors that the Columbus Facility would be operating close to its nameplate capacity in the short-term:

> Longer runs in the third quarter are our main objective. With our amount of repair

34

work behind us, the plant is running now. Today, high quality oil is being produced and stored, and I anticipate that the hydrotreater will start up shortly. *Meaning, we will have fuel ready to ship in the very near term. We feel that we've addressed most of the issues and are confident that the BFCC will remain in operation through the end of this quarter.*

Ramping up with what the rest of 2013 looks like. *I can tell you that we intend to push closer to nameplate capacity, and we expect to drive operating conditions to greater efficiencies.* Given our operational priorities, we are not intending to run the plant towards specific volume targets during 2013. *As such, we expect our full year production levels will be in the 1 million to 2 million gallon range.* I then believe that we will be in a good position to increase our yields consistent with our expectations.

*With this foundation in place, I look for us to achieve normal, steady-state optimal operations at Columbus in the first half of 2014*, with the opportunity to enhance this performance beyond our original expectations, which I would like to turn to next.

85.     KiOR filed its Form 10-Q for 2Q13 on August 9, 2013. The Form 10-Q was signed by Karnes and certified by Cannon and Karnes. For the six-month period ended June 30, 2013, the Columbus Facility generated 75,000 gallons of product which resulted in just over $200,000 in product revenue.

86.     The Form 10-Q also addressed KiOR's plans for additional commercial biofuel production facilities. While previously the Company had been focused on the construction of a second facility in Natchez, Mississippi (the Natchez Facility), with an estimated cost of $460 million, KiOR presented a second option for the first time. As stated in the Form 10-Q, the Company was considering building a second commercial facility adjacent to the Columbus Facility (Columbus Facility II) instead of a stand-alone facility in Natchez, Mississippi. The Company explained the advantages of this option as follows:

The Company is considering this option because it believes that a second initial scale commercial facility in Columbus may allow it to (i) accelerate its ability to achieve overall positive cash from operations with less need for capital from

35

external sources and risk of financing, (ii) reduce design, engineering and construction costs due to its ability to leverage its experience from the construction of the current Columbus facility, (iii) incorporate the most recent improvements to its technology into both the existing facility and the planned facility in Columbus, (iv) achieve operational synergies as a result of shared personnel, infrastructure and operational knowledge with the existing Columbus facility, and (v) leverage existing feedstock relationships while introducing other types of lower cost feedstocks such as hardwood, energy crops, and waste products such as railroad ties. The Company currently estimates on a preliminary basis that the total cost of this second initial scale commercial facility Columbus, Mississippi would be approximately $175 million to $225 million, based upon expected design and engineering savings combined with its recent experience of designing, engineering and constructing the current Columbus facility for approximately $213 million.

87.     The Company's change of plans was highly indicative, if not an admission, of the fact that the Columbus Facility's core technology and design was not yet stable enough to replicate or serve as a basis for production forecasts. To be sure, the Company also stated that if it were to go forward as planned with the Natchez Facility, the total cost would be "approximately $560 million to $600 million."

88.     KiOR's 2Q13 10-Q also reiterated the Company's need to publicize positive progress at the Columbus Facility for the purpose of obtaining additional financing. "We expect any financing for our second commercial scale production facility will be contingent upon, among other things, successful fuel production at our Columbus facility . . . ."

89.     Defendants' statements with respect to KiOR's 2Q13 operations were false and misleading. Despite lowering its year-end production goal to 1 to 2 million gallons, KiOR continued to intentionally and/or recklessly mislead investors as to the viability of the Columbus Facility and failed to disclose the true extent of its design flaws. The design issues plaguing the Columbus Facility were not "typical," but rather severe design flaws as explained by CW1 and CW2. Defendants' assurances that the Columbus Facility would remain in operations through

36

the end of the quarter and obtain steady-state operations in 2014 were not based on the facts known at the time. To the contrary, the Columbus Facility had not been able to maintain continuous operations for any substantial amount of time and the prospect of achieving steady-state operations in the first half of 2014 was extremely unrealistic in light of the consistently growing quarterly start-up costs. Furthermore, the Company's decision regarding the Natchez Facility and Columbus Facility II was the result of KiOR's inability to proceed past the "start-up" phase and the Company's investors' unwillingness to commission a second standalone commercial scale facility before resolving the ongoing issues that were paralyzing the first.

90.     KiOR's press releases and earnings news caused investors to flee from the stock, which declined from $4.83/share on August 8, 2013 to $2.62/share on August 15, 2013, a drop of almost 40%.

*September 19, 2013*

91.     KiOR issued a press release on September 19, 2013. The press release was attached as an exhibit to the Company's Form 8-K filed on September 19, 2013. The press release notified investors that, as of August 31, 2013, the Company had produced a total of 357,532 gallons of fuel, leaving roughly four months for the Columbus Facility to produce over 600,000 gallons of fuel to meet the lower bound of its production forecast. Notwithstanding the fact that the Columbus Facility would need to produce nearly 5,000 gallons per day every day over the course of the next four months, the Company did not revise the estimate. Rather, the Company reaffirmed its guidance:

> "KiOR's Columbus facility continues to make strides toward steady state operations," said Fred Cannon, President and CEO. "With the BFCC section of the Columbus facility currently producing additional oil, we believe that we are well-positioned to build on the progress made during July and August and to

produce additional volumes of cellulosic fuel for American vehicles consistent with our most recent guidance."

92.     Given the ongoing production problems and especially the fact that the Columbus Facility had never previously operated for a period of longer than 30 days, the Company's failure to revise its production estimate amounted to a material misrepresentation.

*November 7-12, 2013*

93.     On November 7, 2013, KiOR issued a press release which again touted the Columbus Facility's progress towards stable operations, as well as the Company's ability to meet its previously issued production forecast. The press release was attached to the Company's Form 8-K filed on November 7, 2013. It stated in pertinent part:

> "I am happy to report again that we are seeing *significant operational progress* at our Columbus facility and we believe that we are *turning the corner toward steady state operations*," said Fred Cannon, KiOR's President and Chief Executive Officer. "We produced 323,841 gallons of fuel in the quarter, which brought us to a total production of 508,975 gallons of cellulosic fuel through the end of the third quarter."

> "Just as importantly," Cannon continued, "Columbus is on a run which began in mid-September, and we are continuing to ramp up throughput at the facility. Our fourth quarter has gotten off to a good start and we saw total production in October of 167,087 gallons of fuel, our highest month to date. *As a result, we believe that with stable production over the balance of the year, our full year production levels will exceed 1 million gallons.* These achievements support our strategy to pursue Columbus II as the company's next project and the $100 million in financing commitments we received are serving as the cornerstone investments for that facility."

94.     Defendants held an investor conference call to discuss 3Q13 earnings on November 7, 2013. Defendant Cannon again misrepresented the progress of the Columbus Facility by stating it was "turning the corner" and "transitioning to commercial success." Cannon elaborated on the facility's operations:

> As you know, we kept the BFCC down during July, so we can make some repairs

38

and improvements in the Wood Yard. Our activity in July was focused on finished product production and shipments, and I'll give you those figures in a minute. When we brought the BFCC back online in August, it had the second-longest run, operating for 19 days starting on August 5. We encountered some issues in the Wood Yard again. *Nothing had to do with our BFCC or proprietary technology*, and brought the BFCC down to address these Wood Yard issues on August 24. We returned the BFCC to service on September 12, and it is still running today. Just considering the third quarter alone, that second campaign represented an additional 19-day run and resulted in our ability to achieve an on-stream performance of 41% for the third quarter.

. . .

Our team has come together and the plan is continuing to line out toward routine operations, which will allow us to focus on throughput and optimization going forward. *In contrast to our earlier start-up efforts which were more reactive and focused on just keeping the plant running, our operations now are much more proactive and the plant generally goes down only on a planned basis as opposed to unplanned basis as before. We are obviously not yet lined out at nameplate capacity, but we believe that uncertainty and up-and-down operations that marked the start-up period are now largely behind us.*

95.     Despite the ongoing design flaws at the Columbus Facility, Cannon reaffirmed KiOR's previously announced guidance, stating that total production for the year would actually "exceed 1 million gallons." Additionally, when asked point blank when he thought the Columbus Facility would be operating at nameplate capacity, Cannon replied that the Company's "target would be to come close to nameplate capacity in 2014, late 2014." In other words, Cannon represented that KiOR reasonably expected that the Columbus Facility would be capable of producing 13 million gallons annually by late 2014. With respect to increasing production, Cannon even went as far as representing that KiOR would be implementing an upgraded catalyst within just a few months:

> <A – Fred Cannon>: Yes, we will be doing that over the next short period. *So as we get everything lined out and optimized, then we'll put a newer generation --* start putting our newer generation catalyst into the unit.

**<Q – Robert W. Stone>:** So when you say, as you get things lined out, *does that mean you've got to wait until you're fully lined out next year, or is that happening in the next few months?*

**<A – Fred Cannon>:** *No. Next few months, absolutely.*

96.     Presciently, several analysts questioned Cannon and Karnes on the ability of the Columbus Facility to live up to Defendants' assurances. For example:

**<Q – Pavel Molchanov>:** Okay. Well, maybe without reference to any particular timetable, I mean, *is Columbus I capable as it's currently configured to be a source of cash generation rather than cash usage?*

**<A – Fred Cannon>:** Yes.

**<A – John H. Karnes>:** Yes.

**<Q – Pavel Molchanov>:** *Is that theoretically possible?*

**<A – Fred Cannon>:** *Sure, it is theoretically possible. And that's our plan.*

97.     Other analysts, more specifically, questioned Cannon and Karnes as to how the Columbus Facility could operate as promised on a practical basis as opposed to a theoretical one:

**<Q – Edward Westlake>:** So, you said, I think, earlier, Fred, sort of end 2014 is the sort of the finalization of the round-out of the Columbus I. I mean, obviously, that's kind of like 18 months to 2 years, which is probably a bit longer than what you're saying when you were first starting up the units. *And that makes it sound a little bit more like design rather than just start-up rounding out.* So I mean, I'd just like some point of clarification, agree, disagree on what I've just said, and maybe what the issues are you're still facing to get up to full runs?

**<A – Fred Cannon>:** Yes, and maybe there's some under -- I appreciate you're asking that question, Ed. *The plant we're feeding at 50%, 60%, maybe even more on a consistent basis now. And what we'll be doing is, of course, getting that up to 100% of feed right to the unit. At the same time, we'll be going through our optimization to get the yields up. And it's a process we're still working through. Some -- I wouldn't say that the BFCC has run very well, so we're still working through to get our Wood Yard up to that level, so we can consistently feed it.* I guess the question, maybe I didn't understand it earlier, but Thad [ph] will be working over the next few months to accomplish that.

. . .

**\<Q – Michael J. Ritzenthaler\>:** So it's possible if the Wood Yard gets to the right level of efficiency, that the plant could be actually hitting closer to the design capacity a bit earlier in the year?

**\<A – Fred Cannon\>:** *Oh yes, oh yes. That's certainly our target.*

98.     Significantly, during the conference call, Karnes refused to give release guidance as to the Columbus Facility's 2014 production.

99.     On November 12, 2013, the Company filed its Form 10-Q quarterly report. The Form 10-Q was signed by Karnes and certified by Cannon and Karnes. In the report, the Company clarified its past production:

> For the three months ended September 30, 2013, our revenue from our initial scale commercial production facility consisted of $292,000 from shipments of 99,000 gallons of cellulosic diesel; $259,000 from shipments of 110,000 gallons of cellulosic gasoline; and $38,000 from shipments of 36,000 gallons of fuel oil. During the three months ended September 30, 2013, we produced 129,000 gallons of cellulosic gasoline; 119,000 gallons of cellulosic diesel; and 76,000 gallons of fuel oil.

100.     KiOR also notified investors that it decided to proceed with constructing a second production facility adjacent to the Columbus Facility (the Columbus Facility II), as opposed to proceeding with the Natchez Facility. Similar to the Company's previous quarterly and annual disclosures, KiOR again stressed that without financing to build the second facility, the Company's ability to survive as a going concern was questionable. Significantly, the Company's ability to secure the necessary financing for the second facility was dependent upon the results and forecasts coming out of the Columbus Facility.

101.     Defendants' representations and omissions regarding the Columbus Facility's operations during 3Q13 were entirely false and misleading. Given the ongoing problems relating

41

to the woodchip feeding system, as described by CW2 and confirmed by Cannon and Karnes (albeit severely downplayed), Defendants' portrayal of the Columbus Facility "turning the corner" and "transitioning to commercial success" was in no way accurate or fair to investors. Despite the ongoing design problems at the Columbus Facility, the Company represented that it would be able to "exceed 1 million gallons" by December 31, 2013. In other words, KiOR represented that the Columbus Facility was stable and reliable enough to produce roughly 500,000 gallons of cellulosic fuel in just seven weeks, or over 10,000 gallons per day every day for 53 days straight, a feat that the Company had not even come close to accomplishing at any point in the past. Defendants failed to accurately convey the severe design issues plaguing the Columbus Facility, and by doing so withheld material information and/or perpetrated false and misleading statements.

*December 4, 2013*

102.    On December 4, 2013, KiOR filed a Form 8-K with the SEC announcing that Karnes resigned from the Company. The Form 8-K stated in pertinent part as follows: "On December 1, 2013, John H. Karnes notified KiOR, Inc. (the 'Company'), of his intent to resign as Chief Financial Officer and principal financial officer the Company. Mr. Karnes' resignation was effective December 3, 2013."

103.    The Company has failed to issue any statement explaining why or under what circumstances Karnes resigned. However, the facts show that Karnes routinely provided materially false and misleading guidance regarding the Columbus Facility's production capabilities during investor earning calls, followed by his abrupt refusal to provide such guidance on the November 7, 2013 earnings call, and the Company's outright refusal to provide further

42

guidance during the January 9, 2014 investor conference call (discussed below). This sequence of events gives rise to the inference that Karnes either resigned because of a disagreement with KiOR's executive management regarding the Company's operations and reporting or was forced to resign because KiOR's executive management disagreed with Karnes' method of forecasting production.

104. This announcement caused the Company stock to fall from $2.06/share to $1.89/share or 8.25% on December 4, 2013.

*December 23, 2013*

105. KiOR issued a press release on December 23, 2013. A copy of the press release was attached as an exhibit to the Company's Form 8-K filed December 23, 2013. The press release indicated that the Company "expect[ed] that, *given current and anticipated operations* through the remainder of the year, the Columbus facility will produce approximately 410,000 gallons of fuel during the fourth quarter of 2013, *bringing full year production total from the facility to approximately 920,000 gallons.* The ratio between gasoline, diesel and fuel oil expected to be produced during the year is approximately 35% gasoline, 40% diesel, and 25% fuel oil." The Columbus Facility's total productions and shipments for 2013 would actually be 894,000 gallons and 597,000, respectively, as confirmed by Defendants in a subsequent January 9, 2014 conference call (described below).

106. Despite Defendants' assurances as to the commercial viability of the Columbus Facility and its ability to meet and exceed production forecasts, the press release also revealed that the Columbus Facility would be ceasing commercial production through the end of 1Q14 for "mechanical improvements."

"Despite our accomplishments to date, *we still have a lot of work to do to bring the Columbus facility towards target throughput, yield and financial performance levels.* The financial performance of the facility was also negatively impacted by the temporarily depressed pricing for RINs caused by proposed 2014 renewable volume obligation rulemaking by the USEPA."

"Given these factors," Mr. Cannon continued, "we believe that, from both an operational and financial perspective, we need to focus our execution on three simple goals: first, bringing the Columbus facility to the levels of operational and financial performance that we expected when we designed that facility over three years ago; second, continuing to develop our technology so that we can improve our yields and process improvements both at Columbus and at future facilities; and third, aggressively managing our cost without sacrificing our long term goals. *To that end, from now through the end of the first quarter of 2014, we expect that our efforts at Columbus will be focused on implementing a series of mechanical improvements to the facility rather than production volumes.* We plan to operate the facility on a limited campaign basis only to verify the expected impact of improvements we intend to implement. In addition, we continue to see encouraging developments in our catalyst and process development efforts that we believe will continue to drive improvement in yields and overall plant economics.

107. Defendants' announcement that it would be shutting down the Columbus Facility for "mechanical improvements" is an admission that the ongoing "typical" start-up problems were in fact not "typical" but serious design flaws, as described by CW1 and CW2.

*January 9, 2014*

108. On January 9, 2014, KiOR held a conference call to discuss its decision to shut down the Columbus Facility. During the call, Defendants revealed to investors that the proposed "mechanical improvements" required and would cost an additional $10 million to complete. KiOR also stated that it would need to spend an additional $22 million in research in development to achieve the kind of yields that could make it a sustainable business. During the conference call, Cannon stated in relevant part:

This project is designed to address the three key drivers of Columbus' performance: throughput, yield and overall process efficiency and reliability. Let

44

me walk through what we intend to do regarding each of these three drivers in greater detail. On throughput, we have identified several improvements that will implement some changes to the BFCC hydrotreater and wood yard that we believe will eliminate structural design bottlenecks and reliability issues that limit the amount of wood that we can introduce to our BFCC system.

For example, we are planning to place additional equipment in the wood yard that will allow us to recover biomass currently lost in the processing of the wood chips and process more wood chips. We expect that many of these improvements will be implemented during the first three quarters of 2014, with the majority of them in the first quarter of 2014.

Assuming that we can implement these improvements on the timetable we have planned and that they work as planned, we believe that these improvements will allow Columbus plant to process at or near nameplate capacity for biomass, 500 bone dry tons per day by the end of 2014.

On yield, we have identified additional enhancements that we believe will improve the overall yield of transportation fuels from each ton of biomass from the Columbus facility. For example, we expect to obtain commercial supply of our next-generation catalyst, which we had previously expected to receive in the fourth quarter of 2013 during the second quarter of 2014.

In addition, we plan to install additional equipment that we believe will give us the ability to recover yield both from our process gases and process water. Again, assuming that we can implement these projects on the timetable we have planned and they work as planned, we would expect that our yield in Columbus will increase significantly by the first quarter of 2015.

On process efficiency and reliability, we have identified another series of improvements that we believe will further optimize our processes and increase reliability and on-stream percentage through the facility. Some of these projects include an installation of additional tankage to increase operational flexibility and efficiency, and modifications to the hydrotreating unit which will decrease the volumes of fuel oil and off-spec product, while others will be aimed at reducing our cost structure by, among other things, decreasing natural gas consumption by the facility.

Again, assuming that we can implement these projects on the timetable we have planned and they work as planned, we would expect that we would be able to significantly increase our end-to-end on-stream percentage at Columbus by the end of 2014.

In the aggregate, we expect that this project will require approximately $10 million of capital investment in the facility over the course of 2014 and we are

actively pursuing a number of ways to finance this project as a condition to our board approval process. I believe that we have the right team in place both in Pasadena and Columbus to successfully execute this project on time, on budget and achieve the results we expect. We believe that this relatively small capital investment will bring the Columbus facility to a level of operational and financial performance that can serve as a basis for the design and financing of our next commercial facility.

Over the course of this year, we intend to provide updates on a quarterly basis as to our execution on this project. While a substantial element of our execution focus will be on the Columbus facility, it remains critically important that we continue our R&D efforts to drive yield and process efficiencies. To that end, we expect to continue to invest in our world class R&D and technology teams to develop next generation catalyst and process efficiencies.

We believe that further development of our technology will generate enhanced economics for both our Columbus facility and our next commercial scale facility, which is critical in order to create a sustainable business that generates value for our shareholders. We must continue to drive yields toward and beyond 80 gallons per ton, while reducing our production cost per gallon in order for us to fulfill our vision of providing drop-in cellulosic fuels for American vehicles that are cost-competitive to traditional fuels without subsidies.

We believe that the further investment in R&D and the results that we expect to achieve from that investment is the only way to achieve this goal. To that end, we plan to spend approximately $22 million of cash in support of our R&D efforts in 2014. And we look forward to updating you on their achievements over the course of the year.

. . .

To that end, we have decided to operate the Columbus facility during the first quarter of 2014 only to the extent we want to test and prove our optimization projects. This decision makes sense for two reasons. First, with the facility out of operations, we will have the opportunity to begin to implement the Columbus optimization project consistent with the expected timetable that I described above.

. . .

Second, we do not believe that it is prudent to fund the production of our cellulosic fuels out of Columbus at a significant loss relative to the prices we would expect to receive from our customers. In large part, these losses are driven from Columbus' current operating state as the low volumes presently produced by the facility cannot fully absorb the cost of production, a condition that we believe our optimization projects will help, although not entirely eliminate.

109.    Defendants also addressed the Company's precarious financial position during the call.  Specifically, Cannon advised that KiOR was facing difficulty obtaining funding for the Columbus Facility II because of the Columbus Facility's "operational history" and Karnes' resignation from the Company in December 2013.  Again, Cannon tied KiOR's ability to secure financing to the productivity of the Columbus Facility:

> We expect that these challenges will lessen when the Columbus facility operates at or near nameplate capacity, with significantly enhanced yields.  As a result, we believe that the current execution plan for 2014, which as I mentioned above, is to focus exclusively on bringing the Columbus facility to design basis and further developing yield and process efficiencies through our R&D efforts, provides the strongest foundation for the future growth and development of KiOR.

> We expect that the successful execution of this plan will allow us to develop, finance and build future facilities in a way that will generate the best value for KiOR stockholders. Until then, we must remain vigilant in managing our cash in order to minimize the amount of cash we will need before financing our next commercial facility.

110.    Contrary to past earnings calls and representations made therein, Defendants refused to provide specific guidance with respect to "yield and process efficiency and on-stream percentage."  Christopher A. Artzer, KiOR's Vice President, General Counsel, and Interim CFO, explained as follows in response to an analyst question:

> <Q – Pavel S. Molchanov>: Yeah. Guys, thanks very much for taking the question. With regard to your plans for the second half of the year, I realize you're not giving guidance formally, but would you anticipate reaching nameplate capacity at Columbus perhaps by the end of 2014?
> . . .
> <A – Christopher A. Artzer>: From a perspective of throughput, as we've outlined, we do expect to be able to increase our throughput rate consistent with what Fred outlined in his remarks, which is getting to at or near our nameplate capacity of throughput of 500 tons per day by the end of 2014.

> In terms of yield and process efficiency and on-stream percentage, because the projects that we have are largely interrelated, we believe that it's prudent at this

point not to provide specific guidance with regard to what those results might be, although we do expect to see a significant improvement over the levels that we achieved in 2013.

111. KiOR previously and routinely provided investors with guidance relating to the Columbus Facility's productivity. Given that the Columbus Facility had not undergone "mechanical improvements" since the last time such guidance was provided, the Company's refusal to give such guidance on the January 9, 2014 conference call evidences that past forecasts were materially false and misleading because they were not reasonably based on sufficient facts.

112. This adverse news caused the Company's stock to decline from $1.75/share to $1.65/share or 5.7% on January 9, 2014.

113. The next day, KiOR was then downgraded by analyst firm Raymond James & Associates, citing production concerns, causing the Company's stock to decline from $1.65/share to $1.49/share or 9.6% over the next trading days.

114. On January 14, 2014, KiOR was also downgraded by analyst firm Cowen and Company, who cited production concerns. This adverse news caused the Company caused the Company's stock to fall from $1.49/share to $1.36/share or 8.7%.

115. The statements referenced above, including but not limited to ¶¶ 43-46, 48-49, 52-55, 57-58, 61-67, 69, 73-78, 80, 82-84, 86, 91, 93-97, 105-106, and 108-111, were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that, (a) the Company was not on track to produce commercially meaningful quantities of biofuel at the Columbus Facility at the timetables provided by the Company; (b) contrary to KiOR's public statements, the delays and lack of production at the Columbus Facility were attributable to

48

design deficiencies and not "typical" start-up problems; (c) the Columbus Facility required numerous operational, design, and equipment changes costing tens of millions of dollars just to move toward commercially meaningful production of biofuels; and (d) and additional mechanical improvements were required after over a year of repairs in order to obtain yields of biofuel that would create a sustainable business. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## THE DEFENDANTS INTENTIONALLY OR RECKLESSLY MISLED INVESTORS

116. The material false and misleading statements discussed above were made by Defendants either intentionally and/or with reckless disregard to accuracy for the purposes of: (a) securing additional financing to continue as a going concern as well as build additional commercial production facilities; (b) inflating the Company's stock so as to be able to meet obligations under a number of loan and credit arrangements; and (c) maintain an inflated stock price so as to be able to maximize the proceeds from insider stock sales.

117. Defendants Karnes and Cannon were aware of the severe design problems at the Columbus Facility. The ability to secure additional financing, not only for continued operations at the Columbus Facility but also for additional commercial production facilities (i.e., the Natchez Facility and Columbus Facility II), depended on the viability of the Columbus Facility and its ability to produce as promised. KiOR's quarterly and annual reports during the Class Period even stated that the "[t]he lack of any committed sources of financing other than those discussed above raises substantial doubt about our ability to continue as a going concern." There can be no doubt that Cannon and Karnes' primary objective was to portray the Columbus

Facility as a successful commercial operation; to do anything else would have resulted in the Company losing all hopes of prospective financing.

118.    Given its critical importance to the viability of the Company, the Columbus Facility was a core operation of KiOR.  Indeed, ability of the Company to remain a going concern depended on the Columbus Facility reaching nameplate capacity.  As a core operation of the Company, CEO Cannon and CFO Karnes were intimately involved with the Columbus Facility and painfully aware of its production deficiencies and design flaws.  Therefore, Cannon and Karnes were cognizant of and responsible for the oral and written misrepresentations, falsehoods, and omissions made during earnings conference calls and within certified SEC disclosures throughout the Class Period while reassuring investors and lenders alike that the Columbus Facility was "turning the corner towards steady state operations" and that the "very, very typical" start-up issues would be resolved in short time.

119.    Cannon and Karnes' motivation behind the misrepresentations and omissions as to the true state of the Columbus Facility stemmed from KiOR's perpetual operating losses and critical need for financing.  Over the course of the Class Period, the Company's net operating losses and accumulated deficits increased by roughly 60%.  In September 30, 2012, KiOR had generated "cumulative operating net losses of $175.2 million and an accumulated deficit of $197.1 million."  By the following year, KiOR had "generated $299.3 million of operating losses and an accumulated deficit of $339.7 million."  In fact, KiOR's ability to survive as a going concern depended on the Columbus Facility.  Throughout KiOR's quarterly (Form 10-Q) and annual (Form 10-K) filings during the Class Period, the Company repeated that the "[t]he lack of any committed sources of financing . . . raises substantial doubt about [KiOR's] ability to

continue as a going concern" and that KiOR's ability to secure additional financing "[would] be contingent upon, among other things, successful start-up of [its] Columbus Facility . . . ." Accordingly, Cannon and Karnes needed to make the Columbus Facility sound as promising as possible in order to avoid a complete collapse of the Company.

120. Without any substantial revenue, the Company was forced to fund itself through hundreds of millions of dollars in debt financing. KiOR obtained the financing it needed from private and government entities. However, the loans required KiOR to make significant and frequent interest payments, which KiOR was able to do by issuing warrants to purchase substantial amounts of its common stock.

121. The Company's issuance of warrants is chronicled throughout its quarterly (Form 10-Q) and annual (Form 10-K) SEC filings during the Class Period. According to its most recent Form 10-Q filed on November 12, 2013, KiOR issued the following warrants in connection with its loan agreements: (a) initial warrants to purchase 1,161,790 shares at $11.62 per share; (b) ATM warrants to purchase 619,867 shares at $5.71 per share (with provisions to purchase additional shares based on the amount of the loan balance); (c) ATM warrants to purchase 480,123 shares at prices ranging from $3.10 to $5.06 per share; (d) Drawdown warrants to purchase 2,139,997 shares at prices ranging from $3.10 to $5.06 per share; (e) Initial PIK warrants to purchase 334,862 shares at prices ranging from $11.62 to $13.15 per share; (f) Subsequent PIK warrants to purchase 478,626 shares at $5.71 per share; and additional (g) Subsequent PIK warrants to purchase 377,238 shares at prices ranging from $3.10 to $5.06 per share. These warrants were made at various times throughout the Class Period coinciding with interest payment due dates and loan term modifications.

122.  KiOR's ability to satisfy its payment obligations through warrants depended on the Company's stock price.  Consequently, to obtain the financing it needed to keep the Company afloat, Cannon and Karnes perpetuated the misrepresentations about the viability and production capabilities of the Columbus Facility so as to keep KiOR attractive to prospective investors.  As long as investors believed in the viability of the Columbus Facility, the Company's stock price would remain high and KiOR's warrants would remain valuable.  Defendants' omissions and misrepresentations resulted in a direct, concrete benefit to the Company and Cannon and Karnes, as the Company remained able to stay in business and Cannon and Karnes were able to remain employed and continue receiving their lucrative salaries.[6]

123.  KiOR's cash flow and debt problems were amplified by the terms of the MDA Loan with the Mississippi Development Authority.  In exchange for $75 million in investment, KiOR promised to "make specified investments within Mississippi by December 31, 2015, including an aggregate $500.0 million investment in property, plant and equipment located in Mississippi and expenditures for wages and direct local purchases in Mississippi totaling $85.0 million."  Failure to do so would trigger a default resulting in "the acceleration of repayment amounts due under the loan agreement."  The MDA Loan was secured by KiOR's equipment, land, and buildings.  The only way KiOR would have been in a position to satisfy its intrastate investment obligations under the MDA Loan was to successfully draw enough investment to facilitate the construction of either the Natchez Facility or the Columbus Facility

---

[6] According to KiOR's most recent proxy statement (Schedule 14A filed on April 17, 2013), Cannon's compensation for the years 2011 and 2012 was approximately $4.2 million and $4.5 million, respectively.  Karnes' compensation for 2011 and 2012 was approximately $7.7 million and $2.0 million.  Additionally, Cannon held well over five million exercisable stock options with exercise prices between $0.08 and $1.98 as of the date of the proxy statement.  Based on KiOR's stock price at the beginning of the Class Period of $6.86, Cannon's options were capable of netting roughly $30 million in proceeds (i.e., the product of the stock price at the beginning of the Class Period less the exercise price times the number of options).

II. However, as stated previously, KiOR's ability to secure additional financing "[would] be contingent upon, among other things, successful start-up of [its] Columbus Facility . . . ." Without the successful portrayal of the Columbus Facility, KiOR was not in a position to secure the financing necessary to construct its second commercial production facility, was not going to be able to satisfy its obligations under the MDA Loan, and would have been responsible to repay its $75 million on an accelerated basis. Again, by perpetuating the misrepresentations regarding the production capabilities of the Columbus Facility, Defendants were able to make KiOR and its Columbus Facility appear as an attractive investment opportunity and keep the Company's stock price artificially inflated. As a result, KiOR, Cannon, and Karnes derived a direct, concrete benefit.

124. Cannon and Karnes also possessed personal motivations to continue the fraudulent misrepresentations and omissions. Throughout the Class Period, Cannon and Karnes engaged in unusual and atypical insider transactions while the Company's stock was artificially inflated. The following charts display Cannon and Karnes' insider transactions, as obtained from their respective SEC Form 4 filings:

|        | Date Sold | Quantity Sold | Percentage of Ownership | Price Per Share | Proceeds |
|--------|-----------|---------------|-------------------------|-----------------|----------|
| Cannon | 3/1/2012  | 8,830         | 2.848%                  | $8.64           | $76,291.20 |
|        | 3/15/2012 | 4,771         | 1.504%                  | $8.94           | $42,652.74 |
|        | 9/4/2012  | 8,944         | 2.863%                  | $7.36           | $65,827.84 |
|        | 3/4/2013  | 9,402         | 3.098%                  | $5.46           | $51,334.92 |
|        | 3/12/2013 | 22,894        | 6.107%                  | $5.8            | $132,785.20 |
|        | 5/7/2013  | 37,082        | 8.071%                  | $4.88           | $180,960.16 |
|        | 9/4/2013  | 15,672        | 3.711%                  | $1.9312         | $30,265.77 |
| Total  |           | $107,595      |                         |                 | $580,117.83 |

– Class Period transactions (August 14, 2012 through January 8, 2014)

53

|        | Date Sold | Quantity Sold | Percentage of Ownership | Price Per share | Proceeds |
|--------|-----------|---------------|-------------------------|-----------------|----------|
| Karnes | 3/6/2012  | 2,179         | 4.358%                  | $8.14           | $17,737.06 |
|        | 3/15/2012 | 4,826         | 7.564%                  | $8.93           | $43,096.18 |
|        | 9/4/2012  | 1,789         | 3.033%                  | $7.36           | $13,167.04 |
|        | 3/4/2013  | 2,083         | 3.642%                  | $5.50           | $ 11,456.50 |
|        | 3/12/2013 | 10,103        | 11.287%                 | $5.76           | $ 58,193.28 |
|        | 5/7/2013  | 13,517        | 10.803%                 | $4.88           | $65,962.96 |
| Total  |           | 34,497        |                         |                 | $209,613.02 |

⬜ – Class Period transactions (August 14, 2012 through January 8, 2014)

125.   As indicated in the above charts, Cannon reaped approximately $461,173 in proceeds from insider trades during the Class Period. Karnes was able to secure $148,779 in proceeds from insider trades during the Class Period. Despite becoming a publicly traded company in June 2011, neither Cannon nor Karnes sold shares prior to March 2012. For Cannon, especially, this is noteworthy given the significant number of exercisable options he possessed at the time. The sizes and timing of Cannon and Karnes' trades, as compared with their pre- and post-Class Period trading activity, is indicative of their motivation to benefit financially from the Company's stock price while it was being inflated by their continued misrepresentations and omissions.

126.   Additionally, as explained above, the ability of KiOR to remain a going concern depended on Cannon and Karnes' ability to portray the Columbus Facility in the most positive light possible so as to be able to secure financing for operations. Without financing, KiOR would not be able to survive and, by closing its doors, would put Cannon and Karnes out of work. Given Cannon and Karnes' respective salaries and outstanding stock options, each defendant was highly motivated to keep KiOR open and its stock price as high as possible. Cannon's compensation for 2011 and 2012 was $4.2 million and $4.5 million. Karnes'

compensation for the same periods was $7.7 million and $2.0 million. Additionally, Cannon held well over five million exercisable stock options with exercise prices between $0.08 and $1.98 as of the date of the proxy statement. Depending on his ability to maintain an inflated stock price, Cannon stood to benefit by tens of millions of dollars. For example, based on KiOR's stock price at the beginning of the Class Period of $6.86, Cannon's options were capable of netting roughly $30 million in proceeds. Cannon and Karnes' respective salaries were material and, in part, motivated them to perpetuate the fraudulent misrepresentations and omissions upon which this lawsuit is founded.

127. In addition to the above reasons, Defendants' scienter is evident based on Karnes' unexpected and unexplained resignation from the Company in December 2013. On December 4, 2013, the Company announced that Karnes had abruptly resigned as CFO from the KiOR. No reason was provided and, significantly, the Company failed to state that the resignation was for personal reasons or that it did not have anything to do with the way in which KiOR was operating or presenting its production forecasts.

128. The only inference investors were able to draw as to the reasons behind Karnes' resignation was that Karnes' either failed or refused to give guidance as to the production capabilities of the Columbus Facility during the November 7, 2013 earnings conference call or, based on the Company's refusal to provide such guidance during the January 9, 2014 conference call, and guidance Karnes gave prior to his resignation was materially false and misleading. As such, Karnes' departure is indicative of Defendants' scienter.[7]

129. Throughout the Class Period, Defendants acted with the intent to defraud, or with a reckless disregard towards the potential of defrauding, Plaintiffs and other members of the

---

[7] On December 23, 2013, KiOR issued a press release announcing that its director, Condoleezza Rice, had resigned.

class by disseminating false and misleading statements relating to, among other things, (a) the Company's ability to produce commercially meaningful quantities of biofuel at the Columbus Facility at the timetables provided by the Company; (b) the design deficiencies and the fact that they were not "typical" start-up problems; (c) the numerous operational, design, and equipment changes costing tens of millions of dollars just to move toward commercially meaningful production of biofuels; and (d) and the additional mechanical improvements were required after over a year of repairs in order to obtain yields of biofuel that would create a sustainable business.

130. As key members of KiOR's executive management, Cannon and Karnes' actions, intentions, and reckless conduct are imputed to the Company as a matter of law. Likewise, because of their key roles in the Company, Cannon and Karnes caused KiOR to act in the manner it did and perpetuate the material misrepresentations it made throughout the Class Period. Defendants acted with the requisite intent to establish liability under the federal securities laws.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

131. Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired KiOR securities during the Class Period, and were damaged by the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

132. The members of the Class are so numerous that joinder of all members is

impracticable. Throughout the Class Period, KiOR securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by KiOR or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of August 8, 2012, several days before the start of the Class Period, KiOR had 45,169,877 outstanding shares of common stock. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

133. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

134. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

135. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of KiOR;

- whether the Individual Defendants caused KiOR to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of KiOR securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

136. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**RELIANCE PRESUMPTION: FRAUD-ON-THE-MARKET DOCTRINE**

137. At all relevant times, the market for KiOR's common stock was an efficient market for the following reasons, among others:

(a) KiOR's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) During the Class Period, on average, 1.9 million shares of KiOR's common stock were traded on a weekly basis. Approximately 4.25% of KiOR's outstanding shares were bought and sold on a weekly basis, demonstrating a very strong presumption of an efficient market;

(c) KiOR regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national

circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     KiOR was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(e)     Numerous firms were active market-makers in KiOR stock at all times during the Class Period; and

(f)     Unexpected material news about KiOR was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

90.     As a result of the foregoing, the market for KiOR's common stock promptly digested current information regarding Kiro from all publicly available sources and reflected such information in KiOR's stock price. Under these circumstances, all purchasers of KiOR's common stock during the Class Period suffered similar injury through their purchase of KiOR's common stock at artificially inflated prices, and a presumption of reliance applies.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE*

138.    Neither Plaintiffs nor the Class need prove reliance - either individually or as a class because under the circumstances of this case, which involves a failure to disclose and disclosure and internal control deficiencies, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information

important in deciding whether to buy or sell the subject security. Here, the facts withheld were material because a reasonable investor would have considered the Columbus Facility's production capabilities critical in evaluating the investment potential of the Company.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

139. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

140. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

141. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of KiOR securities; and (iii) cause Plaintiffs and other members of the Class to purchase KiOR securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

142. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the

defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for KiOR securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about KiOR's finances and business prospects.

143. By virtue of their positions at KiOR, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

144. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of KiOR, the Individual Defendants had knowledge of the details of KiOR's internal affairs.

145. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

KiOR. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to KiOR's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of KiOR securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning KiOR's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased KiOR securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

146.     During the Class Period, KiOR securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of KiOR securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiffs and the Class, the true value of KiOR securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of KiOR securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

147.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-

promulgated thereunder.

148.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

<div align="center">

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

</div>

149.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

150.    During the Class Period, the Individual Defendants participated in the operation and management of KiOR, and conducted and participated, directly and indirectly, in the conduct of KiOR's business affairs. Because of their senior positions, they knew the adverse non-public information about KiOR's ability to produce its biofuels in commercially viable quantities at the Columbus Facility.

151.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to KiOR's financial condition and results of operations, and to correct promptly any public statements issued by KiOR which had become materially false or misleading.

152.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which KiOR disseminated in the marketplace during the Class Period concerning KiOR's results of operations. Throughout the Class Period, the Individual

Defendants exercised their power and authority to cause KiOR to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of KiOR within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of KiOR securities.

153. Each of the Individual Defendants, therefore, acted as a controlling person of KiOR. By reason of their senior management positions and/or being directors of KiOR, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, KiOR to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of KiOR and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

154. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by KiOR.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: January 27, 2014            **GASCOYNE & BULLION, P.C.**

By: s/ James Gascoyne
James Gascoyne (Fed. No. 1980 / Tx. No. 07744800)
77 Sugar Creek Center Blvd.
Sugar Land, Texas 77478
Phone: (281) 340-7000
Fax: (281) 340-7001

*Liaison Counsel*


**LEVI & KORSINSKY LLP**

By: s/ Nicholas I. Porritt
Nicholas I. Porritt, Esq. (*admitted pro hac vice*)
Adam M. Apton, Esq. (*to be admitted pro hac vice*)
1101 30th Street NW, Suite 115
Washington, D.C. 20007
Phone: (202) 524-4290
Fax: (202) 333-2121

**THE ROSEN LAW FIRM, P.A.**

By: s/ Phillip Kim
Laurence M. Rosen, Esq. (*admitted pro hac vice*)
Phillip Kim, Esq. (*admitted pro hac vice*)
275 Madison Avenue, 34th Floor
New York, New York 10016
Phone: (212) 686-1060
Fax: (212) 202-3827

*Co-Lead Counsel*

65

## CERTIFICATE OF SERVICE

I hereby certify that on this on the 27th day of January 2014 a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

               s/ James Gacoyne
               James Gascoyne (Fed. No. 1980 / Tx. No. 07744800)