## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| MICHAEL BERRY, | § | |
| Individually and on behalf of all others | § | |
| similarly situated, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:13-cv-02443 |
| | § | |
| KIOR, INC., FRED CANNON, and | § | |
| JOHN K. KARNES, | § | |
| | § | **ORAL ARGUMENT REQUESTED** |
| Defendants. | § | |
| | § | |
| | § | |

## DEFENDANTS KIOR AND FRED CANNON'S MOTION TO DISMISS
## THE SECOND AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES .................................................................................................. iii

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 1

II.   NATURE AND STAGE OF THE PROCEEDING ........................................................ 2

III.  QUESTIONS PRESENTED AND STANDARD OF REVIEW ......................................... 3

IV.   BACKGROUND FACTS .......................................................................................... 4

      A.    KiOR's Business and the Columbus Facility ........................................... 4

      B.    Alleged Misstatements ............................................................................ 7

            1.    Status of the Facility ...................................................................... 7

            2.    Projections for the Facility ............................................................. 8

V.    ARGUMENT AND AUTHORITY .......................................................................... 10

      A.    The allegations of falsity are inadequate ............................................ 10

            1.    KiOR fully disclosed the status of the Facility and had no
                  obligation to describe the issues as "severe design flaws." ....... 10

            2.    Plaintiffs fail to plead with particularity that any projection was
                  unachievable when made. ............................................................. 16

      B.    KiOR's forward-looking statements and expressions of corporate
            optimism are not actionable. ................................................................ 18

            1.    KiOR's forward-looking statements are protected by the PSLRA
                  Safe Harbor. ................................................................................. 18

                  a.    KiOR's forward-looking statements are not actionable
                        because they were identified as such and accompanied by
                        meaningful cautionary language. ....................................... 19

                  b.    Plaintiffs fail to allege with particularity that the
                        Defendants had actual knowledge that the statements were
                        false when made. ................................................................ 22

            2.    Courts have consistently held that broad statements of corporate
                  optimism are not actionable .......................................................... 24

C.    Plaintiffs have not pled facts to support a strong inference of scienter ................24

    1.    Plaintiffs' vague allegations of actual knowledge are inadequate to plead scienter. ............................................................................26

    2.    Plaintiffs' motive and opportunity allegations are insufficient to establish scienter. ...................................................................28

        a.    Corporate motives are insufficient to plead scienter.....................28

        b.    Plaintiffs' trading allegations do not support a strong inference of scienter.....................................................29

    3.    Plaintiffs' attempt to plead scienter by status fails ....................................33

    4.    The resignation of KiOR's CFO does not support an inference of scienter. ..............................................................................34

    5.    Plaintiffs do not plead scienter as to KiOR...................................................35

D.    Plaintiffs have not alleged a control person cause of action under section 20(a). ...................................................................................35

VI.    CONCLUSION....................................................................................................35

CERTIFICATE OF SERVICE ............................................................................................37

**Page(s)**

**CASES**

*Abrams v. Baker Hughes Inc.*,
   292 F.3d 424 (5th Cir. 2002) .........................................................................13, 28, 29, 33, 35

*Bamburg v. Axis Onshore LP*,
   2009 WL 1579512 (W.D. La. June 4, 2009) .............................................................19, 23, 27

*Browning v. Amyris, Inc.*,
   2014 WL 1285175 (N.D. Cal. Mar. 24, 2014)...............................................11, 16, 17, 21, 22

*Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.*,
   2013 WL 2931422 (N.D. Cal. June 12, 2013) ........................................................................23

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
   632 F.3d 751 (1st Cir. 2011)...................................................................................................30

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
   963 F. Supp. 2d 1092 (E.D. Wash. 2013)...............................................................................27

*Collmer v. U.S. Liquids, Inc.*,
   268 F. Supp. 2d 718 (S.D. Tex. 2003) ...................................................................................34

*Congregation of Ezra Shalom v. Blockbuster, Inc.*,
   504 F. Supp. 2d 151 ..........................................................................................................22, 31

*Coyne v. Metabolix, Inc.*,
   943 F. Supp. 2d 259 (D. Mass. 2013) ....................................................................................17

*Dawes v. Imperial Sugar Co.*,
   975 F. Supp. 2d 666 (S.D. Tex. 2013) ......................................................3, 14, 27, 33, 34, 35

*DeMarco v. DepoTech Corp.*,
   149 F. Supp. 2d 1212 (S.D. Cal. 2001)...................................................................................34

*Fin. Acquisition Partners LP v. Blackwell*,
   440 F.3d 278 (5th Cir. 2006) .............................................................................................3, 29

*Hammerstone NV, Inc. v. Hoffman*,
   2010 WL 882887 (S.D.N.Y. Mar. 10, 2010) .........................................................................31

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) .................................................................................................27

*Hopson v. Metro PCS Commc'ns, Inc.*,
   2011 WL 1119727 (N.D. Tex. Mar. 25, 2011)..............................................13, 18, 19, 22, 24

*Horowitz v. Green Mtn. Coffee Roasters, Inc.*,
2013 WL 1149670 (D. Vt. Mar. 20, 2013) ............................................................14

*In re Administaff, Inc. Sec. Litig.*,
2006 WL 846378 (S.D. Tex. Mar. 30, 2006)....................................................17, 21

*In re Alamosa Holdings, Inc.*,
382 F. Supp. 2d 832 (N.D. Tex. 2005) .............................................17, 22, 28, 32

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010)........................................15, 16, 23, 27, 35

*In re BP plc Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ...............................................................19

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)............................................................30, 31

*In re Cross Media Mktg. Corp. Sec. Litig.*,
314 F. Supp. 2d 256 (S.D.N.Y. 2004)..................................................................28

*In re Cyberonics, Inc. Sec. Litig.*,
523 F. Supp. 2d 547 (S.D. Tex. 2007) ................................................................32

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) .....................................................29, 30, 31

*In re First Union Corp. Sec. Litig.*,
128 F. Supp. 2d 871 (W.D.N.C. 2001) .................................................................30

*In re Franklin Bank Corp. Sec. Litig.*,
782 F. Supp. 2d 364 (S.D. Tex. 2011) ......................................................24, 25, 28

*In re Gentiva Sec. Litig.*,
971 F. Supp. 2d 305 (E.D.N.Y. 2013) .................................................................30

*In re Gildan Activewear, Inc. Sec. Litig.*,
636 F. Supp. 2d 261 (S.D.N.Y. 2009)..................................................................17

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
2014 WL 197919 (D.D.C. Jan. 17, 2014)..............................................................19

*In re Houston Am. Energy Corp. Sec. Litig.*,
970 F. Supp. 2d 616 (S.D. Tex. 2013) .................................................................34

*In re Mako Surgical Corp. Sec. Litig.*,
2013 WL 2145661 (S.D. Fla. May 15, 2013) ........................................................23

iv

*In re Maxwell Techs., Inc. Sec. Litig.*,
  2014 WL 1796694 (S.D. Cal. May 5, 2014)...........................................................14

*In re Michaels Stores, Inc. Sec. Litig.*,
  2004 WL 2851782 (N.D. Tex. Dec. 10, 2004) ...............................................19, 32

*In re Northpoint Commc'ns Grp., Inc., Sec. Litig.*,
  221 F. Supp. 2d 1090 (N.D. Cal. 2002) ..............................................................14

*In re Sec. Litig. BMC Software, Inc.*,
  183 F. Supp. 2d 860 (S.D. Tex. 2001) ...................................5, 20, 22, 24, 28, 30

*In re Tibco Software, Inc.*,
  2006 WL 2844421 (N.D. Cal. Sept. 29, 2006) ....................................................23

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008) ...................................25, 27, 28, 29, 32, 33

*Institutional Investors Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009).................................................................................23

*Krim v. BancTexas Grp., Inc.*,
  989 F.2d 1435 (5th Cir. 1993) .............................................................................24

*Lormand v. US Unwired*,
  565 F.3d 228 (5th Cir. 2009) ...............................................................................19

*Lovelace v. Software Spectrum Inc.*,
  78 F.3d 1015 (5th Cir. 1996) .........................................................................20, 31

*Magruder v. Halliburton Co.*,
  2009 WL 854656 (N.D. Tex. Mar. 31, 2009) ......................................................33

*Material Yard Workers Local 1175 Benefit Funds v. Men's Wearhouse, Inc.*,
  2011 WL 3059229 (S.D. Tex. July 22, 2011).......................................................27

*Melder v. Morris*,
  27 F.3d 1097 (5th Cir. 1994) ...........................................................................3, 29

*Montano-Valdez v. Wells Fargo Bank, N.A.*,
  2014 WL 69886 (S.D. Tex. Jan. 8, 2014) ..............................................................5

*Nathenson v. Zonagen, Inc.*,
  267 F.3d 400 (5th Cir. 2001) ...............................................................................33

*Oppenheim Pramerica Asset Mgmt. SARL v. Encysive Pharm., Inc.*,
  2007 WL 2720074 (S.D. Tex. Sept. 18, 2007) ....................................................31

*Proter v. Medifast, Inc.,*
    2013 WL 1316034 (D. Md. Mar. 28, 2013)................................................30

*R2 Invs. LDC v. Phillips,*
    401 F.3d 638 (5th Cir. 2005) ......................................................33

*Ressler v. Liz Claiborne, Inc.,*
    75 F. Supp. 2d 43 (E.D.N.Y. 1998) ..............................................31

*Rosenzweig v. Azurix Corp.,*
    332 F.3d 854 (5th Cir. 2003) ........................................3, 13, 16, 18, 24, 28, 33

*SEC v. Janvey,*
    404 F. App'x 912 (5th Cir. 2010) ................................................19

*SEC v. U.S. Sustainable Energy Corp.,*
    2011 WL 2980549 (S.D. Miss. July 21, 2011) ..................................22

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,*
    365 F.3d 353 (5th Cir. 2004) ..................3, 10, 18, 19, 20, 21, 24, 25, 32, 34, 35

*Stockman v. Flotek Indus., Inc.,*
    2010 WL 3785586 (S.D. Tex. Sept. 29, 2010) ..................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)................................................................4, 25

## STATUTES

15 U.S.C. § 77z-2.................................................................................18

15 U.S.C. § 77z-2(c)(2), 78u-5(c)(3) ................................................18

15 U.S.C. § 78u-4(b)(2) .....................................................................10

15 U.S.C. § 78u-5(i)............................................................................18

15 U.S.C. § 78u-5(c)(1) ......................................................................19

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

KiOR, Inc. ("KiOR" or the "Company") is a renewable fuels startup that has developed a process for converting non-food biomass into cellulosic gasoline and diesel fuel.  To operate this process on a larger scale, the Company built a first-of-its-kind facility in Columbus, Mississippi (the "Facility"), at which KiOR employs its proprietary technology as well as standard refinery equipment.  The Facility started operations in September 2012 and made its first fuel shipment in March 2013.  Despite a steady, quarter-over-quarter increase of fuel production at the Facility during 2013, total production volumes were lower than anticipated, not because of any issues with KiOR's core proprietary technology, but due to unexpected start-up issues with the Facility and other unanticipated factors beyond KiOR's control.

KiOR has repeatedly detailed for investors not only its great potential as a renewable energy startup company, but also the risks that it faced—including risks related to the Facility's start-up schedule and costs and other risks that might cause production volumes to differ materially from those anticipated.  For example, in one of its many detailed disclosures, the Company informed investors that the Facility

> is a first-of-kind project, and we cannot assure you that it will be completed on the schedule that we intend or at all.  If and when completed, [it] may not process biomass at designed levels or produce our cellulosic gasoline and diesel at acceptable  yields … [and] we may be unable to achieve commercial-scale production in a timely manner, or at all, … [and] our operating and maintenance costs may be significantly higher than we anticipate.

*See infra* § V.B.1.a.  Despite such clear and repeated warnings, the overarching theory of fraud alleged by Plaintiffs in the Second Amended Complaint ("SAC") is that, during the Class Period, nearly all of KiOR's statements and projections were false and misleading because Defendants allegedly knew that the Facility suffered from "severe design flaws," such that it was "impossible" for the Facility to produce fuel at the anticipated volumes.

The lack of any particularized factual support in the SAC is fatal to Plaintiffs' theory. Because Defendants disclosed the issues with the Facility about which Plaintiffs complain, their theory necessarily reduces to the rejected notion that Defendants were under a duty to use Plaintiffs' preferred pejorative terms to describe those same issues. Plaintiffs similarly fail to allege any particularized facts to show that any projection was knowingly false when made. Instead, they rely on hindsight and fail to explain how the Facility's early performance during the start-up period somehow rendered it incapable of meeting future projections, particularly when performance and output at the Facility improved on a quarter-over-quarter basis. Finally, Plaintiffs fail to establish the requisite cogent and compelling inference of scienter, relying instead on vague allegations by unnamed witnesses that the "design flaws" were "readily apparent" to "everyone;" on general corporate motives universally rejected by courts; and on inadequate allegations of insider trading (which improperly rely in large part on trading by non-defendants). For these and other reasons, the SAC must be dismissed.

## II.    NATURE AND STAGE OF THE PROCEEDING

This is Plaintiffs' third attempt to plead an actionable claim of securities fraud. On January 27, 2014, Dave Carlton and Sharon Kegerreis ("Plaintiffs") filed the first Amended Complaint (Dkt. 38), alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Act") (and Rule 10b-5 promulgated thereunder) against all Defendants and violations of Section 20(a) of the Act against Defendants Fred Cannon (KiOR's CEO) and John Karnes (KiOR's former CFO).[1] Rather than respond to Defendants' first motion to dismiss the Amended Complaint (Dkt. 41), Plaintiffs moved for leave to file a second amended complaint on May 19, 2014, which the Court granted. On May 27, 2014, Plaintiffs filed the SAC (Dkt. 50),

---

[1] Mr. Karnes is filing a separate motion to dismiss. Because his scienter is relevant to that of KiOR, *see infra* § V.C, allegations concerning his statement and scienter are addressed in this brief as well.

asserting the same claims against the same defendants. Defendants KiOR and Cannon now move to dismiss the SAC pursuant to Rules 12(b)(6) and (9)(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

### III. QUESTIONS PRESENTED AND STANDARD OF REVIEW

This motion presents questions of whether the SAC should be dismissed for failing to state a claim and failing to plead fraud with particularity as required by the PSLRA and Rule 9(b):[2]

<u>First</u>, whether the SAC should be dismissed for failing to allege with particularity the falsity of the statements at issue. The Court must determine whether Defendants had a duty to describe disclosed start-up issues in Plaintiffs' preferred pejorative terms, and whether Plaintiffs have pled with particularized facts that Defendants knew various projections could not be achieved at the time they made them. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 868 (5th Cir. 2003); *Melder v. Morris*, 27 F.3d 1097, 1101 (5th Cir. 1994).

<u>Second</u>, whether allegedly false and misleading forward-looking statements are protected by the PSLRA's Safe Harbor. The Court must determine whether the statements were accompanied by "meaningful" cautionary language, and whether Plaintiffs have failed to plead particularized facts that Defendants had actual knowledge of the statements' falsity. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 371 (5th Cir. 2004).

<u>Third</u>, whether the SAC should be dismissed for failing to allege with particularity the scienter of each Defendant. The Court must decide whether Plaintiffs have pleaded particularized facts as to each Defendant from which the Court may draw a strong inference of

---

[2] *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 687 (S.D. Tex. 2013) ("The PSLRA's pleading requirements incorporate Rule 9(b)'s fraud-pleading standard," and "[a] district court must dismiss a securities-fraud claim failing to satisfy either the PSLRA or Rule 9(b)." (citing *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006))).

scienter that is as cogent and compelling as a competing innocent inference.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

## IV.    BACKGROUND FACTS[3]

### A.    KiOR's Business and the Columbus Facility

KiOR is a renewable fuels startup company that has developed a process for converting non-food biomass into cellulosic fuels that are virtually indistinguishable from their petroleum-based counterparts.  (SAC ¶ 45.)  After establishing the validity of the Company's processes and technology at pilot- and demonstration-scale operations, the Company began construction of a first-of-its-kind biofuel facility in Columbus, Mississippi (the "Facility") in 2011.  (SAC ¶¶ 48-49.)  The Facility, which has a design (or "nameplate") capacity to process 500 bone dry tons ("BDT") of biomass per day, has three essential processes, or units:

> (i) **Wood Conditioning**: harvested cellulosic biomass (*e.g.*, woodchips) is brought to the Facility's wood yard, where it is dried and conditioned via standardized processes common in the pulp and paper industry.  From there, biomass feeders feed the biomass into the Facility's reactor.

> (ii) **Conversion (biomass-to-oil)**: inside the reactor, KiOR's proprietary catalyst "cracks" the molecular structure of the biomass (vaporizing and rearranging the biomass), creating (in seconds) crude oil.  (The reaction also creates byproducts of light gases, water, and coke.)  The crude, byproducts, and catalyst then enter a separator where the catalyst is separated from the products.  The crude, water, and light gases proceed to a product recovery unit, while the catalyst moves to a regenerator (where the coke is burned off) and then is recycled back into the reactor to repeat the process.  The combination of the reactor, separator, and catalyst regenerator are referred to as the biomass fluid catalytic cracking ("BFCC") process.  The product recovery unit cools and separates the byproducts and the crude (which condenses into liquid).  The light gases are then sent to a waste heat boiler (where they are burned to generate steam to power the process) and the crude is transferred for upgrading.

> (iii) **Upgrading (oil-to-fuel)**: inside the upgrading unit, the crude oil undergoes a hydro-treating process (standard in refining) during which the crude reacts with hydrogen for de-oxygenation and then is separated in a fractionation column into gasoline, diesel, and fuel oil blendstocks.[4]

---

[3] Defendants accept the factual allegations of the SAC solely for purposes of this motion.

[4] The Facility also has a number of utilities (*e.g.*, steam turbine, cooling towers, waste heat recover, electrical substation) that, collectively, make a separate unit at the Facility.

(Ex. M[5] (KiOR Annual Report (Form 10-K) (Mar. 18, 2013)), at 8-9; *see also* SAC ¶ 3.) As with petroleum-based fuels, the fuel that results from KiOR's process can be employed in the existing liquid fuels infrastructure (i.e., vehicles on the road today). (*Id.*)

The Facility was mechanically complete by May 2012, at which time the Company began "commissioning" (i.e., verifying the functionality of) its various systems, such as water, steam, air, and instrumentation. (SAC ¶ 50.) The Facility was fully commissioned in September 2012 and then entered a "start-up" phase, during which the Company planned to operate fully two of the three essential processes of the Facility: biomass conditioning and conversion. (SAC ¶ 54.) Such operations involved "full-scale deployment of the wood yard and the biomass feeders, 100% catalyst circulation, separation and regeneration within the BFCC system, full operation of the cogeneration unit supplying all of the [F]acility's powers, [sic] needs, and successful recovery in separation and storage for upgrading." (Ex. I at 3; SAC ¶ 54.) Successful startups of these two processes were "gating" events, i.e., start-up operations of the upgrading unit would occur only when the first two processes were "producing stably" (referred to sometimes as

---

[5] "Ex. _" refers to the exhibits to the Declaration of Kerry C. Tipper. The Court may consider here "the full text of documents that are partially quoted or referred to in the complaint" without converting the motion to one for summary judgment. *Montano-Valdez v. Wells Fargo Bank, N.A.*, 2014 WL 69886, at *1 (S.D. Tex. Jan. 8, 2014) (quoting *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001)). In this regard, the SAC explicitly refers to and/or selectively quotes from Exhibits D (KiOR Prospectus filed pursuant to Rule 424(b)(4) (Form 424b4) (June 24, 2011)) (¶ 46); E (KiOR Annual Report for FY 2011 (Form 10-K) (Mar. 27, 2012)) (¶ 133); F (KiOR Quarterly Report for Q2 2012 (Form 10-Q) (Aug. 14, 2012)) (¶ 133); G (KiOR Q2 2012 Earnings Call Tr. (Aug. 14, 2012)) (¶ 122 n.10); H (KiOR Current Report (Form 8-K) (Nov. 8, 2012)) (¶ 57); I (KiOR Q3 2012 Earnings Call Tr. (Nov. 8, 2012)) (¶¶ 54-56); J (KiOR Quarterly Report for Q3 2012 (Form 10-Q) (Nov. 14, 2012)) (¶ 59 ); K (KiOR Current Report (Form 8-K) (Mar. 18, 2013)) (¶ 60); L (KiOR Q4 2012 Earnings Call Tr. (Mar. 18, 2013)) (¶¶ 61-65); M (KiOR Annual Report for FY 2012 (Form 10-K) (Mar. 18, 2013)) (¶ 67); N (KiOR Current Report (Form 8-K) (May 9, 2013)) (¶ 68); O (KiOR Q1 2013 Earnings Call Tr. (May 9, 2013)) (¶¶ 69-73); P (KiOR Quarterly Report for Q1 2013 (Form 10-Q) (May 10, 2013)) (¶ 133); Q (Cowen Technology Conf. Tr. (May 29, 2013)) (¶ 77); R (KiOR Current Report (Form 8-K) (July 1, 2013)) (¶¶ 79-81); S (KiOR Current Report (Form 8-K) (Aug. 8, 2013)) (¶ 84); T (KiOR Q2 2013 Earnings Call Tr. (Aug. 8, 2013)) (¶¶ 85-88); U (KiOR Quarterly Report for Q2 2013 (Form 10-Q) (Aug. 9, 2013)) (¶ 133); V (KiOR Current Report (Form 8-K) (Sept. 19, 2013)) (¶¶ 90-91); W (KiOR Current Report (Form 8-K) (Nov. 7, 2013)) (¶ 92); X (KiOR Q3 2013 Earnings Call Tr. (Nov. 7, 2013)) (¶¶ 93-95); Y (KiOR Quarterly Report for Q3 2013 (Form 10-Q) (Nov. 12, 2013)) (¶¶ 127, 133); Z (KiOR Current Report (Form 8-K) (Dec. 4, 2013)) (¶¶ 98-99); AA (KiOR Current Report (Form 8-K) (Dec. 23, 2013)) (¶¶ 101-02); BB (KiOR Conference Call Tr. (Jan. 9, 2014)) (¶¶ 104-09); CC (KiOR Annual Report for FY 2013 (Form 10-K) (Mar. 17, 2014)) (¶ 112-13); and Exhibits DD-ZZ (Forms 3, Initial Statement of Beneficial Ownership, and Forms 4, Statement of Changes in Beneficial Ownership, for Messrs. Cannon and Karnes) (¶¶ 141,144), and each is attached to the Tipper Declaration for the Court's consideration.

"steady-state" operations.  (*Id.*)

Although KiOR's proprietary technology functioned well during the biomass conditioning and conversion processes, the Facility experienced "normal start-up" issues, as disclosed in November 2012.  (SAC ¶ 55.)  As Mr. Cannon told investors:

> We've run a few days, three days in a continuous production where we've run everything in the plant from wood chips to high-quality oil.  And then a portion the start-up, which is extremely normal you run in the short periods and you find things that need correcting.  **We've had normal kind of start-up things, the solenoid valve on the cogeneration unit went out and shut us down.  Things like that – we've had leaks … on the flue gas, which is very typical of start-up, pump seals and other things.**

(*Id.* (emphasis in original).)  Nonetheless, the Company believed it would begin the upgrading process shortly thereafter and be producing, selling, and shipping fuel before the end of 2012.  (*Id.* ¶ 54.)

The Facility experienced operational setbacks in late 2012 and at various times in 2013, all of which KiOR disclosed to investors.  (SAC ¶¶ 61, 64, 69, 77, 85, 93; Ex. H at 3, 6, 7; Ex. L at 2-3, 8; Ex. O at 2-3, 6.)  In particular, the Facility was affected by a citywide blackout, which caused plugging in the vapor recovery unit ("VRU") used at the backend of the conversion process.  (SAC ¶ 64.)  Other mechanical problems included instrument failures, operating variability in the utilities and wood processing systems, a waste heat boiler tube failure, feed synchronization issues, and the need to replace bearings in the wood yard.  (*Id.* ¶¶ 61, 64, 69, 77, 85, 93; Ex. O at 2-3, 6.)  Importantly, none of these involved KiOR's core technology.  (*See, e.g.*, Ex. O at 2; Ex. T at 2.)

As a result of these setbacks, the conversion unit operated less than optimally, but steadily increased its on-stream[6] time from late 2012 through 2013: approximately 74 hours

---

[6] When any unit of the Facility is running and in use, it is sometimes said to be "on-stream" (and to be "off-stream" when not in operation).

during Q4 2012; 441 hours during Q1 2013; 900 hours during each of Q2 and Q3 2013; and 1,560 hours during Q4 2013.  (SAC ¶¶ 68, 69, 93; Ex. O at 2; Ex. T at 2; Ex. X at 2; Ex. BB at 3.)  In March 2013, the Company produced and shipped its first cellulosic diesel fuel.  (SAC ¶ 60.)  Thereafter, KiOR produced approximately 132,000 gallons of fuel in Q2 2013 (during which the Company commenced regular shipments of gasoline and diesel); 324,000 gallons in Q3 2013; and over 385,000 gallons in Q4 2013.  (*Id.* ¶¶ 84, 92, 101, 104; Ex. V at 99.1; Ex. X at 2; Ex. BB at 3.)

### B.  Alleged Misstatements

Trying to concoct securities fraud claims from KiOR's slower-than-anticipated start-up, Plaintiffs characterize various statements that KiOR made in press releases, securities filings, and analyst conference calls during the Class Period as "false and misleading" (*e.g.*, SAC ¶ 58), "especially misleading and/or deliberately reckless" (*e.g.*, *id.* ¶ 59), and/or "either intentionally or recklessly misleading" (*e.g.*, *id.* ¶ 67).  Plaintiffs' allegations fall generally into two categories:  (1) that KiOR's statements about the status of the Facility were misleading because they characterized as "start-up issues" what really were "design defects" (*id.* ¶¶ 58, 66, 74, 78, 82, 89, 96, 110); and (2) that KiOR made knowingly false projections regarding the Facility's start-up schedule, start-up costs, and fuel production (*id.* ¶¶ 59, 67, 76, 83, 91, 97).

### 1.  Status of the Facility

The SAC alleges that numerous statements about the current or past "status" of the Facility were "not grounded in reality and only served to mislead investors as to the true status of the Facility's operations."  (*E.g.*, *id.* ¶ 10.)  But, as detailed below, KiOR disclosed in detail the various issues that the Facility experienced.  Thus, Plaintiffs' position appears to be that KiOR should have pejoratively described the issues as "severe design issues" rather than "typical start-up issues."  (*E.g.*, *id.* ¶¶ 14, 67.)

Plaintiffs also attempt to use March 2014 statements by KiOR (outlining optimization projects and upgrades to improve throughput, yield, and overall process efficiency and to address issues identified at that time) as evidence that statements issued as many as 18 months earlier were false, but this is pure hindsight. The March 2014 statements are not inconsistent with the prior statements, do not acknowledge any insurmountable structural issue, and certainly do not show the *contemporaneous falsity* of the earlier 2013 statements.

Aside from hindsight, Plaintiffs rely on five anonymous sources to bolster their theory. But three of these sources make no allegations as to "design issues," severe or otherwise. The remaining two sources worked at the Facility for only a portion of the Class Period (over a year before both the Class Period and the March 2014 statements) and were several levels removed from operational authority. Although these two sources claim that these "severe design issues" were "apparent to everyone," they point to no facts to support that claim.

## 2. Projections for the Facility

Defendants identified in their first motion to dismiss (Dkt. 41) the repeated, unambiguous, and detailed cautions that KiOR issued regarding forward-looking statements. But Plaintiffs altogether fail to acknowledge these cautions in the SAC when alleging that certain production estimates and other statements of future expectations were false or misleading. For example, although when considered in context no one could have been misled, Plaintiffs challenge the bolded portion of Mr. Cannon's March 2013 statement that:

> Until we have the [F]acility lined out, which we believe could take at least nine months, any guidance that we might give to the basic metrics of plant performance that we use in petrochemicals or have to have an unusually wide error bar around that. **Given what I just said about the fact that production volumes in the first quarter will be negligible, looking at the remaining nine months of the year, we believe our volume expectations to be approximately 3 to 5 million gallons for the balance of the year**.

(SAC ¶ 62 (emphasis in original).) Plaintiffs make similar allegations with respect to forward-

looking statements made in November 2012,[7] and May,[8] July,[9] September,[10] and November 2013.[11]  Such statements are alleged to be actionable because they were "baseless" and the referenced targets were "impossible" to achieve.  (*E.g.*, *id.* ¶ 67.)

This, too, is purely hindsight, and the SAC fails to particularize *why* such projections were "baseless" or "impossible" to meet when they were made.  Plaintiffs point to no report, witness statement, or other source of information, let alone describe the content of any such source, indicating that the projected volumes could not be met or that any Defendant knew they would not be met.  Plaintiffs at several points rely only on rudimentary math, alleging that the Facility could only meet a particular estimate if it subsequently produced a certain number of gallons per day.  But Plaintiffs fail to reconcile their claims that projections were "impossible" to meet with the Facility's actual output at points during the Class Period; and they fail to recognize that the Facility's output is determined not simply by the number of hours the conversion process runs, but also by the tonnage of biomass processed and yield achieved on each ton.  Thus, Plaintiffs fail to allege adequately *why* any projection could not have been met, and their allegations are fraud by hindsight.

---

[7] (SAC ¶ 56 ("[W]e do think our prior guidance of around 500,000 to one million gallons of blend stock sales, seems like a reasonable planning.").)

[8] (SAC ¶¶ 71 ("Consistent with our previous guidance, we expect that total fuel production during the second quarter will range between 300,000 and 500,000 gallons, keeping us on track to fall within our projected production range of 3 million to 5 million gallons for 2013"); 72 ("we don't see any reason at this point to change our prior production guidance  as Fred mentioned, of 3 million to 5 million gallons for the year … we're just assuming  this production ramp occurs  fairly linearly from 5,000 gallons in Q1 to between 300,000 and 500,000 gallons in Q2, as Fred mentioned.").)

[9] (SAC ¶ 81 ("The success of these efforts gives us confidence, more than ever, that the performance targets for the Columbus plant are attainable in the months ahead.").)

[10] (SAC ¶ 90 ("With the BFCC section of the Columbus facility currently producing additional oil, we believe that we are we11-positioned to build on the progress made during July and August and to produce additional volumes of cellulosic fuel for American vehicles consistent with our most recent guidance.").)

[11] (SAC ¶ 92 ("As a result, we believe that with stable production over the balance of the year, our full year production levels will exceed 1 million gallons.").)

## V. ARGUMENT AND AUTHORITY

### A. The allegations of falsity are inadequate

For each alleged misstatement, Plaintiffs must provide particularized factual support to show why it was false or misleading. *See* 15 U.S.C. § 78u-4(b)(2); *Southland*, 365 F.3d at 364. The SAC does nothing of the sort. Plaintiffs allege that "statements and omissions" relating to the Facility's operations were "false and misleading" for one of the following reasons: (i) they "materially misled investors" into "believ[ing] that the Columbus Facility was progressing as designed and intended"; (ii) they "omitted material information concerning then-existing atypical, significant design and mechanical flaws affecting operations" at the Facility"; and/or (iii) the various projections and estimates were "impossible" to achieve (in part because of these design flaws). (SAC ¶¶ 58, 66, 74, 78, 81, 89, 96.) But Plaintiffs fail to plead adequately the factual predicate for these allegations or otherwise to establish a duty to disclose alleged "design flaws."

### 1. KiOR fully disclosed the status of the Facility and had no obligation to describe the issues as "severe design flaws."

Far from hiding the "true status" of the Facility or omitting material information about operational setbacks, Defendants repeatedly disclosed the actual operational progress of the Facility and detailed the setbacks that were occurring, including those "design issues" identified by the two confidential witnesses who purport to speak to them.

First, Defendants disclosed the on-stream times of the converter unit. (SAC ¶ 40-41.) For example, in May 2013, Mr. Cannon disclosed the number of hours that the converter unit was operated between October 2012 and March 2013 (i.e., 4Q2012 and 1Q2013). (Ex. O at 2 (disclosing that the "conversion unit…operated for a total of 441 hours" during Q1, which is an "on-stream percentage of approximately 20%" and "an improvement of approximately 500%

from the on-stream percentage during the previous quarter").)  He did the same for 2Q2013 during the August 8, 2013 conference call (Ex. T at 2 ("BFCC operated for a total of just under 40 days…more than doubling our quarterly on-stream percentage from 20% to 43%.")) and for 3Q2013 during the November 7, 2013 conference call (Ex. X at 2 (BFCC ran for 38 days, "achiev[ing] an on-stream performance of 41% for the third quarter.")).  The claim that KiOR misled investors with respect to the "progress towards obtaining steady state operations" (SAC ¶ 13; *see also id.* ¶¶ 58, 66, 74, 78, 81, 89, 96) cannot be reconciled with these precise disclosures regarding operational run times (particularly when coupled with the disclosure of operational setbacks and their causes, as described below).[12]  Moreover, Defendants repeatedly detailed the reasons *why* progress was slower than anticipated, including for "design issues" Plaintiffs allege were "omitted" (SAC ¶¶ 58, 66, 74, 78, 81, 89, 96):[13]

**VRU**[14]: As early as March 2013 KiOR disclosed an issue with "a lot of pluggage … [that had taken] many weeks to work through."  (Ex. L at 8.)  KiOR discussed this problem again in May 2013, specifically detailing issues with the VRU and noting that "[a]pproximately 70% of the downtime during the quarter has been associated with addressing typical issues in the Vapor

---

[12]Plaintiffs also complain of certain statements regarding performance having "met expectations."  (*See, e.g.*, SAC ¶ 57 ("[T]he [F]acility's performance to date not only meets our expectations based on our experience at our pilot and demonstration scale facilities…").)  But Plaintiffs do not identify what expectation Defendants had that was not met.  *See Browning v. Amyris, Inc.*, 2014 WL 1285175, at *11 (N.D. Cal. Mar. 24, 2014) (statement that "our processes and our equipment performed as expected" is not actionable where plaintiffs "do not say what expectations [defendant] had concerning its yeast, processes, or equipment during the start-up that did not perform as [defendant] expected").  To the contrary, Plaintiffs point out that "Defendants' stated expectation [was] that the 'shutdowns would continue to be par for the course until the [F]acility fully stabilized.'"  (SAC ¶ 76.)

[13] To the extent Plaintiffs challenge statements concerning the performance of KiOR's core technology (as distinct from the Facility as a whole), they offer no facts whatsoever suggesting the core technology was not operating as designed and as expected.  Moreover, Plaintiffs repeatedly read into Defendants' statements regarding KiOR's ***core, proprietary technology*** some implicit representation that the ***entire Facility*** was progressing as designed.  (*Compare* SAC ¶¶ 58, 66, 74, 78, 82, 89, 96 ("[S]tatements materially misled investors to believe that ***the Columbus Facility's*** startup phase was progressing as designed and intended.") (emphasis added) *with* the statements themselves, *e.g.*, SAC ¶ 54 ("[O]ur proprietary technology is operating as designed."); ¶ 68 ("[O]ur core technology is continuing to operate as designed.").)

[14] CW1: "identifying the VRU … as having significant design flaws" (SAC ¶ 38); CW3: "an entire tank filled with tar-like substance … was caus[ing] the various mechanical components, including pumps, to jam and required maintenance."  (SAC ¶ 41.)

Recovery Unit or VRU at the [F]acility." (Ex. O at 2.) Defendants further explained that "issues in the VRU reflect the impact of typical variable start-up operations and minor problems elsewhere in the plant. As a result, we must bring the [F]acility down, fix the minor root cause problem, clean and restart the plant, all of which takes time." (Ex. O at 2.)

**Feeding System**[15]: On several occasions, Defendants disclosed mechanical issues occurring in the wood processing unit. In May 2013, Defendants disclosed that "approximately 30%" of the off-stream time was related to "mechanical issues in utilities and wood processing systems of the plant." (*Id.* at 3.) In August 2013, Defendants disclosed that "[w]e decided to terminate both of these [April and May] runs due to feed synchronization issues … The [June] operation was terminated when needed to make a repair in the wood-yard and that was just to reply some bearings." (Ex. T at 2.) Then, in November, Defendants disclosed that "[w]e encountered some issues in the wood-yard again … and brought the BFCC down to address these wood-yard issues on August 24…The last couple of outages were certainly a result of wood-yard." (Ex. X at 2.)

**Wastewater**[16]: In May 2013, Defendants disclosed that "a tube in a boiler fail[ed] – waste heat boiler." (Ex. O at 9.) Defendants disclosed that they had not "re-tube[d] the entire exchanger" and instead "plugged the tubes." (Ex. O at 10.)

**Blackouts in November 2012**[17]: In March 2013, Defendants discussed the "total blackout in the city of Columbus, which also blacked out the KiOR plant," which "probably

---

[15] CW2: "woodchip feeding system used to feed the … conversion system was unable to properly supply" the converter. (SAC ¶ 40); CW3: biomass "conveyer systems and, in particular, they would jam and severely delay the introduction of biomass." (SAC ¶ 41); CW4 "wood chipping unit … struggled with correct feed rates and actual processed tons." (SAC ¶ 43); CW5: "the "small hog" [of the wood processing unit] repeatedly failed while the "main hog" went down twice [in two weeks] and for which blades that were "improper in terms of size" were employed. (SAC ¶ 44.)

[16] CW2: "certain equipment … could not handle the wastewater byproduct." (SAC ¶ 40.)

[17] CW2: "several blackouts occurring in November 2012." (SAC ¶ 40.)

accounted for almost half of our total delay in our actual production of fuel," and which also "caused, obviously, just like a refinery, a lot of pluggage. And that took us many weeks to work through and then some residual after that." (Ex. L at 8.)

Plaintiffs do not dispute the accuracy of any of these disclosures. Instead, Plaintiffs' claims are premised on the notion that KiOR was obligated to characterize those issues as "severe design flaws" rather than "start-up issues." (SAC ¶¶ 58, 66, 74, 78, 81, 89, 96.) But the securities laws impose no such duty to self-criticize or to characterize disclosed facts in a derogatory fashion. *See, e.g.*, *Hopson v. Metro PCS Commc'ns, Inc.*, 2011 WL 1119727, at *19 (N.D. Tex. Mar. 25, 2011) ("To the extent the plaintiff is arguing that the defendants should have painted an even gloomier picture," instead of describing their business as "strong" or "resilient," "the plaintiff's position has no basis in law because the defendants are under no duty to cast their business in an overly gloomy or pejorative light."); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003) (explaining that a company is under "no duty to cast its business in a pejorative, rather than a positive, light"); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002) (similar).[18]

In any event, only CW1 and CW2 even purport to identify "design" defects. (SAC ¶¶ 38-40.) CW1 (alleged to be a Commissioning and Start-up Consultant) reported to CW2 (alleged to be a Former Operations Superintendent). (*Id.* ¶ 38.) In turn, CW2 reported to CW4 (Operations Manager), who then reported to the actual Plant Manager. (*Id.* ¶ 39.) The SAC offers no basis to believe (let alone well pleaded facts to support a conclusion) that either CW1 or CW2—

---

[18] Plaintiffs also allege that Mr. Karnes's May 9, 2013 statement regarding start-up costs at the Facility was misleading because these costs increased later that year. (SAC ¶¶ 73, 76.) Apart from employing impermissible hindsight, this allegation is flawed because Mr. Karnes's statement was about the nature of the start-up costs (*e.g.*, KiOR's ability to bring the costs in-house), not total costs themselves: "the *nature* of the start-up cost clearly reflects the leveling out and stabilization of the facility as it's handed over from start-up to the operations group. For example, outside contractor costs were down sequentially around $900,000 indicating a reduction in major operations as well as an increased reliance on KiOR's operators to handle the [F]acility on a day-to-day basis." (Ex. O at 5 (emphasis added).) Thus, nothing he said could even be construed as false.

obviously several levels removed from any operational authority—was in a position to identify a "design flaw" or to distinguish one from a startup issue in this type of Facility.[19]  *See, e.g.*, *Horowitz v. Green Mtn. Coffee Roasters, Inc.*, 2013 WL 1149670, at *8-9 (D. Vt. Mar. 20, 2013) (dismissing complaint because, *inter alia*, no reason to think that "a lower-level employee" in company's shipping department "would have been in a position to know that [alleged] transfers [of product from one plant to another] were improper").[20]

Moreover, the allegation attributed to CW1[21] that the VRU had "significant design flaws giving rise to production shortfalls" that would "need to be redesigned" (SAC ¶ 40) is wholly

---

[19] Moreover, although CW2 is alleged to have years of refinery experience, Plaintiffs do not describe how such experience is applicable to the Facility, a first-of-its-kind facility operating KiOR's platform of proprietary technology.

[20] CW4, although one level closer to operational authority than CW2, alleges only "equipment issues" and ***does not allege any design flaws***, though Plaintiff attempts to recast them as such and then rely heavily on the importance of the latter.  (SAC ¶ 43 ("CW4 recalled specific <u>equipment issues</u>…. According to CW4, senior management were aware of <u>these mechanical and design problems</u> because they were discussed constantly.").)  Moreover, the complained-of "equipment issues" is alleged to have contributed to erroneous biomass feed rates (SAC ¶ 43)—an issue that was disclosed by Defendants.  *See supra*.  CW4 also vaguely alleges that he "concluded" that "certain equipment (*e.g.*, the catalyst cooler on the BFCC) was undersized" on account of unspecified "catalyst formulation problems."  (SAC ¶ 43)  But he does not explain the nature of these "formulation problems" or how they were (or even could be) related to "undersized" equipment.  The Defendants previously disclosed the problems that CW3 and CW5 purportedly identify (*see supra*), and in any event, Plaintiffs have failed to do that which they are required to do here:  identify these witnesses with sufficient particularly to support the probability that a person in such a position would possess the information alleged.  *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 692 (S.D. Tex. 2013) (plaintiff must provide descriptions (including individual responsibilities, specific employment dates, and where and when the CW came to know the information) "with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statement").  CW3 is alleged to be a millwright, but only for the vague period of time of "summer 2013," and no explanation is provided why he would be in a position to opine on the VRU or system feeder.  (SAC ¶ 41.)  Plaintiffs do not supply CW5 with any title and instead allege only that he provided non-specified "maintenance services" for a total of two weeks.  (SAC ¶ 44.)

[21] Significantly, CW1, CW3, CW4, and CW5 are never quoted, and the only direct allegation clearly attributable to CW2 is the vague assertion that "the whole damn thing was a design issue.  It was hastily put together and they were trying to make it run." (SAC ¶ 40.)  Consequently, "***it is often unclear what the witness actually said***, *what the Plaintiff has inferred, and what is commentary by the Plaintiff*," and "the Court therefore cannot tell whether [a] statement is CW's characterization of events or merely Plaintiff's interpretation." *In re Maxwell Techs., Inc. Sec. Litig.*, 2014 WL 1796694, at *6-7 (S.D. Cal. May 5, 2014) (emphasis added) (granting motion to dismiss).  This opacity is not trivial.  For example, rather than quoting CW2, Plaintiffs first paraphrase him as "confirm[ing] that **the fractioning system** was prone to buildup of excess tar, which led to equipment jams" (SAC ¶ 40 [emphasis added?]), but then allege repeatedly that "**the BFCC reactor** was prone to excess tar build-up, which led to equipment jams and additional repair (CW2)." (SAC ¶¶ 58, 66, 74, 78, 82, 89, 96, 116.)  Of course, the "fractioning system" and the "BFCC reactor" are entirely different.  (SAC ¶ 46.)  This obfuscation is compounded by Plaintiffs' use of soft, ambiguous verbs (*e.g.* "CW2 confirmed," "CW4 concluded," "CW5 believed"), which reveal nothing about what the CWs ***actually said***, raising the question of whether they said anything at all in support of Plaintiffs' theory, or "if the complaint is simply putting a spin on what the confidential witness actually said."  *In re Northpoint Commc'ns Grp., Inc., Sec. Litig.*, 221 F. Supp. 2d 1090, 1098 (N.D. Cal. 2002).

conclusory.  *See, e.g.*, *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 720 (W.D. Tex. 2010) (confidential witness allegations not credited where they "simply state their own conclusions about what occurred, without giving any meaningful details to support for those conclusions").  CW1 does not, for example, explain the nature of the design flaw or offer any other support.  In any event, Defendants provided detailed disclosures on the VRU issues as well as the underlying facts described by CW2 (i.e., downtime resulting from failure of waste heat boiler and from the biomass feeding system).[22]  *See supra.*

Finally, Plaintiffs allege that KiOR's FY2013 10-K (filed March 17, 2014)—which notes that KiOR failed to meet targets because of "structural design bottlenecks," "reliability and mechanical issues," and "catalyst performance"—"confirms" the CW allegations and the falsity of the challenged statements.  (SAC ¶¶ 58, 66, 74, 78, 81, 89, 96.)  But the March 2014 statements are not inconsistent with any prior statements.  For example, Defendants repeatedly made disclosures throughout the class period (including by referencing potential "design" improvements) regarding the same "bottlenecks" and "reliability issues" referenced in the March 2014 statements that affected the wood yard and biomass processing components of the Facility. *See supra.*[23]

---

[22] CW2 also alleges that the "[f]ractionation system was prone to build up of excess tar, which led to equipment jams."  (SAC ¶ 40.)  But the fractionation system (with the hydrotreater, part of the upgrading process) is never again mentioned in the complaint—in particular, it is not referenced as a reason that any statement was false.

[23] Although Plaintiffs also allege that the March 2014 statements specifically illustrate the falsity of January 2014 statements (SAC ¶ 110), this claim is without merit:  (i) Plaintiffs say the January statements did not "reveal" that "structural design bottlenecks and reliability issues" "cause[d] the Columbus Facility to run significantly below nameplate capacity.  But Defendants repeatedly disclaimed throughout the class period (including during the January 2014 statements) any indication that the Facility had reached "steady state" operations or nameplate capacity (*see, e.g.*, Ex. L at 3); (ii) Plaintiffs allege the January statements did not reveal the Facility's yield had been materially negatively affected by the continued use of an outdated catalyst and mechanical failures disrupting the BFCC reactor.  But Defendants repeatedly disclosed (including in January 2014) the delay in introducing the new catalyst (*see, e.g.*, Ex. BB at 4); (iii) Plaintiffs allege that the January statements did not accurately disclose the hydrotreater had been prone to repeated shutdowns leading to off-spec product.  But Defendants *did* disclose in January 2014 that the hydrotreater was producing off-spec product (*see, e.g.*, Ex. BB at 5); (iv) Finally, Plaintiffs say the January statements did not inform investors that the Facility's problems were "substantive design."  But Defendants repeatedly disclosed throughout the Class Period the mechanical difficulties

## 2. Plaintiffs fail to plead with particularity that any projection was unachievable when made.

The SAC asserts that KiOR's forward-looking statements about estimated startup costs and production volumes were "recklessly misleading" or "deliberately reckless" because they were "utterly incapable" of being achieved (SAC ¶ 59), "impossible" (*id.* ¶ 67), and "entirely baseless" (*id.*). Noticeably absent are any factual allegations to support this rhetoric. Plaintiffs' confidential witnesses do not even purport to comment on the projections, and Plaintiffs fail to identify any factual basis for the proposition that any projection was incapable of being achieved at the time it was made, or that anyone (let alone any Defendant) knew it would not be made. *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *11 (N.D. Cal. Mar. 24, 2014) ("The Plaintiffs have not sufficiently pleaded that the defendants knew the outlooks were impossible to achieve and the defendants therefore lied, or the outlooks were so unlikely to be reached that the defendants were deliberately reckless in making their statements."); *Rosenzweig*, 332 F.3d at 868 (dismissing complaint where report "fail[ed] to identify exactly who supplied the information [that contradicted company's public disclosures] or when [management] knew the information").

Instead, Plaintiffs rely on rudimentary and misleading arithmetic, alleging that the Facility could only meet a particular production estimate if it subsequently produced a certain number of gallons per day (*e.g.*, SAC ¶ 91), and then alleging that in light of the Facility's past run times, it could not do so. (SAC ¶¶ 59, 76, 83, 91, 97.) But making that argument, Plaintiffs do not even attempt to address the method by which the projections were calculated or the various factors besides run time that account for production volumes: BDT processed (throughput) and yield achieved on each ton. (Ex. E at 36 (explaining that "conversion yield is the barrel of saleable product achieved from our process for each BDT of feedstock" and "is

---

faced by Facility, including noting potential design issues in the wood-yard (*see, e.g., supra*).

maximized primarily through optimization of our catalyst systems"). Although an improvement in any of these factors will necessarily increase production volumes, Plaintiffs' faulty extrapolation focuses only on run time and simply ignores potential changes in tonnage or yield that could increase output. *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 850 (N.D. Tex. 2005) (estimates "are inactionable" where "the Complaint fails to allege any particulars as to what method the Defendants used to make the estimates and why that was unreasonable," as "[s]imply alleging in a conclusory fashion is insufficient").[24]

Moreover, Plaintiffs ignore certain production levels the Facility did achieve during the Class Period, which ***exceeded*** the volumes that Plaintiffs allege were necessary for KiOR to meet the stated projections.[25] The SAC offers no explanation as to why sustained production at such levels would not have enabled KiOR to meet its forecasts. *See, e.g.*, *Amyris*, 2014 WL 1285175, at *11 (projections are not false where "the complaint leaves open the possibility that the projections were achievable if a significant number of factors go as well as they theoretically could"); *In re Administaff, Inc. Sec. Litig.*, 2006 WL 846378, at *8 (S.D. Tex. Mar. 30, 2006) (dismissing challenge to projections where plaintiff did not allege facts that "made the projections mathematically impossible"); *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 267 (D. Mass. 2013) (projected timeline not false where plaintiff offered "vague (and largely conclusory) allegations of struggling sales [and] problems with production" but "none demonstrat[ing] that

---

[24] *See also In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 273 (S.D.N.Y. 2009) (projected earnings alleged to be "impossible" or "patently unrealistic" are inactionable where "Plaintiffs do not allege any facts to suggest what [internal] models revealed at the time [and] Plaintiffs have failed to allege with the requisite specificity exactly what contemporaneous data Defendants had, even to be able to suggest" that "the Company had been aware that the problems at the … facility contradicted their bullish comments about projected earnings").

[25] *Compare, e.g.*, SAC ¶ 91 ("In other words, Defendants needed to produce approximately 5,353 gallons per day every day from September through December 2013") *with* Ex. X at 2 (actual average of 7,979 gallons produced for each of 19 days of BFCC operation in September 2013); *and compare* SAC ¶ 97 ("in other words, 5,400 gallons per day every day for" November and December 2013") *with* Ex. BB at 3 (actual average of nearly 6,000 gallons produced for each of 65 days of BFCC operation in Q4 2013). Indeed, in absolute terms, the production level of the Facility increased 640% from Q1 2013 to Q4 2013. *See, e.g.*, Ex. BB at 3 (Q4 production of 385,000 gallons and 894,000 gallons for 2013)); Ex X at 2 (Q3 production of 324,000 gallons, a 150% increase over Q2).

[defendant] was *incapable* of meeting its predicted target dates") (emphasis in original).[26]

Finally, the allegation that the Company's "refusal to give … guidance" in January 2014 "evidences that past forecasts were materially false and misleading" is fundamentally flawed. (SAC ¶ 106.) The quoted "refusal" refers to the Company's practice of not providing guidance on "yield," "processes efficiency" or "on stream percentage"—metrics about which the SAC's previous paragraphs make no mention (and for which KiOR had never provided guidance). In any event, without more, KiOR's decision not to provide a forecast under the circumstances prevalent at the time cannot possibly permit an inference that prior forecasts had been fraudulent; instead, it is pure fraud-by-hindsight.

**B.     KiOR's forward-looking statements and expressions of corporate optimism are not actionable.**

**1.     KiOR's forward-looking statements are protected by the PSLRA Safe Harbor.**

Much of the SAC challenges KiOR's forward-looking projections of startup costs and production volumes at the Facility. But these projections and estimates are classical examples of quintessential forward-looking statements that the Safe Harbor provisions of the PSLRA protect. *See* 15 U.S.C. § 78u-5(i).[27]

Under the PSLRA, forward-looking statements are not actionable when ***either*** (1) they

---

[26]Plaintiffs also assert that Defendants' own cautions that "many start-up and shutdowns … would disrupt and delay production activities for significant time periods" are somehow indicative of the falsity of the Company's future projections. (SAC ¶ 59.) If anything, such language shows that the projections were not framed as guarantees, and any reliance on specific figures was unreasonable. *See, e.g., Rosenzweig*, 332 F.3d at 869 (forward-looking statement "accompanied by extensive cautionary language" is immaterial and not reasonably relied upon).

[27] A forward-looking statement is defined to include statements: containing projections of financials; concerning plans and objectives for future operations; concerning future economic performance; and of the assumptions underlying other forward-looking statements. 15 U.S.C. § 77z-2; *Southland Sec. Corp. v. INSpire Solutions, Inc.*, 365 F.3d 353, 371-72 (5th Cir. 2004) ("[P]redictions of future earnings and revenues … meet the PSLRA's definition of a forward looking statement."). Oral as well as written statements may fall under this definition. *Southland*, 365 F.3d at 372 (citing 15 U.S.C. § 77z-2(c)(2), 78u-5(c)(3)); *see also Hopson*, 2011 WL 1119727, at *18 (oral statements made during earnings calls are forward-looking statements where calls began with forward-looking-statement caution, reviewed risk factors and directed listeners to SEC filings).

are identified as forward-looking statements and are accompanied by meaningful cautionary language **or** (2) the plaintiff fails to plead that the forward-looking statement was made with **actual knowledge** that the statement was false or misleading.  15 U.S.C. § 78u-5(c)(1).  These two prongs are disjunctive—a defendant is immune from liability if either prong is met.[28]  *Southland Sec. Corp. v. INSpire Solutions, Inc.*, 365 F.3d 353, 371 (5th Cir. 2004) ("The safe harbor has two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind."); *In re BP plc Sec. Litig.*, 843 F. Supp. 2d 712, 777 (S.D. Tex. 2012) ("If a forward-looking statement is identified as forward-looking and accompanied by meaningful cautionary statements, the statement is not actionable and the defendant's state of mind is irrelevant.").[29]  The statements at issue here are protected, separately, by each prong.

> a.    **KiOR's forward-looking statements are not actionable because they were identified as such and accompanied by meaningful cautionary language.**

From the time it issued its initial registration statement in April 2011, KiOR has repeatedly and clearly detailed for investors the risks that the Company (employing a first-of-its-

---

[28] Dismissal via either prong of the Safe Harbor is appropriate at the pleading stage.  *See, e.g.*, *Bamburg v. Axis Onshore LP*, 2009 WL 1579512, at *6 (W.D. La. June 4, 2009) ("The Fifth Circuit has interpreted the statute to require plaintiffs to 'plead' actual knowledge." (citing *Lormand v. US Unwired*, 565 F.3d 228 (5th Cir. 2009)));  *In re Michaels Stores, Inc. Sec. Litig.*, 2004 WL 2851782, at *6-7 (N.D. Tex. Dec. 10, 2004) stating that (court may assess adequacy of cautionary language on motion to dismiss).

[29] In *Lormand*, 565 F.3d 228, the Fifth Circuit stated that the Safe Harbor was "inapplicable" because "the plaintiff adequately alleges that the defendants actually knew that their statements were misleading."  But, as other courts have since recognized, reading *Lormand* as holding (contrary to *Southland*) that the two prongs are not disjunctive would be contrary to the statute.  *Hopson*, 2011 WL 1119727, at *18 n.19 (noting that the various courts of appeal have construed prongs as disjunctive); *see, e.g.*, *In re Harman Int'l Indus., Inc. Sec. Litig.*, 2014 WL 197919, at *9 n.5 (D.D.C. Jan. 17, 2014) (Safe Harbor's second prong "is not vital to [the Fifth Circuit's] conclusion, as the plaintiff there adequately pleaded actual knowledge *and* the defendant's cautionary statements were insufficiently meaningful.  Thus, the safe harbor would have been inapplicable under either a disjunctive or conjunctive reading.  The court will therefore treat the statement in *Lormand* as dicta and the holding in *Southland* as current Fifth Circuit law on this point."); *see generally SEC v. Janvey*, 404 F. App'x 912, 914 (5th Cir. 2010) (well established in Fifth Circuit that one "panel does not have the authority to overrule a previous panel's decision absent an intervening, contrary, or superseding decision by the [the Fifth Circuit], sitting en banc, or by the Supreme Court").

kind technology) faced.[30]  These unambiguous, detailed cautions continued throughout the

alleged Class Period and included warnings specific to start-up schedules and costs and expected

production volumes, as well as factors that might cause them to vary.  For example, in KiOR's

Annual report filed in March 2012 (to which many of the relevant Class Period statements refer),

the Company warned that

> [w]e have not yet completed construction of or operated a commercial-scale production facility, and…we may encounter operational challenges for which we are unable to devise a workable solution.…**[W]e cannot assure you that it will be completed on the schedule that we intend or at all.**  If and when completed, [it] may not process biomass at designed levels or produce our cellulosic gasoline and diesel at acceptable yields … [and] we may be unable to achieve commercial-scale production in a timely manner, or at all.

(Ex. E at 16 (emphasis added).)[31]

Such detailed and frank disclosures are found throughout the relevant SEC filings and

cover each forward-looking statement that Plaintiffs allege to be false or misleading.  (*See*

Ex. A.)[32]  These are precisely the type of "substantive company-specific warnings based on a

realistic description of the risk applicable to the particular circumstances" that are required under

---

[30] (*See* Ex. C at 7 ("Our business is subject to a number of risks and uncertainties that you should understand before making an investment decision ... These risks include the following: … the actual cost of constructing, operating and maintaining the facilities necessary to produce our renewable transportation fuel in commercial volumes may be significantly higher than we plan or anticipate."); *id* at 14 ("If and when our facilities are constructed, our operating and maintenance costs may be significantly higher than we anticipate. In addition, our facilities may not operate as efficiently as we expect and may experience unplanned downtime, which may be significant. As a result, our initial-scale commercial production facility under construction in Columbus, Mississippi or one or more of the planned standard commercial production facilities may be unable to achieve our expected investment return, which could adversely affect our business and results of operations.").)  The Court may consider on a motion to dismiss public disclosure documents filed with the SEC and in this regard Exhibit C is attached hereto for the Court's consideration.  *See Southland*, 365 F.3d at 367 n.10 (district court "properly consider[ed]" "defendants' SEC filings" on motion to dismiss) (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996)).

[31] This caution continues: "Our operating and maintenance costs may be significantly higher than we anticipate.  If and when our facilities are constructed, our operating and maintenance costs may be significantly higher than we anticipate.  In addition, our facilities may not operate as efficiently as we except and may experience unplanned downtime, which may be significant.  As a result, our initial-scale commercial production facility under construction in Columbus, Mississippi … may be unable to achieve our expected investment return." (Ex. E at 16.)

[32] Exhibit A, which summarizes information otherwise contained in documents (Exs. F – CC) that are partially quoted or referred to throughout the SAC is included for the Court's convenience and the Court may properly consider it on a motion to dismiss.  *See, e.g.*, *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 884 (S.D. Tex. 2001) (court may on motion to dismiss consider chart "included only for the court's convenience as a summary of information included in SEC filings attached to the memorandum").

the PSLRA—that is, they are in no way "a boilerplate litany of generally applicable risk factors." *Southland*, 365 F.3d at 372. Indeed, KiOR "explain[ed] in its [SEC filings] that it may not be able to translate its technology to a commercial scale[,] … that production delays may happen, that there might be engineering problems in construction plants, and that it might not produce the products in the time frame planned;" such statements "are precise and directly address the plaintiffs' complaint." *Amyris*, 2014 WL 1285175, at *14.[33] More "meaningful," non-"boilerplate," cautionary language is difficult to imagine.[34]

Moreover, on conference calls with analysts throughout the Class Period, Messrs. Cannon and Karnes unambiguously stated that investors should not view any guidance as guarantees because there were risks that might cause actual results to differ materially. For example, on March 18, 2013, Mr. Cannon prefaced his tentative guidance by saying, "***Until we have the facility lined out, which we believe could take at least nine months, any guidance that we might give to the basic metrics of plant performance that we use in petrochemicals will have to have an unusually wide error bar around that.***" (SAC ¶ 62 (emphasis added); Ex. L at 3.) Similarly, on May 9, 2013, Mr. Karnes noted that "***our limited production history makes forecasting difficult***" and that "***without any more operational data***" the forecast merely assumed a linear, quarter-over-quarter increase and that "***shutdowns will continue to be par for the***

---

[33] The Company even provided summaries of the detailed risk factors, noting that forward-looking statements were subject to: "the ability of our initial-scale commercial facility to produce fuel on time and at expected yields"; "commercial-scale production of cellulosic gasoline and diesel on a cost-effective basis and in the time frame we anticipate"; "the timing of start-up and steady-state operations at our initial scale commercial production facility in Columbus, Mississippi."; "our ability to commercialize successfully our cellulosic gasoline diesel and fuel oil"; "the cost of constructing, operating and maintaining facilities necessary to produce our cellulosic gasoline, diesel and fuel oil in commercial volume"; and "our ability to raise additional capital in the future in order to fund our current operations." (*See e.g.*, Exs. F at 2; J at 3.)

[34] Moreover, on each conference call the Company provided cautions regarding forward-looking statements and noted that "important factors and other factors that could potentially affect the Company's financial results are described in the section called Risk Factors in the Company's most recent annual report on Form 10-K … and the company's other filings with the SEC." (*See, e.g.*, Ex. L at 1-2); *see also In re Administaff*, 2006 WL 846378, at *7 (disclosure at the outset of earnings call that call would contain forward-looking statements and that associated risks and uncertainties had been described in SEC filings was sufficient to cover all forward-looking statements during the call).

*course until the facility fully stabilizes, so shipments can be expected to be sporadic*." (SAC ¶ 72 (emphasis added); Ex. O at 5.)[35]

Each of the complained-of forward-looking statements (including the statements regarding future production volumes) is therefore protected by the Safe Harbor. *See, e.g.*, *Hopson*, 2011 WL 1119727, at *17 (cautionary language sufficient where "it identifies risks that are specific to [the company] and its ability to achieve the forecasts predicted"); *Amyris*, 2014 WL 1285175, at *14 (statement "we expect to produce between 2 million and 3 million liters of [oil] this year" is protected by Safe Harbor because of cautions that company "might have problems … achieving desired technical results and meeting production targets").[36]

   **b.      Plaintiffs fail to allege with particularity that the Defendants had actual knowledge that the statements were false when made.**

Although the Safe Harbor is disjunctive and the meaningful cautionary language itself is sufficient to protect the statements at issue, Plaintiffs also fail to allege (except in wholly conclusory terms) that the Defendants had actual knowledge that the statements were false when made. CW2's vague contention that "everyone knew" (SAC ¶¶ 40, 124) pertains only to

---

[35] *See also*: November 8, 2012, Mr. Karnes: Guidance of "around 500,000 gallons of blend stock to one million gallons of blend stock sales, seems like a reasonable planning cases *assuming the start-up continues as we've got it planned*, and assuming the EPA promulgates the renewable gasoline pathway." (SAC ¶ 56; Ex. I at 5.) March 18, 2013, Mr. Karnes: "*Columbus on the other hand is not just straight forward to provide guidance on*. As Fred mentioned, while we have commenced shipments – but we have not cut over yet to routine or extended operations, and we don't expect to be cut over for some time. As a result, *shipments can be expected to be a bit sporadic as unit operations are optimized over the months ahead*, gradually smoothing later in the year as the plant's focus turns from lining out to maximizing utilization and efficiency." (SAC ¶ 63; Ex. L at 7 (emphasis added).).

[36] *See Alamosa Holdings*, 382 F. Supp. 2d at 844-45 (safe harbor protection is proper where "the language in this instance was forward-looking and sufficient to clearly warn investors of the risks—the very risk at issue here"); *Stockman v. Flotek Indus., Inc.*, 2010 WL 3785586, at *25 (S.D. Tex. Sept. 29, 2010) (cautions that information defendant provided was "based on only two months of experience," and that "capacity constraints" "reduced activity" were sufficient); *Congregation of Ezra Shalom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 163 j(N.D. Tex. 2007) (meaningful cautionary language included that "proposed investments will adversely affect [company's] profitability" and that the company had "limited experience with certain new customer proposition initiatives and cannot assure you when or if these future initiatives will have a positive impact on [company's] profitability"). Moreover, for the same reasons the statements are not actionable under the first prong of the Safe Harbor, the judicially created "bespeaks doctrine" also protects them. *See, e.g., SEC v. U.S. Sustainable Energy Corp.*, 2011 WL 2980549, at *14 n.6 (S.D. Miss. July 21, 2011) ("The 'bespeaks caution' doctrine, similar to the PSLRA safe harbor provision, survived enactment of the PSLRA and protects optimistic projections accompanied by cautionary language." (citing *BMC Software*, 183 F. Supp. 2d at 860))).

supposed design issues, not expected production volumes, and in any event is far too generalized to permit the requisite compelling inference of actual knowledge. *See, e.g.*, *ArthroCare*, 726 F. Supp. 2d at 720 (allegations of confidential informants did not contribute to the inference of scienter where, among other things, "[m]any of the CWs simply state their own conclusions about what occurred"); *see also infra* § V.C.[37] Moreover, as described above, there is no basis to believe that CW2 was in a position to identify a "design flaw" or to distinguish one from a start-up issue in this type of Facility. *See supra* § V.A.1.

Plaintiffs otherwise do not offer a single witness, document, or source suggesting that any Defendant had actual knowledge of falsity as to any statement or projection. And as set forth below (*infra* § V.C), to the extent the SAC endeavors to allege actual knowledge via inferences from the Defendants' status, corporate motives, or trading, it fails to allege even recklessness, and, *a fortiori*, fails to allege actual knowledge of falsity under the more rigorous Safe Harbor standard.[38]

---

[37] CW2 also suggests that a "critical mass" of employees left KiOR in February 2013, which, according to Plaintiffs, "add[ed] yet another significant obstacle in the way of achieving steady state operations." (SAC ¶ 67.) As with the allegation that "everyone knew," neither CW2 nor Plaintiffs offer the requisite particulars (including who left, why this group was "critical," in what way these departures presented an "obstacle," why the employees could not be replaced, or when or how Defendants knew this information) to permit any inference with respect to actual knowledge. *See, e.g.*, *In re Tibco Software, Inc.*, 2006 WL 2844421, at *3 (N.D. Cal. Sept. 29, 2006) (dismissing complaint where CW does not specify what defendants were aware of purported "culture clash" and "loss off … personnel"). Plaintiffs' effort to cobble together actual knowledge of falsity from the remaining CWs is similarly weak, as neither CW1 nor CW3 makes *any* allegation as to knowledge, and CW4 and CW5's allegations are conclusory and vague at best. (*See e.g.*, SAC ¶ 42 (Defendants "would be notified" of problems); *id.* ¶¶ 43-44 (Defendants must have known of such problems because they "were discussed constantly" or because the engineers and other managers "all knew about the ongoing problems").) Such allegations fall short of actual knowledge. *See, e.g.*, *In re Mako Surgical Corp. Sec. Litig.*, 2013 WL 2145661, at *12 (S.D. Fla. May 15, 2013) ("CW['s] insistence that [defendants] 'must have known and approved the deferred [revenue] recognition' … fails to establish actual knowledge on the part of the [defendants]" as required when statements are protected by the Safe Harbor); *Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.*, 2013 WL 2931422, at *6-7 (N.D. Cal. June 12, 2013) (allegations that Defendants "must have known" certain information insufficient to state claim as to forward looking projection because "even if Defendants were aware [of information,] there is no indication they had actual knowledge that the forecast failed to account for them").

[38] *See Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009) ("actual knowledge … requirement for forward-looking statements is stricter than that for statements of current fact [because] the latter requires a showing of either knowing falsity or recklessness [and] liability for the former attaches only upon proof of knowing falsity"); *Bamburg*, 2009 WL 1579512, at *8 n.14 (in failing to allege adequately scienter, "[a] fortiori, plaintiffs fail to adequately plead that defendants had 'actual knowledge'" of falsity and as such "the forward-

## 2. Courts have consistently held that broad statements of corporate optimism are not actionable

Plaintiffs also challenge certain of KiOR's expressions of optimism regarding the Company's financial and operational prospects. (*See e.g.*, SAC ¶ 90 ("[W]e believe that we are well-positioned to build on the progress made during July and August and to produce additional volumes of cellulosic fuel for American vehicles consistent with our most recent guidance"); ¶ 92 ("[W]e believe that we are turning the corner toward steady state operation").) These are textbook examples of immaterial puffery. "Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 888 (S.D. Tex. 2001) (citing *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993)); *Rosenzweig*, 332 F.3d at 870 ("'[M]aking steady progress' is precisely the sort of generalized positive characterization that is not actionable under the securities laws.").[39]

## C. Plaintiffs have not pled facts to support a strong inference of scienter

KiOR's scienter turns, of course, on whether scienter is alleged as to the individuals making the statements at issue—here, Messrs. Cannon and Karnes. *Southland*, 365 F.3d at 366 (company's scienter turns on "state of mind of the individual corporate official or officials who make or issue the statement"). The SAC must be dismissed for the independent reason that it

---

looking statement is further protected by the PSLRA's safe harbor provision").

[39] *See also In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 385-86, 393-94 (S.D. Tex. 2011) ("we can shepherd this institution through this cycle" and "pretty comfortable with the Bank's reserve level" are non-actionable puffery), *aff'd sub nom. by Harold Roucher Trust V/A DTD 09/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012); *Hopson*, 2011 WL 1119727, at *21 ("very strong competitive position," "pretty confident how we stack up," and "perfectly situated" are "non-actionable immaterial puffery").

fails to plead any facts giving rise to the requisite strong inference of scienter as to either officer.[40]  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (under "[e]xacting pleading requirements" of the PSLRA, an inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent"); *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (*Tellabs* requires that "a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter.").  Plaintiffs must plead specific facts to show Defendants acted with "an intent to deceive, manipulate, or defraud" or with "severe recklessness."  *Southland*, 365 F.3d at 366.[41]  This may be shown by direct evidence of conscious disregard for the truth, or evidence of motive and opportunity. *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 377 (S.D. Tex. 2011), *aff'd sub nom. by Harold Roucher Trust V/A DTD 09/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012).

Plaintiffs contend, in wholly conclusory fashion, that Defendants made the statements at issue "either intentionally [knowing the statements were inaccurate] and/or with reckless disregard to accuracy."  (SAC ¶ 119.)  Apparently, these allegations are based on CW2's contention that the "design flaws" were "readily apparent" to "everyone" (SAC ¶¶ 40); CW4's contention that "senior management was aware of" design problems because "they were discussed constantly" (SAC ¶ 43); and/or CW5's "belief" that "senior management was 'definitely aware'" of problems "because the Columbus Facility Engineers and Operations Managers all knew about [them]" (SAC ¶ 44).

Plaintiffs also attempt to infer conscious disregard by resorting to "status" and "must

---

[40] As to Mr. Karnes specifically, *see* John Karnes's Mot. to Dismiss the Second Am. Compl. (Jul. 3, 2014).

[41] This is recklessness "in which the 'danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Southland*, 365 F.3d at 366.

have known" allegations routinely found to be insufficient: (i) "given their respective positions" at KiOR "each Cannon and Karnes was aware (or should have been aware)" of "red flags" and "understood the severity of these red flags (or were deliberately reckless in disregarding them)" (SAC ¶ 132); and (ii) the Defendants "were cognizant of" "production deficiencies and design flaws" because the Facility is a "core operation" (SAC ¶ 131). Plaintiffs further assert that scienter can be inferred from Mr. Karnes's resignation. (SAC ¶136.) Each of these "status" allegations fails for the reasons described below.

Finally, Plaintiffs also seek to infer scienter from motive and opportunity, alleging that Defendants were motivated to commit fraud in order to (1) maintain a high stock price to attract investment and obtain the financing KiOR needed to keep the Company afloat (SAC ¶¶ 125-26); (2) "continue business, and continue paying themselves and their fellow executive officers and directors substantial salaries and compensation" (*id.* ¶¶ 131, 143, 146); and (3) sell KiOR stock at inflated prices (*id.* ¶¶ 120, 140-61). These allegations, too, are woefully inadequate.

### 1. Plaintiffs' vague allegations of actual knowledge are inadequate to plead scienter.

As addressed above in the Safe Harbor argument (*supra* § V.B.1), Plaintiffs improperly attempt to impute knowledge of "ongoing design and mechanical problems impeding production" to the individual defendants based on three CWs who "confirm" or "believe" that such problems were "apparent" to "everyone" (SAC ¶¶ 14, 40, 44, 124), were "consistently focused on" or "discussed" in *operations and engineering staff* meetings (SAC ¶124), or (according to CW4 only) were made aware to them because in general, "whenever design issues and/or technical problems were discussed," engineers, plant managers, and production staff "would notify Defendant Cannon and other senior management" (SAC ¶124).

*First*, in the scienter context, the Fifth Circuit has applied *Tellabs* to require district courts to

"discount allegations from confidential sources" because "[s]uch sources afford no basis for drawing the plausible competing inferences." *Shaw*, 537 F.3d at 535; *see also Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist."); *see also Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 693 (S.D. Tex. 2013) (court must "give[] relatively less weight to the allegations from anonymous sources"); *Material Yard Workers Local 1175 Benefit Funds v. Men's Wearhouse, Inc.*, 2011 WL 3059229, at *6 (S.D. Tex. July 22, 2011) ("A secret witness is not far above a false witness.").

*Second*, conclusory assertions about what was "apparent to everyone" or that senior management "was aware" or was "notified of" of discussions about issues at Columbus cannot possibly establish with particularly what Messrs. Cannon or Karnes knew with respect to the alleged misstatements and do not satisfy the requirements of the PSLRA. (*See e.g.*, SAC ¶¶ 42-43, 124). None of the CWs making these claims alleges any dealings with either Mr. Cannon or Mr. Karnes (indeed, CW2 expressly denies as much (SAC ¶ 39)), nor does any CW identify any document or specific meeting otherwise pointing to their knowledge of falsity. *See e.g.*, *ArthroCare*, 726 F. Supp. 2d at 720 (allegations of confidential informants did not contribute to the inference of scienter where, as here, "[t]here is hardly a single instance in which one of the CWs alleges they had a conversation with or overheard a comment by [defendants]" and "[m]any of the CWs simply state their own conclusions about what occurred").[42] These vague allegations

---

[42] *See also Bamburg*, 2009 WL 1579512, at *8 ("'must have known' [allegations regarding] the current and future production rates . . . are not specific enough to support scienter"); *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1136 (E.D. Wash. 2013) ("generic allegations that 'everyone knew' are insufficient, because they do not establish that the CWs were in a position to gain personal knowledge of what Defendants saw,

are insufficient to plead actual knowledge.

### 2. Plaintiffs' motive and opportunity allegations are insufficient to establish scienter.

Plaintiffs also allege scienter based on "motive and opportunity," asserting that "Cannon and Karnes perpetuated…misrepresentations about the viability and production capabilities" in order to (1) "make KiOR and its Columbus Facility appear as an attractive investment opportunity" (SAC ¶ 129); (2) "enable" them to "remain employed and continue receiving their lucrative salaries" (SAC ¶ 130); and (3) reap the benefits of selling their stock (SAC ¶¶ 120, 140-46). In the Fifth Circuit, "allegations of motive and opportunity standing alone will not suffice." *Shaw*, 537 F.3d at 533; *Rosenzweig*, 332 F.3d at 867 ("It is well established that bare allegations of motive and opportunity will not suffice to demonstrate scienter."). In any case, none of these motives is sufficiently pleaded to even contribute to a strong inference of scienter.

### a. Corporate motives are insufficient to plead scienter.

Plaintiffs' allegations regarding KiOR's desire to attract investors and secure financing (SAC ¶ 122-29) cannot be the basis of the required inference of scienter because they pertain to motives common to all prudent corporate executives. *Franklin Bank*, 782 F. Supp. 2d at 377 ("Allegations that a defendant was motivated to commit fraud to . . . raise capital are . . . inadequate, because the executives of virtually every corporation in the United States would be subject to fraud allegations."); [43] *Abrams*, 292 F.3d at 434 (similar); *In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 265 (S.D.N.Y. 2004) (similar); *BMC Software*, 183 F.

---

knew or thought") (internal quotation marks omitted); *Alamosa Holdings*, 382 F. Supp. 2d at 858 ("Plaintiffs' attempts to base scienter pleadings on the confidential witness statements will not suffice because the allegations show no link between the confidential witnesses and any knowledge by any Defendant as to any allegedly improper activity.").

[43] *See also Franklin Bank*, 782 F. Supp. 2d at 377 ("Allegations of motives that are possessed by almost all corporate executives do nothing to enhance pleading of scienter. Scienter in a particular case may not be footed solely on motives universal to corporate executives, such as the desire to maintain the company's credit rating or maintain high stock prices to increase its value.") (internal quotation marks omitted).

Supp. 2d at 896 (similar).

Plaintiffs also claim that Messrs. Cannon and Karnes were motivated to sustain KiOR to continue their employment and to receive their "lucrative" salaries and compensation. (SAC ¶¶ 120, 143, 146.) But, as they do with generic "corporate motives," courts routinely hold that defendants' "desire to retain their jobs does not satisfy the scienter requirement." *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 289-90 (5th Cir. 2006) (citing *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994)). Indeed, such allegations are insufficient even where purported motive is to enhance (not merely maintain) compensation. *See, e.g.*, *Abrams*, 292 F.3d at 434 ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated.").

> **b.** **Plaintiffs' trading allegations do not support a strong inference of scienter.**

Plaintiffs' trading allegations as to Messrs. Cannon and Karnes not only are insufficient; they actually *undermine* any inference of scienter. To be probative of scienter, insider stock sales must be *unusual* and involve trading in "*suspicious amounts* or at *suspicious times*." *Shaw*, 537 F.3d at 543 (emphasis added). "Whether there is an unusual or suspicious pattern of insider trading may be gauged by such factors as timing of the sales (how close to the class period's high price), the amount and percentage of the seller's holdings sold, the amount of profit the insider received, the number of other insiders selling, or a substantial change in the volume of insider sales." *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 593-94 (S.D. Tex. 2003). "Context is critical to the analysis," and "the mere pleading of insider trading, without regard to either context or the strength of the inferences to be drawn, is not enough." *Id.* at 594 (internal quotation marks omitted). Plaintiffs' trading allegations fail to provide the critical

context required in order for *any* inference of scienter to be drawn.[44]

*First,* Plaintiffs ignore that Messrs. Cannon and Karnes' total holdings throughout the Class Period **increased by 21.6% and 91.6% respectively**.  (Ex. B.)[45]  This alone negates an inference of scienter.  *In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 325-26 (E.D.N.Y. 2013) (any inference of scienter negated by CEO's increase in total holding by the end of the class period); *Proter v. Medifast, Inc.*, 2013 WL 1316034, at *20 (D. Md. Mar. 28, 2013) ("any inference of scienter is clearly eviscerated by the fact that [defendant's] common stock holdings over the Class Period increased [by 21%]"); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (similar)

*Second,* Mr. Cannon's seven Class Period sales disposed of 0.1%, 0.5%, 0.7%, 0.3%, 0.2%, 0.5% and 1.2%, respectively of his total holdings, which amounts to 3.3% of his holdings during the Class Period.  (Ex. B at 1.)  Mr. Karnes's four sales disposed of 3.6%, 11.3%, 10.8%, and 1.8%, respectively, of his holdings, totaling 20.2% of his Class-Period holdings (which included only stock).  (Ex. B at 2.)  These figures belie any intent to divest a substantial portion of holdings, particularly where both defendants were **acquiring** additional stock during the same period.  *See Enron*, 258 F. Supp. 2d at 594 ("If an insider is in a significant position to know the 'true' facts and sells only 13% of his shares over a fifteen-month period, his trading percentage

---

[44] All that Plaintiffs allege as to insider sales is the amount of profits based on an "illustrative" calculation (SAC ¶ 120 n.9) that includes transactions predating the purported Class Period (SAC ¶¶ 141, 144).  Standing alone, this cannot  give rise to a strong inference of scienter, *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 898 (W.D.N.C. 2001) ("even large sales with large profits, without more, are not enough to satisfy a plaintiff's burden of pleading scienter"), and Plaintiffs fail to provide any other context which would suggest the sales were suspicious (because they cannot).

[45] Plaintiffs self-servingly omit nearly 900,000 units of Class B stock and (variously) between 3.4 and 4.2 million vested options that must be counted among Mr. Cannon's total Class Period holdings. (*Compare* SAC ¶ 141 *with* Ex. B. at 1.); *see, e.g.*, *BMC Software*, 183 F. Supp. 2d at 902 (Defendants' holdings comprised of stock *and* vested options); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 760-61 (1st Cir. 2011) (same).  Properly calculated as such, Mr. Cannon's seven Class-Period sales disposed of between 0.19% and 1.23% of his total holdings during the Class-Period.  (*See* Ex. B. at 1.) Even as to stock, Mr. Cannon's sales amounted to disposals of between 0.78% and 4.5% over the Class Period.  (*Id.*)  Similarly, Mr. Karnes' four sales only disposed of between 1.8% and 11.3% of his total Class Period holdings (which included only stock). (*Id.*)

belies any intent to rid himself of a substantial portion of his holdings.") (internal quotation marks omitted); *Oppenheim Pramerica Asset Mgmt. SARL v. Encysive Pharm., Inc.*, 2007 WL 2720074, at *5 (S.D. Tex. Sept. 18, 2007) (no cogent inference of scienter "[b]ecause the sales were of small percentages [17.59% and 13.79%] and only by two insiders," and because "[e]ach had sold shares prior to the Class Period and each retained the vast majority of their shares throughout the Class Period").

*Third*, in any event (and as disclosed on their Forms 4),[46] each of Messrs. Cannon's and Karnes's sales during the Class Period was executed "to satisfy [their] federal income tax obligations with respect to" the vesting of restricted stock units or the receipt of an equity award."[47]  (*See e.g.*, Exs. JJ, WW).  Such tax-motivated sales do not support an inference of scienter.  *See Congregation of Ezra Shalom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 165 (N.D. Tex. 2007) (sales "pursuant to a prearranged sale plan for tax purposes…do not support a strong inference of scienter");  *Hammerstone NV, Inc. v. Hoffman*, 2010 WL 882887, at *9-10 (S.D.N.Y. Mar. 10, 2010) ("according to a 'Form 4' filed with the SEC, [defendant] sold … little more than 10% of his [holdings] and did so for the stated purpose of 'satisfying tax liabilities associated with the vesting of restricted stock," which is "not sufficiently unusual to demonstrate motive").[48]

---

[46] The Forms 4 are referenced in the SAC. (*E.g.,* SAC ¶ 141.)  Moreover, "[b]ecause insider corporate executives must document their stock transactions (on a Form 4, Statement of Changes in Beneficial Ownership) and file the documents with the SEC," the Forms 3 and 4 "are public records that may appropriately be reviewed on a motion to dismiss." *Enron*, 258 F. Supp. 2d at 593 n.12 (citing *Lovelace*, 78 F.3d at 1017-18).

[47] The best Plaintiffs manage to conjure regarding the timing of any sales is that Messrs. Cannon and Karnes "began" selling their stock "shortly after February 2013," which "coincides" the departure of "several significant" members of the operations staff.  (SAC ¶ 142.)  But Plaintiffs' own chart indicates that Defendants did not "begin selling ... stock shortly after February 2013."  Each Defendant is listed as having executed several trades well over year before.  Moreover, these allegations are bereft of any particulars as to the significance of the departures, Defendants' knowledge of them, or any connection between departures in February and sales in March.

[48] *See also Bristol-Myers Squibb*, 312 F. Supp. 2d at 561 (granting motions to dismiss and citing defendants' Forms 4 and 5 that "show a consistent pattern of trading undertaken primarily to make payments required for the exercise of stock option or to pay taxes"); *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 59-60 (E.D.N.Y. 1998) (sales to

*Fourth,* Plaintiffs say nothing about the timing of the sales vis-à-vis the stock price or any of the allegedly false statements.[49] *Southland*, 365 F.3d at 369 (insider's sales were not suspicious, in part, because they did not come immediately after an allegedly misleading statement caused spike in share price); *Shaw*, 537 F.3d at 543-44 (insider's sales not suspicious, in part, because, although they occurred after positive announcement, they "missed the immediate price spike following the announcement"); *id.* ("Suspicion may be generated if the sales are . . . made at times *calculated to maximize* personal profit.") (emphasis added). This failure is not surprising given that, as described above, all sale were made for the express purpose of satisfying tax obligations.

*Finally*, Plaintiffs' allegations of stock sales by five non-defendant, non-speaking insiders are irrelevant to the scienter analysis. *See In re Cyberonics, Inc. Sec. Litig.*, 523 F. Supp. 2d 547, 554 n.10 (S.D. Tex. 2007), *aff'd sub nom. by Catogas v. Cyberonics, Inc.*, F. App'x 311 (5th Cir. 2008); *In re Michaels Stores, Inc. Sec. Litig.*, 2004 WL 2851782, at *13 (N.D. Tex. Dec. 10, 2004) (citing *Southland*, 365 F.3d at 380 n.17); *Alamosa Holdings*, 382 F. Supp. 2d at 860. For all these reasons, Plaintiffs' allegations of insider trading do not support a strong inference of scienter.

---

meet tax obligations not indicative of fraud), *aff'd sub nom. by Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999).

[49] Because the Class Period encompasses half the public life of the Company, the fact that neither Mr. Cannon nor Mr. Karnes "sold shares prior to March 2012"—only eight months after KiOR went public and eight months in advance of the Class Period—is not "noteworthy" and adds nothing to the scienter analysis. *See Southland*, 365 F.3d at 368 n.11 ("the brevity of the period" (i.e., eight months) between IPO and Class Period "dissipates any significance" of allegations defendants "sold no stock" during this time). In fact, the Individual Defendants were precluded from selling stock by a post-IPO lock-up that lasted until December 21, 2011(180 days after the June 24, 2011 Prospectus). (Ex. D at 128.) As for post-class period trading, Plaintiffs' assertion that anything can be drawn from two months of post class period trading activity, during which neither Defendant traded, is meritless.

### 3. Plaintiffs' attempt to plead scienter by status fails[50]

Plaintiffs next resort to pleading scienter by status, asserting that given "Cannon and Karnes' positions" they were aware of certain "red flags" (KiOR's growing deficit, operating losses and start-up costs) and therefore could not have possibly believed their statements to the public about future projections were true. (SAC ¶¶132-35.) However, "[Fifth Circuit] case law makes clear that pleading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." *Shaw*, 537 F.3d at 535; *Abrams*, 292 F.3d at 432; *Magruder v. Halliburton Co.*, 2009 WL 854656, at *9 (N.D. Tex. Mar. 31, 2009) ("Corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pled.").[51]

Plaintiffs also seek to plead scienter under the so-called "core operations" doctrine (SAC ¶131), a narrow exception under which—in extraordinary circumstances—courts permit the inference that executives "must have known" certain facts. Although some cases have recognized this doctrine in very limited circumstances, *see Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 425 (5th Cir. 2001) (inferring that CEO of one-product company knew status of product's patent), many others within the Fifth Circuit have rejected it and demanded specific allegations showing actual knowledge. *See Rosenzweig*, 332 F.3d at 867-68 (rejecting plaintiffs' argument that "the failure of [defendant's] core business . . . supports the inference that defendants knew or

---

[50] Because they fail to allege adequately any motive for the purported fraud, Plaintiffs' other circumstantial allegations must provide an even stronger inference of scienter than if a motive were properly pled. *See Dawes*, 975 F. Supp. 2d at 690 ("Where a defendant's motive is not apparent … the strength of the circumstantial allegations must be correspondingly greater." (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 644-45 (5th Cir. 2005))).

[51] Moreover, Plaintiffs' repackaging of certain financial metrics as "red flags" conveniently ignores that run times were increasing quarter over quarter, as were production volumes and overall Plant reliability—operational metrics that supported Management's belief about the Facility's future outputs. *See, e.g.*, Ex. BB at 3 (Q4 production of 385,000 gallons (a 640% increase over Q1) and 894,000 gallons for 2013)); Ex. T at 2 (Q2 on-stream percentage doubles Q1); Ex. BB at 3 (Q4 on-stream percentage highest yet, nearly 30% increase over Q3)

recklessly disregarded [defendant's] prospects for success" and holding that plaintiffs must "identify exactly who supplied the information or when they knew the information"); *Dawes*, 975 F. Supp. 2d at 698-99 (dismissing complaint because allegations that defendants "were likely aware of important issues affecting" refined sugar sales on account of the company's "business centered around refined sugar sales," and "by virtue of their senior executive positions," were insufficient to infer "that knowledge could be presumed under the limited circumstances permissible under *Nathenson*" and noting that "[t]he Fifth Circuit and other courts have been reluctant to apply *Nathenson's* limited exception to the particularized pleading required for scienter").[52]  In any event, whether or not core operations applies, not one of the facts of which the Individual Defendants "were intimately aware" plausibly suggests any statement was false when made.  *See supra* § V.A.  Therefore, none of the statements could have been made with the requisite scienter.  *See, e.g.*, *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1232 (S.D. Cal. 2001) (if statements are not false, "scienter entails the illogical inquiry into whether the defendant intended to deceive when, in fact, there was no deception").

### 4.   The resignation of KiOR's CFO does not support an inference of scienter.

Finally, neither the announcement of Mr. Karnes' resignation without a specific denial that it was connected in any way to KiOR's operations or forecasts, nor the prior resignations of two directors (SAC ¶¶ 137-138), shows scienter.  *See Southland,* 365 F.3d at 383 (resignations of

---

[52] *See also In re Houston Am. Energy Corp. Sec. Litig.*, 970 F. Supp. 2d 616, 653  (S.D. Tex. 2013) (core operations insufficient to establish cogent and compelling inference of scienter even though company had only three employees and where court found that "it is not reasonable that … [they] did not thoroughly discuss the problems … and/or that [they] were not fully apprised of the specific details of the actual situation when the challenged disclosures to potential investors were made about the drilling of the well"); *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 754 (S.D. Tex. 2003) ("core operations" allegations fail "without some additional facts such as exposure to content-identified internal corporate documents (and who drafted them, who received them or how plaintiffs learned of them) or specific conversations or attendance at specified management or board meetings dealing with such problems").

executives do not contribute to scienter analysis).[53]

### 5. Plaintiffs do not plead scienter as to KiOR.

As to KiOR, "a defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or she makes the statement." *Southland*, 365 F.3d at 366. Having failed to establish the requisite scienter of Messrs. Cannon or Karnes, Plaintiffs, *a fortiori*, fail to plead a strong inference of scienter as to the Company.

### D. Plaintiffs have not alleged a control person cause of action under section 20(a).

Having failed to plead a primary violation, Plaintiffs' Section 20(a) "control person" claim fails as well. *Dawes*, 975 F. Supp. 2d at 711 (dismissal of Section 10(b) claims requires dismissal of Section 20(a) claims because "'control person liability is secondary only and cannot exist in the absence of a primary violation'") (quoting *Southland*, 365 F.3d at 383).

## VI. CONCLUSION

Defendants respectfully request that the Court dismiss the SAC with prejudice, and that the Court order such further relief to which Defendants may be justly entitled.

---

[53] *See also ArthroCare*, 726 F. Supp. 2d at 724-25 ("multiple Fifth Circuit decisions suggest resignations have little implication on the scienter analysis" and, as such, even where resignations of CEO and CFO "expressly" resulted because of facts discovered in post-restatement-announcement internal review they "bear little, if at all, on the scienter analysis" (citing *Southland*, 365 F.3d at 383, *Abrams*, 292 F.3d at 434)).

Respectfully submitted,

**Defendants KiOR, Inc., and Fred Cannon**

By their Attorneys,

*Of Counsel*:
(admitted *pro hac vice*)                    */s/ Cristina Espinosa Rodriguez*
Michael G. Bongiorno                          David D. Sterling
Peter J. Kolovos                                       *Attorney-In-Charge*
Peter A. Spaeth                                     Texas Bar No. 19170000
Gregory D. Chisholm                          Federal I.D. No. 07079
Kerry Tipper                                          Cristina Espinosa Rodriguez
WILMER CUTLER PICKERING            Texas Bar No. 00793701
    HALE AND DORR LLP                Federal I.D. No. 20575
60 State Street                                        BAKER BOTTS LLP
Boston, Massachusetts  02109            One Shell Plaza, 910 Louisiana Street
Telephone: (617) 526-6000                Houston, Texas 77002
Fax: (617) 526.5000                            Telephone: (713) 229-1234
michael.bongiorno@wilmerhale.com    Fax: (713) 229-1522
                                                           cristina.rodriguez@bakerbotts.com

Dated July 3, 2014

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served electronically on the following counsel of record on this the 3rd day of July, 2014.

/s/ Cristina Espinosa Rodriguez
Cristina Espinosa Rodriguez

James L. Gascoyne
Deborah Jean Bullion
GASCOYNE & BULLION, PC
77 Sugar Creek Center Blvd., Ste. 280
Sugar Land, TX 77478
gascoyne@bgpclaw.com

Nicholas I. Porritt
Adam M. Apton
LEVI & KORSINSKY LLP
1101 30th Street NW, Suite 115
Washington, D.C. 20007
nporritt@zlk.com

Phillip Kim
Laurence M Rosen
THE ROSEN LAW FIRM, P.A.
275 Madison Ave., 34th Floor
New York, NY 70016
pkim@rosenlegal.com
lrosen@rosenlegal.com

Ronald Dean Gresham
PAYNE MITCHELL LAW GROUP
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
dean@paynemitchell.com

Noelle M. Reed
Wallis M. Hampton
SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
1000 Louisiana St., Ste 6800
Houston, TX 77002
noelle.reed@skadden.com
wallis.hampton@skadden.com