UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DAVE CARLTON and SHARON KEGERREIS, Individually and On Behalf of All Others Similarly Situated, | § § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:15-cv-00012 |
| | § | |
| FRED CANNON, JOHN K. KARNES, and VINOD KHOSLA, | § § | JURY TRIAL DEMANDED |
| | § | |
| Defendants. | § | |

**JOHN KARNES'S REPLY IN SUPPORT OF HIS
MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT**

Noelle M. Reed
Attorney-in-Charge
State Bar No. 24044211
Federal Bar No. 27139
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
Telephone No.:  713-655-5122
Facsimile No.:   713-483-9122
E-mail:  noelle.reed@skadden.com

Of Counsel:
Wallis M. Hampton
State Bar No. 00784199
Federal Bar No. 16123
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
Telephone No.:  713-655-5116
Facsimile No.:   713-483-9116
E-mail:  wallis.hampton@skadden.com

**ATTORNEYS FOR DEFENDANT
JOHN KARNES**

# TABLE OF CONTENTS

Introduction ...............................................................................................................1

Argument ...................................................................................................................2

I.     Plaintiffs are still putting words in Karnes's mouth. ..........................................2

II.    Plaintiffs have not pleaded with particularity that Karnes himself made any false
statements. ...........................................................................................................2

      A.    Plaintiffs have not demonstrated that the two challenged statements in the
SEC filings were false. .................................................................................2

      B.    The Columbus Facility's past performance didn't limit its future possibilities. .........4

      C.    Plaintiffs cannot rewrite history about the definition of "technology." .....................4

III.    The PSLRA safe harbor protects most of Karnes's statements. .......................................5

IV.    Plaintiffs have not pleaded a strong inference that Karnes acted with scienter. ................8

      A.    Plaintiffs can't piggyback allegations about what others allegedly knew onto
their allegations about what Karnes knew. ..............................................................8

      B.    The Court should not assume that Karnes must have known the alleged truth
about operational issues. ...........................................................................................9

            1.    The core operations doctrine should not apply – and certainly not to
impute knowledge of operational issues to a CFO ...........................................10

            2.    Publicly disclosed "red flags" don't show scienter; they refute it. .................11

            3.    What ultimately happened at KiOR after Karnes resigned doesn't
show scienter ...................................................................................................11

      C.    The "circumstantial" allegations don't salvage Plaintiffs' scienter theory. ..............12

            1.    The Fifth Circuit rejects generic motive allegations. .....................................12

            2.    Far from supporting an inference of scienter, Karnes' stock sales and
resignation refute it ........................................................................................13

            3.    The impairment charge doesn't change the analysis. ......................................14

      D.    Taken together, the scienter allegations show a financial executive who relied
on operational people for information on operational matters ..................................15

Conclusion ...............................................................................................................16

TABLE OF AUTHORITIES

**CASES**

*Abrams v. Baker Hughes Inc.*,
    292 F.3d 424 (5th Cir. 2002)......................................................................................12

*Asher v. Baxter International Inc.*,
    377 F.3d 727 (7th Cir. 2004)........................................................................................7

*Dawes v. Imperial Sugar Co.*,
    975 F. Supp. 2d 666 (S.D. Tex. 2013)..............................................................8, 10, 11

*Dorsey v. Portfolio Equities, Inc.*,
    540 F.3d 333 (5th Cir. 2008)......................................................................................10

*Fitzpatrick v. Uni-Pixel, Inc.*,
    35 F. Supp. 3d 813 (S.D. Tex. 2014)..........................................................................10

*Goldstein v. MCI WorldCom*,
    340 F.3d 238 (5th Cir. 2003)......................................................................................15

*Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
    537 F.3d 527 (5th Cir. 2008)........................................................................................9

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009)....................................................................................7, 9

*Magruder v. Halliburton Co.*,
    No. 3:05-CV-1156-M, 2009 WL 854656 (N.D. Tex. Mar. 31, 2009) ...........................11

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001)......................................................................................10

*Scanlan v. Texas A&M University*,
    343 F.3d 533 (5th Cir. 2003)......................................................................................14

*Simons v. Dynacq Healthcare, Inc.*,
    No. H-03-05825, 2006 WL 1897270 (S.D. Tex. Jul. 10, 2006) .......................................5

*Spitzberg v. Houston American Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014)........................................................................................4

*Stockman v. Flotek Industries, Inc.*,
    No. H-09-2526, 2010 WL 3785586 (S.D. Tex. Sept. 29, 2010) .......................................5

*Stone v. Life Partners Holdings, Inc.*,
    26 F. Supp. 3d 575 (W.D. Tex. 2014) ...............................................................7, 10, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................8, 15

*Trendsetter Investors, LLC v. Hyperdynamics Corp.*,
    No. H-06-0746, 2007 WL 172627 (S.D. Tex. Jan. 18, 2007)....................................12-13

*Tuchman v. DSC Communications Corp.*,
    14 F.3d 1061 (5th Cir. 1994) .......................................................................................12

## STATUTES

15 U.S.C. § 78u-5(c)(1)................................................................................................6

15 U.S.C. § 78u-5(c)(1)(A)(i) ...................................................................................6, 7

To the Honorable Judge of Said Court:

While Karnes incorporates by reference the arguments made in his co-defendants' reply briefs filed today, he writes this separate reply to address several matters that are particularly relevant to the allegations made against him.

## Introduction

KiOR failed because of operational problems.  John Karnes was the CFO.  He had no responsibility for operations.  Virtually none of the allegations in the case link him to any knowledge whatsoever of operational issues.[1]  Aware of the obstacles this creates for them, Plaintiffs have resorted to sweeping generalizations about what the "Executive Defendants" said and knew.

These statements collapse under scrutiny.  Karnes is alleged to have made only a handful of the challenged statements, most of which fall squarely within the PSLRA safe harbor for forward-looking statements.  Plaintiffs' scienter allegations fare no better.  Plaintiffs claim to have a host of confidential witnesses, but only one of them purports to assert that Karnes knew about any misstatements – and even there, it concerned only a single statement about yields in the demonstration unit.  Plaintiffs do not explain why Karnes should have credited this individual's unspecified concerns after other operations personnel considered them.  Nor do they explain why a CFO would have known the details of the operational issues.

Read fairly, the allegations show that Karnes did what all CFOs should do:  He focused on his sphere of responsibility (financial matters) and relied on operational people to address operational matters.  The claims against him should be dismissed.

---

[1]   By differentiating Karnes's status as CFO from that of operations personnel, Karnes does not intend to imply that Cannon or any other operations personnel knew of any misstatements to the public.

<u>Argument</u>

**I.     Plaintiffs are still putting words in Karnes's mouth.**

Karnes's Motion to Dismiss explained that the Fifth Circuit prohibits group pleading. (Motion at 2-3.) Plaintiffs simply ignore this caselaw and continue to refer to what the undifferentiated "Executive Defendants" allegedly told investors. (*See, e.g.*, Opp. at 1, 5-6, 12-13, 16 n.5, 23.) But Karnes clearly didn't make most of the challenged statements. The only issue is whether he is liable for the few specific statements that Plaintiffs attribute to him.

**II.    Plaintiffs have not pleaded with particularity that Karnes himself made any false statements.**

The Motion explained why Karnes made no misrepresentations about the nature of KiOR's start-up costs. (Motion at 9.) Because Plaintiffs did not respond to this argument, the only questions are whether Karnes's specific statements in SEC filings, his production guidance, or his oral statements about KiOR's technology are actionable.

**A.     Plaintiffs have not demonstrated that the two challenged statements in the SEC filings were false.**

Plaintiffs challenge two statements in several SEC filings signed by Karnes: (1) the projection that KiOR could eventually produce fuel at $1.80/gallon in a standard commercial facility, and (2) the statement that KiOR had achieved yields of approximately 67 gallons of fuel in the demonstration unit.

The Opposition mentions the $1.80 projection only in passing. (Opp. at 24.) And with good reason: The Complaint attacked that projection on the ground that the 2011 production costs in the demonstration unit or pilot facility were much higher. But the projection itself makes clear that it assumed that the costs would eventually be lower in a standard commercial facility.

2

Plaintiffs' two arguments on the yield issue are also meritless. First, they contend that CW6 said in 2010 that the technology wasn't ready for commercialization prior to the IPO. (Opp. at 23.) But knowing the technology's status at some point in 2010 says little about its status in 2011. And, of course, no one ever claimed that the technology was ready to be commercialized at the time of the IPO. In fact, the Prospectus expressly disclosed that KiOR was a development stage company that had not yet commercialized its fuel products. (Ex. 5 (6/24/11 Prospectus) at 13.) It also warned that KiOR might not achieve commercial-scale production on a cost-effective basis. (*Id.*)

Second, Plaintiffs contend that CW6's colleagues "questioned the accuracy" of yield information and that CW6 "was aware of data that indicated yields of less than 40 gallons per ton." (Compl. ¶ 50; Opp. at 23-24.) But Plaintiffs cannot answer the basic flaws in their argument:

- The fact that <u>some</u> demonstration unit data showed yields of 40 gallons does not mean that <u>other</u> data didn't show yields of 67 gallons. At the time of the IPO, KiOR was still a development-stage company that was trying to determine how best to commercialize its business. It's hardly surprising to hear that KiOR's testing experiments might generate a range of yields.

- Plaintiffs contend that given his job and technological role, CW6 would have known the "true" 40 gallon yield data. (Opp. at 24.) But that is not the issue. The question is whether CW6 would have known <u>all</u> the yield data. Plaintiffs never allege that he did. If CW6 had claimed to have known all the test results, Plaintiffs undoubtedly would have said so.

- Finally, Plaintiffs misunderstand the importance of where the "yield" is being measured. As Plaintiffs recognize, the entire biofuel production process included several phases, including catalytic cracking, product recovery, and hydrotreating. (Compl. ¶ 77.) Plaintiffs do not allege that CW6's statements about the yield were based on the same methodology that the company had used to measure yield.

Accordingly, Plaintiffs have failed to sufficiently demonstrate that the statements about yield were false.

3

**B.     The Columbus Facility's past performance didn't limit its future possibilities.**

Because Cannon's briefing addresses in detail the problems with Plaintiffs' theory about the production guidance, Karnes will focus on one critical point.  Plaintiffs repeatedly say that the projections were false because they assumed that the Columbus Facility would increase its production rates.  (Opp. at 32-33, 37.)  But that's the lifecycle of every new plant:  Production builds over time.  (Motion at 8.)  Plaintiffs offered no response to this point.

**C.     Plaintiffs cannot rewrite history about the definition of "technology."**

Plaintiffs try to distort Karnes's statements that the problems at the Facility did not concern KiOR's technology into a generalized representation that the Facility had no significant start-up problems.  (Opp. at 35.)  But start-up issues and technology are different concepts.  Plaintiffs offer no particularized facts suggesting that the technology itself (*i.e.*, the catalytic cracking process) did not work.  Indeed, they admit that the Facility was producing fuel.  (*Id.* at 32.)

Plaintiffs try to finesse this by arguing that investors may not have perceived a difference between technology and start-up problems.  (Opp. at 35.)  The question is whether Plaintiffs' interpretation of Karnes's statements was "'at least as compelling as any opposing inference one could draw'" about what Karnes had meant.  *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 685 (5th Cir. 2014) (citation omitted).  In *Spitzberg*, for instance, the Fifth Circuit concluded that giving such terms as "reserves" their commonly-accepted industry meaning was at least as compelling as giving them the idiosyncratic definitions offered by the defendants.  *See id*. at 684-85.

Here, Plaintiffs cite nothing suggesting that investors treated "technology" and start-up issues interchangeably.  The contemporaneous public statements demonstrate that Karnes used

4

the term "technology" to refer only to KiOR's catalytic conversion process itself.[2]   And in the two statements at issue, Karnes specifically distinguished between the underlying technology and the issues that the Facility was having.  (Compl. ¶¶ 123, 134.)  In essence, Plaintiffs' argument boils down to the argument that core technology and start-up issues are the same because Plaintiffs say that they are.  That spurious reasoning cannot support a fraud claim.

## III.   The PSLRA safe harbor protects most of Karnes's statements.

Karnes's projections about the anticipated cost of fuel production and the Columbus Facility's future performance were quintessential forward-looking statements.  *See, e.g.*, *Stockman v. Flotek Indus., Inc.*, No. H-09-2526, 2010 WL 3785586, at *24 (S.D. Tex. Sept. 29, 2010) (holding that earnings guidance was a forward-looking statement).  Unable to dispute this, Plaintiffs urge the Court to apply the "mosaic misrepresentation" theory.  (Opp. at 15.)  That theory, however, concerns whether someone made a material misstatement.  *See Simons v. Dynacq Healthcare, Inc.*, No. H-03-05825, 2006 WL 1897270, at *1-2 (S.D. Tex. Jul. 10, 2006).  It has nothing to do with the PSLRA safe harbor.

As to the safe harbor, Plaintiffs argue that Defendants made mixed present/future statements.  But they admit, as they must, that the safe harbor protects those portions of mixed statements that are forward-looking.  (Opp. at 16.)  Karnes's cost projections and production guidance were forward-looking on their face and Plaintiffs do not argue otherwise.  Whether other statements by other Defendants were forward-looking is irrelevant to whether Karnes's

---

[2]   In his May 29, 2013 presentation, Karnes stated that KiOR wanted "to come up with a wholly new fuel technology using a different feedstock, a different process and resulting in a different product . . . . The catalyst scientist that founded KiOR challenged the proposition of following the natures [sic] path for making hydrocarbon, crude oil, but doing it in seconds catalytically essentially using <u>fluid catalytic cracking technology</u> . . . ."  (Ex. 22 (5/29/13 transcript) at 1-2 (emphasis added).)  Likewise, in the August 8, 2013 conference call, Cannon explicitly distinguished between the start-up issues and the core technology:  "These are the types of start-up issues we are experiencing . . . .  As has been the case since we first started the facility, these issues are not related to our core technology."  (Ex. 25 (8/8/13 transcript) at 2.)

5

cost projections and production guidance were forward-looking statements.

As Cannon's briefing explains, the safe harbor protects forward-looking statements if (1) they are identified as forward-looking statements and are accompanied by meaningful cautionary statements, or (2) the plaintiff fails to sufficiently plead that the speaker had actual knowledge of their falsity.  *See* 15 U.S.C. § 78u-5(c)(1).  Karnes's guidance is protected under both prongs.

*Karnes's projections were accompanied by meaningful cautionary statements.*  While Plaintiffs generally contend that various cautionary statements were inadequate, they largely ignored the specific warnings that accompanied Karnes's guidance.  (Opp. at 19-20.)  All of Karnes's oral guidance was combined with oral warnings about the difficulty in making predictions because of the Columbus Facility's limited production history.  (Motion at 12-13.)

Meaningful, written cautionary statements also accompanied Karnes's projections.  The warnings addressed the very matters at issue in this case, including KiOR's status as a development-stage company, its lack of experience conducting operations on a commercial scale, the "technical challenges developing [its] commercial production processes," the risk that KiOR would not achieve cost-effective commercial scale production or would not improve the Columbus Facility's performance, and the risk that KiOR could not increase its yields.  (Motion at 11-12.)

Under the PSLRA, the cautionary statements must warn of "important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1)(A)(i).  These warnings fully met that test.  They provided meaningful warnings about the potential problems that might (and, according to Plaintiffs, ultimately did) affect the Columbus Facility's production.  That alone disproves Plaintiffs' conclusory assertion that they were not company-specific.

These warnings stand in stark contrast to the vague statements described in Plaintiffs' authority. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 246 (5th Cir. 2009) (statement only warned of "limited, general, and vague risk to customer satisfaction and to [the company's] independent discretion"); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 733-34 (7th Cir. 2004) (court could not determine whether the warnings concerned the actual risks facing the company); *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 598 (W.D. Tex. 2014) (projections stated what was "predicted" or "expected").

Plaintiffs' remaining argument – that the cautionary statements were "drowned out" by the forward-looking statements – is nonsensical.  (Opp. at 19-20.)  Plaintiffs cite the fact that Defendants "openly acknowledge[d] the existence of production or revenue recognition problems" before making projections as evidence that the safe harbor doesn't apply.  (*Id.* at 21.) But that stands the safe harbor on its head.  The entire point of the safe harbor is to protect forward-looking statements that are accompanied by meaningful cautionary statements.  If the safe harbor vanishes whenever there is tension between the projections and the warnings, then it is meaningless.  Unsurprisingly, Plaintiffs' hypothesis is not the law.  The safe harbor applies so long as meaningful cautionary statements are made.  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).

*Plaintiffs didn't even try to show that Karnes actually knew his projections were false.* While Plaintiffs generally assert that the Executive Defendants had actual knowledge that the forward-looking statements were false, their entire discussion of that issue centers around Cannon's alleged knowledge.  (Opp. at 17-18.)  Plaintiffs do not identify a single communication or document that Karnes received that would have made him aware that his specific forward-looking statements were false.  Moreover, Section IV *infra* explains how Plaintiffs have failed to allege with particularity that Karnes had scienter.  If Plaintiffs' allegations do not satisfy the

lesser standard of scienter, they necessarily do not show actual knowledge.

**IV.    Plaintiffs have not pleaded a strong inference that Karnes acted with scienter.**

      **A.    Plaintiffs can't piggyback allegations about what others allegedly knew onto their allegations about what Karnes knew.**

As this Court has noted, "'[o]missions and ambiguities count against inferring scienter.'" *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 689 (S.D. Tex. 2013) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007)).    Here, the gaps in Plaintiffs' allegations are glaring.    Plaintiffs do not specifically allege that Karnes (the CFO) had any supervisory responsibility over operational or technical issues.    Most of their confidential witnesses do not claim that Karnes was aware of any specific operational issues at the Columbus Facility.    (Compl. ¶¶ 40-47, 55-75.)    Plaintiffs describe "daily operational meetings," but say only that the attendees included the Columbus Facility's unnamed senior management and engineers from headquarters.    (*Id.* ¶ 172.)    And they cannot identify a single operational report that went to Karnes.

Aware of these pleading deficiencies, Plaintiffs repeatedly say that the "Executive Defendants" were told of operational issues.    (Opp. at 39-42.)    But most of their specific allegations on this point don't involve Karnes.    Moreover, Plaintiffs do not allege any facts suggesting that anyone alerted Karnes to any particular problems at the Columbus Facility.    The closest they come to alleging that Karnes knew of any concerns with KiOR's public statements involve several ambiguous allegations about the demonstration unit's yield in 2011 – and even here, Plaintiffs manufacture new allegations or affirmatively misrepresent what the Complaint actually alleged:

- Plaintiffs generally assert that O'Connor and CW6 alerted the "Executive Defendants" to operational issues on at least six occasions.    (Opp. at 39.)    But the Complaint doesn't allege that O'Connor communicated at all with Karnes. (Compl. ¶¶ 60-75.)

8

- They also rewrite the Complaint's allegations about CW6.  The Complaint did not identify the nature of CW6's alleged "complaints" to Karnes in 2011. (Compl. ¶¶ 50, 52.)  In their brief, however, Plaintiffs assert for the first time that these complaints concerned KiOR's yield capabilities.  (Opp. at 39.)

- The Opposition asserts that sometime in or after September 2011, Coates cited the alleged yield problems to Cannon and Karnes and accused them of "cook[ing] the books."  (Opp. at 39-40.)  In the Complaint, however, CW6 stated that Coates left the Company before this meeting ever occurred. (Compl. ¶ 52.)

- The Opposition also attaches the Mississippi Complaint, which contains an ambiguous reference to Coates telling Cannon and Karnes in September 2011 that they had "cooked the books."  (Opp. Ex. C (Mississippi Complaint) ¶ 4.122.)  But contrary to Plaintiffs' assertion, the Mississippi Complaint does not explain what Coates meant by this accusation.  It also conflicts with CW6's allegations that Coates raised his concerns to Cannon alone.  (*See* Compl. ¶ 52.)

Moreover, even under the most generous reading of these allegations, CW6 and Coates raised their operational concerns to superiors with technical and operational responsibility.  And the senior operations personnel rejected them.  Plaintiffs make no attempt to explain why – if Karnes had been told of these issues – he should have credited them after the technical and operational experts vetted them.  This is in marked contrast to Plaintiffs' authority, where specific internal communications showed the defendants knew about a program's problems and defendants admitted that they knew about those problems.  *See Lormand*, 565 F.3d at 253-54.

**B.     The Court should not assume that Karnes must have known the alleged truth about operational issues.**

Plaintiffs' generalized speculation that Karnes was "aware (or should have been aware) of KiOR's and the [Columbus] Facility's failing operations" fares no better.  (Opp. at 42.)  The Fifth Circuit has repeatedly held that corporate officers are not presumed to know of misstatements based on their positions in the company.  *See, e.g.*, *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008).  That principle is particularly compelling here, where Plaintiffs contend that a CFO "should have been aware" of

the details of operational issues.

> 1. **The core operations doctrine should not apply – and certainly not to impute knowledge of operational issues to a CFO.**

This Court has previously noted that the core operations doctrine is a "limited exception" that courts "have been reluctant to apply." *Dawes*, 975 F. Supp. 2d at 699 (rejecting argument that defendants at sugar company would have known of problems with refined sugar purchases). For instance, courts typically apply this doctrine to companies with a small number of employees where other specific allegations supported an inference that the defendant would have known the allegedly-undisclosed truth. *See, e.g.*, *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 337-38, 342-43 (5th Cir. 2008) (allowing common law claim to proceed where eight-employee company already had operational history of failing to secure loans despite representations to the contrary); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001) (complaint "barely" pleaded scienter concerning misstatements about patent's scope where company with fewer than 40 employees had been working on patent application for two years); *Fitzpatrick v. Uni-Pixel, Inc.*, 35 F. Supp. 3d 813, 829-30 (S.D. Tex. 2014) (defendants attended meeting at which alleged production problems at the 27-employee company were discussed).

In *Stone*, for instance, the company's entire business model hinged on a "sham product": the pricing and sales of insurance policies based on the analysis of a single medical doctor with little actuarial experience. *Stone*, 26 F. Supp. 3d at 583. The company's audit committee had expressed concern about the discrepancies between the life expectancy predictions and the actual results, the company's regulatory filings reflected this same discrepancy, and a third party had warned the defendants that the company was not exercising appropriate oversight over its life expectancy calculations. *Id.* at 600-01.

In contrast, KiOR had 212 employees at the end of 2012 and 183 employees at the end of

2013.  (Ex. 17 (2012 10-K) at 14; Ex. 34 (2013 10-K) at 11.)  That fact alone renders the core operations doctrine inapplicable.  This conclusion is particularly compelling as to Karnes.  Plaintiffs' own witnesses demonstrate that operations personnel reported to operations personnel on operational issues.  Plaintiffs do not, and cannot, explain why this Court should infer that the CFO would have known all the allegedly undisclosed details about the Columbus Facility's operational issues, particularly given that none of Plaintiffs' witnesses has suggested that he did.

### 2.    Publicly disclosed "red flags" don't show scienter; they refute it.

Plaintiffs assert that the Columbus Facility's increasing costs, accumulated deficit, and net operating losses were red flags that alerted Karnes to the problems at the Columbus Facility – yet KiOR disclosed this information to the public.  (Compl. ¶¶ 181-82.)  If Karnes were trying to defraud the market, why would he have disclosed these alleged red flags?  Plaintiffs had no answer to this.  The Fifth Circuit has considered this question and found that publicly-disclosed "red flags" do not support a scienter inference:  "It is difficult to form a 'strong inference' of scienter from the alleged undercapitalization of a company when plaintiffs appear to concede that the company accurately disclosed its capital structure and financial obligations in its prospectus." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 868 (5th Cir. 2003).

### 3.    What ultimately happened at KiOR after Karnes resigned doesn't show scienter.

Plaintiffs' arguments about the gross disparity between the projections and actual performance are equally meritless.  This Court has considered the magnitude of the misstatement in the scienter analysis only in limited circumstances.  *See Dawes*, 975 F. Supp. 2d at 691-92; *see also Magruder v. Halliburton Co.*, No. 3:05-CV-1156-M, 2009 WL 854656, at *9 (N.D. Tex. Mar. 31, 2009) (rejecting theory).  Cannon's reply brief explains the basic flaws in Plaintiffs' reliance on this doctrine.  Moreover, this approach conceivably might make some sense in

limited instances involving mature companies operating in mature industries where the projections are presumably more predictable. That logic doesn't apply to companies such as KiOR. Whether a start-up can execute its business plan is inherently uncertain, especially if it is developing a new type of product. Start-up businesses often fail despite their best efforts, and frequently come nowhere close to meeting their projections. For that reason, KiOR specifically warned its investors of the "substantial risk of failure" it faced in its attempt to develop a new product. (Ex. 4 (Prospectus) at 13.) Adopting Plaintiffs' theory in this context could allow this limited exception to swallow the general pleading principles in cases involving startups.

### C.   The "circumstantial" allegations don't salvage Plaintiffs' scienter theory.

Lacking any compelling particularized allegations about what Karnes actually knew, Plaintiffs fall back on several "circumstantial" allegations. But these allegations are flatly inconsistent with the behavior of someone engaged in fraud.

### 1.   The Fifth Circuit rejects generic motive allegations.

The Fifth Circuit has repeatedly held that allegations about motives generally shared by management do not support an inference of scienter. *See, e.g.*, *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068-69 (5th Cir. 1994). Plaintiffs do not dispute this law, but nonetheless urge the Court to consider their cookie-cutter motive allegations in its "holistic" analysis. (Opp. at 48.) But Plaintiffs cannot lump together a series of wholly inadequate allegations in the hopes that they will somehow reach a critical mass of plausibility. *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) (holding that the plaintiffs' allegations that the defendants were motivated by a desire to raise capital, enhance their compensation, and sell stock at inflated prices were insufficient, even when viewed in conjunction with the scienter allegations as a whole); *see also Trendsetter Investors, LLC v. Hyperdynamics Corp.*, No. H-06-0746, 2007 WL 172627, at *14 (S.D. Tex. Jan. 18, 2007) (same).

Nor can Plaintiffs sidestep this caselaw merely by alleging that Defendants' situation was somehow unique.  (Opp. at 48.)  Every company and every executive is unique in some manner. The underlying motive – the desire to succeed at one's job – remains constant among all executives.  Under controlling Fifth Circuit law, Plaintiffs cannot make these generic allegations meaningful merely by saying that the Defendants were particularly motivated in this case.  Even the *Stone* decision cited by Plaintiffs recognized that these generic motive allegations only matter in "extraordinary cases" if they were combined with other scienter allegations.  26 F. Supp. 3d at 607.  This is not that case.

### 2.  Far from supporting an inference of scienter, Karnes' stock sales and resignation refute it.

Karnes' Motion explained why his stock sales do not support an inference of scienter. (Motion at 19-20.)  Plaintiffs ignored all of Karnes's arguments, regurgitated their position that insider stock sales "deserve consideration," and then discussed the stock sales of Cannon alone. Plaintiffs ignored Karnes's stock sales.  If anything, Karnes's substantial increase in his stock holdings during the putative class period shows that he was betting on the company to succeed.

Plaintiffs' allegations about Karnes's resignation also boomerang.  Plaintiffs characterize it as "atypical" compared to the resignation of other executives.  (Opp. at 49-50.)  But they don't explain why KiOR should have been expected to publish "niceties" upon Karnes's departure. Nor do they explain why the "cogent and compelling" inference is that Karnes resigned because he had been participating in securities fraud.  The company never accused him of any misbehavior.  And the Mississippi Complaint cited by Plaintiffs alleges that "Karnes' resignation letter explained he made the decision to leave the company" and then described Karnes's attempts to alert board members to issues at KiOR.  (Opp. Ex. C (Mississippi Complaint) ¶ 4.110.)  Those allegations don't support an inference that Karnes resigned because of

misconduct.

Plaintiffs then make the astounding argument that "Karnes' resignation was far more similar to the resignation of William Coates." (Opp. at 50.)  But elsewhere, they say that Coates left KiOR because he believed that others were engaged in misconduct.[3]  (Compl. ¶ 52 n.9.)  If, as Plaintiffs allege, the resignations of Coates and Karnes are similar, then the appropriate inference is that Karnes did NOT resign because he had been accused of misconduct.

The mere existence of an SEC investigation doesn't change the result.  The Complaint alleges only that the SEC is conducting an investigation and has issued two subpoenas.  (Compl. ¶ 216.)  The SEC often closes inquiries without finding any misconduct occurred, and Plaintiffs have not alleged that the SEC has reached any conclusions.

Plaintiffs' improper attempt to amend their allegations about the SEC investigation do not change this conclusion.  In their Opposition, Plaintiffs assert for the first time that several individuals have been subpoenaed, that attorneys' fees have been incurred, and that "upon information and belief, Defendant Karnes is also under investigation by the SEC." (Opp. at 50.) These allegations are not properly before the Court.  *See Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536-37 (5th Cir. 2003) (holding that plaintiff could not introduce new allegations in his response to a motion to dismiss).  Moreover, Plaintiffs provide no particularized allegations supporting their outrageous speculation that Karnes himself is under investigation.  Nothing in the record before the Court supports that baseless accusation.

### 3. The impairment charge doesn't change the analysis.

Plaintiffs' argument about the size of the impairment is classic fraud-by-hindsight

---

[3]    Plaintiffs also allege that CW6 was removed or asked to resign because he attempted to correct KiOR's misrepresentations.  (Opp. at 51-52.)  Plaintiffs do not allege that Karnes had any role in CW6's departure or the events leading up to it.  (*Id.*)  In fact, Plaintiffs allege that CW6's departure occurred after he called for a meeting with Cannon and "Interim CFO" Chris Artzer in 2013.  (*Id.* at 51.)  This meeting necessarily occurred after Karnes resigned as CFO.

analysis.  *See generally Goldstein v. MCI WorldCom*, 340 F.3d 238, 251 (5th Cir. 2003) (rejecting argument that the fact of a large writeoff showed that the defendants must have previously known that it would be required).  Moreover, Plaintiffs allege that the impairment charge was necessary because the Columbus Facility did not have any alternative uses in its current condition.  (Opp. at 52.)  That analysis in turn ultimately hinges on the Columbus Facility's ability to operate.  Plaintiffs have not alleged specific facts showing that Karnes was aware of (or severely reckless in ignoring) operational issues.

### D.  Taken together, the scienter allegations show a financial executive who relied on operational people for information on operational matters.

Overall, Plaintiffs' generic scienter theories cannot withstand their own internal contradictions and the Complaint's specific allegations.  They have not pleaded a strong inference that Karnes acted with scienter.  Independently, they have not shown that their theory is at least as compelling as any other explanation.  Even if the Court accepts Plaintiffs' theory that Karnes made any misstatements, the much more plausible explanation is that Karnes was generally aware that the Columbus Facility was encountering some issues, but did not believe that the Company's disclosures about those issues was in any way inadequate.  Rather, he looked to the operational people to assess the operational and technical issues and determine their implications.  This explanation is consistent with what he said and did, his responsibilities as CFO, the responsibilities of the operations personnel, and the balance of what Plaintiffs' confidential witnesses supposedly said.  Accordingly, the claims against Karnes should be dismissed.  *See generally Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 324 (2007) (holding that scienter explanation must be "at least as compelling as any opposing inference one could draw from the facts alleged").

15

## <u>Conclusion</u>

For the reasons stated above, Karnes requests that the Court dismiss the lawsuit against him and grant such other relief to which he is entitled.

Dated:  May 22, 2015                            Respectfully submitted,

                                                /s/ Noelle M. Reed
                                                Noelle M. Reed
                                                Attorney-in-Charge
                                                State Bar No. 24044211
                                                Federal Bar No. 27139
                                                1000 Louisiana Street, Suite 6800
                                                Houston, Texas 77002
                                                Telephone No.:  713-655-5122
                                                Facsimile No.:   713-483-9122
                                                E-mail:  noelle.reed@skadden.com

                                                Of Counsel:
                                                Wallis M. Hampton
                                                State Bar No. 00784199
                                                Federal Bar No. 16123
                                                SKADDEN, ARPS, SLATE,
                                                   MEAGHER & FLOM LLP
                                                1000 Louisiana Street, Suite 6800
                                                Houston, Texas 77002
                                                Telephone No.:  713-655-5116
                                                Facsimile No.:   713-483-9116
                                                E-mail:  wallis.hampton@skadden.com

                                                **ATTORNEYS FOR DEFENDANT
                                                JOHN KARNES**

<u>**CERTIFICATE OF SERVICE**</u>

        I hereby certify that on May 22, 2015, I electronically filed the foregoing document with
the Clerk of the Court using the CM/ECF system, which will send notification of such filing to
the counsel who have registered with this Court.

                                                /s/ Noelle M. Reed
                                                Noelle M. Reed